# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| JOHN C. GREGA, | ) | |
|        Plaintiff, | ) | |
| v. | ) | Dkt. No.  5:14-cv-00147 |
| | ) | |
| WILLIAM PETTENGILL, in his individual capacity; | ) | |
| DAN M. DAVIS, in his individual capacity; | ) | |
| GLEN CUTTING, in his individual capacity; | ) | |
| RICHARD HOLDEN, in his individual capacity; | ) | |
| and TOWN OF DOVER, | ) | |
|        Defendants. | ) | |

## <u>PLAINTIFF'S OPPOSITION</u>
## <u>TO ALL PENDING MOTIONS TO DISMISS</u>

December 15, 2014

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     FACTS ................................................................................................................1

III.    LEGAL STANDARD .........................................................................................6

IV.     DISCUSSION .....................................................................................................6

        A.      The State's Arguments ...........................................................................6

                1.      Count I states a viable claim for failure to investigate and
                        destruction of exculpatory evidence ...........................................6

                        a.      Failure to investigate is an independent cognizable claim,
                                and neither Pettengill nor Davis is immune from it .......................7

                                i.      Failure to investigate is an independent cognizable
                                        claim under the Due Process Clause ...................................7

                                ii.     Pettengill and Davis are not entitled to qualified
                                        immunity ........................................................................11

                        b.      The Complaint sufficiently alleges conscience shocking
                                behavior........................................................................12

                        c.      The Complaint sufficiently alleges destruction of
                                exculpatory evidence and bad faith................................................16

                2.      Count II states a viable claim for falsification of evidence and/or
                        failure to disclose false evidence ...............................................17

                        a.      Pettengill is not absolutely immune from Count II.......................17

                        b.      The Complaint alleges a claim for falsification of evidence .........18

                3.      Counts III, VII, and IX state viable claims for malicious
                        prosecution.................................................................................19

                        a.      The criminal proceedings terminated in Mr. Grega's favor ..........20

                        b.      The Complaint sufficiently alleges lack of probable cause
                                in the original prosecution ...............................................24

                        c.      The Complaint sufficiently alleges lack of probable cause
                                in the re-prosecution ..................................................27

d.    Pettengill and Holden are not entitled to qualified immunity from malicious prosecution ........................................... 29

4.    Counts IV, VIII, X and XII state viable claims for false imprisonment ...................................................................... 31

a.    Mr. Grega sufficiently alleges that his original arrest and confinement were not the result of a facially valid legal process ............................................................................. 32

b.    The Complaint sufficiently alleges that Richard Holden confined Mr. Grega and that his confinement was not supported by facially valid legal process ..................................... 32

i.    Mr. Grega was confined in connection with his re-prosecution ................................................. 33

ii.    Holden was involved in Mr. Grega's confinement ........... 33

iii.    Mr. Grega's confinement during the re-prosecution was unsupported by facially valid legal process ............... 34

5.    Count V states a viable claim for conspiracy ............................... 34

6.    Count VI states a viable claim for failure to train/supervise against Cutting and Pettengill ........................................................... 38

7.    Count XI states a viable claim for intentional infliction of emotional distress ("IIED") ...................................................... 40

a.    Davis is not absolutely immune from Count XI ........................... 41

b.    Mr. Grega has alleged extreme and outrageous conduct .............. 42

8.    Count XIV states a viable claim for defamation ......................... 45

B.    Town of Dover's arguments ................................................................. 48

1.    Count VI states a viable failure to train/supervise claim against the Town of Dover ........................................................................... 48

2.    Mr. Grega need not allege a series or pattern of constitutional violations to state a claim for failure train/supervise ........................... 49

3.    There is no need at this stage for Mr. Grega to identify the specific deficiency in Dover's training of its police officers ............................. 53

V.    CONCLUSION ............................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amnesty Am. v. Town of West Hartford*,
   361 F.3d 113 (2d Cir. 2004)..................................................................52, 53, 54

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010).................................................................................36

*Arizona v. Youngblood*,
   488 U.S. 51 (1998)...............................................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................54, 55

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................54, 55

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996)............................................................................42, 44

*Benjamin v. United States*,
   554 F. Supp. 82 (E.D.N.Y. 1982) .......................................................................27

*Blake v. Race*,
   487 F. Supp. 2d 187 (E.D.N.Y. 2007) .............................................................9, 10

*Bourn v. Gauthier*,
   No. 1:09-cv-00212-jgm, 2011 WL 1211569 (D. Vt. Mar. 29, 2011) .....................53

*Buckley v. Fitzsimmons*,
   509 U.S. 259 (1993).......................................................................................17, 41

*Cartier v. Lussier*,
   955 F.2d 841 (2d Cir. 1992).........................................................................29, 31

*Celestin v. City of New York*,
   581 F. Supp. 2d 420 (E.D.N.Y. 2008) .................................................................27

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)...................................................................................3

*Cignetti v. Healy*,
   89 F. Supp. 2d 106 (D. Mass. 2000) ....................................................................18

*City of Canton v. Harris*,
    489 U.S. 378 (1989)........................................................................50, 51, 52

*Condosta v. Grussing*,
    144 Vt. 454 (1984) .................................................................................20

*Daniels v. Bango*,
    487 Fed. Appx. 532 (11th Cir. 2012) ....................................................30

*Day v. Ingle's Markets, Inc.*,
    2006 WL 239290 (E.D. Tenn. 2006), *aff'd*, 227 F. App'x 486 (6th Cir. 2007) ..........25, 26, 31

*Dory v. Ryan*,
    25 F.3d 81 (2d Cir. 1994) ......................................................................17

*Eckman v. Lancaster City*,
    742 F. Supp. 2d 638 (E.D. Pa. 2010), *aff'd*, 515 F. App'x 93 (3d Cir. 2013) *and* 529
    F. App'x 185 (3d Cir. 2013) ....................................................................8

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)....................................................................27

*Ferguson v. Short*,
    No. 2:14-cv-04062, 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) ..........................46, 47, 48

*Ferrari v. County of Suffolk*,
    790 F. Supp. 2d 34 (E.D.N.Y. 2011) .....................................................54

*Fulton v. Robinson*,
    289 F.3d 188 (2d Cir. 2002)....................................................................27

*Green v. Maraio*,
    722 F.2d 1013 (2d Cir. 1983)..................................................................30

*Grullon v. City of New Haven*,
    720 F.3d 133 (2d Cir. 2013)....................................................................39

*Harrington v. Wilber*,
    353 F. Supp. 2d 1033 (S.D. Iowa 2005) ...........................................46, 48

*International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*,
    146 F.3d 66 (2d Cir. 1998)......................................................................3

*Johnson v. Newburgh Enlarged School Dist.*,
    239 F.3d 246 (2d Cir. 2001)....................................................................12

*Kalina v. Fletcher*,
    522 U.S. 118 (1997)................................................................................41

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)..............................................................................6

*Knelman v. Middlebury College*,
    898 F. Supp. 2d 697 (D. Vt. 2012)..................................................................45

*Kucera v. Tkac*,
    No. 5:12-cv-264, 2013 WL 1414441 (D. Vt. Apr. 8, 2013) (Reiss, J.) ..................54

*Lay v. Pettengill*,
    191 Vt. 141 (2011) ...............................................................24, 26, 27, 29

*Liberty Mutual Ins. v. Rotches Pork Packers, Inc.*,
    969 F.2d 1384 (2d Cir. 1992)............................................................................3

*Lowery v. Cnty. of Riley*,
    No. 04-3101-JTM, 2006 WL 2663480 (D. Kan. Sept. 15, 2006)...........................8

*Magnotti v. Kuntz*,
    918 F.2d 364 (2d Cir. 1990)............................................................................30

*Martin v. Anderson*,
    No. 07-CV-2965, 2008 WL 4761734 (E.D. Pa. Oct. 29, 2008) ...........................8

*Maryland v. Pringle*,
    540 U.S. 366 (2003)......................................................................................27

*Masters v. Gilmore*,
    663 F. Supp. 2d 1027 (D. Colo. 2009)........................................................13, 14

*McCaffrey v. City of New York*,
    No. 11Civ.1636 (RJS), 2013 WL 494025 (S.D.N.Y. Feb. 7, 2013).......................10

*McColley v. Cnty. of Rensselaer*,
    740 F.3d 817 (2d Cir. 2014)...................................................................24, 30, 31

*McGee v. Doe*,
    568 Fed. Appx. 32 (2d Cir. 2014) (Summary Order) .........................................36

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004)......................................................................30, 31

*Michael v. Cnty. of Nassau*,
    No. 09-CV-5200 (JS) (AKT), 2010 WL 3237143 (E.D.N.Y. Aug. 11, 2010) .......54

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)........................................................................................45, 46

*Murphy v. Lynn*,
   118 F.3d 938 (2d Cir. 1997).............................................................................. 32-33

*One Source Environmental, LLC v. M %8F W Zander, Inc.*,
   13 F. Supp. 3d 350 ..........................................................................................6, 19, 35

*Panetta v. Crowley*,
   460 F.3d 388 (2d Cir. 2006)........................................................................................27

*Pitt v. District of Columbia*,
   491 F.3d 494 (D.C. Cir. 2007) ..............................................................................42, 44

*R.A. Nelson, M.D. v. Miller*,
   227 Kan. 271 (1980) ....................................................................................................23

*Ramchair v. Conway*,
   601 F.3d 66 (2d Cir. 2010)......................................................................................9, 12

*Ricciuti v. N.Y.C. Transit Auth.*,
   124 F.3d 123 (2d Cir. 1997)............................................................................... passim

*Rivera v. Lake County*,
   974 F. Supp. 2d 1179 (N.D. Ill. 2013) ......................................................................46

*Rivera v. United States*,
   928 F.2d 592 (2d Cir. 1991).................................................................................24, 46

*Romero v. Fay*,
   45 F.3d 1472 (10th Cir. 1995) ...............................................................................8, 13

*Russell v. Smith*,
   68 F.3d 33 (2d Cir. 1995) ...........................................................................................22

*Russo v. City of Bridgeport*,
   479 F.3d 196 (2d Cir. 2007)....................................................................................9, 12

*San Filippo v. United States Trust Co.*,
   737 F.2d 246 (2d Cir. 1984)........................................................................................17

*Saucier v. Katz*,
   533 U.S. 194 (2001).....................................................................................................11

*Siliski v. Allsate Ins. Co.*,
   174 Vt. 200 (2002)................................................................................................20, 22

*Simms v. City of New York*,
   No. 10-CV-3420 (NGG)(RML), 2011 WL 4543051 (E.D.N.Y. Sept. 28, 2011)....................54

*Singer v. Fulton Cnty. Sheriff,*
    63 F.3d 110 (2d Cir. 1995)........................................................................19

*Stampf v. Long Island R. Co.,*
    761 F.3d 192 (2d Cir. 2014)......................................................................21

*State v. Grega,*
    No. 1526-12-94 (Vt. Super. Ct. Mar. 5, 2013)........................................28

*State v. Grega,*
    No. 1526-12-94, at 1 (Vt. Super. Ct. May 31, 2013)..............................28

*State v. Grega,*
    No. 1526-12-94, slip op.(Vt. Super. Ct. Oct. 21, 2013)..........................22

*Thayer v. Herdt,*
    155 Vt. 448 (1990).......................................................................42, 43, 44

*U.S. v. Coppa,*
    267 F.3d 132 (2d Cir. 2001)................................................................7, 9, 12

*U.S. v. Williams,*
    205 F.3d 23 (2d Cir. 2000)........................................................................11

*U.S. v. Elliott,*
    83 F. Supp. 2d 637 (E.D. Va. 1999) .................................................14, 16

*Veggian v. Camden Bd. of Educ.,*
    No. 05-70 (NLH), 2007 WL 2900413 (D.N.J. Oct. 2, 2007) .................35

*Verboys v. Town of Ramapo,*
    12 A.D.3d 665 (N.Y. App. Div. 2004) .............................................21-22

*Virgil v. Town of Gates,*
    455 Fed. Appx. 36 (2d Cir. 2012) ............................................................27

*Walczyk v. Rio,*
    496 F.3d 139 (2d Cir. 2007).....................................................................11

*Walker v. City of New York,*
    974 F.2d 293 (2d Cir. 1992)................................................................51, 54

*Waste Mgmt. of Louisiana, L.L.C. v. Parish of Jefferson ex rel. Jefferson Parish Council,*
    947 F. Supp. 2d 648 (E.D. La. 2013)......................................................21

*Williams v. City of New York,*
    690 F. Supp. 2d 338 (S.D.N.Y. 2010)......................................................54

*Wilson v. Lawrence County, Mo.*,
    260 F.3d 946 (8th Cir. 2001) .................................................................7, 8, 11, 13

*Winslow v. Smith*,
    696 F.3d 716 (8th Cir. 2012) ....................................................................... 7-8, 13

*Wright v. McMann*,
    460 F.2d 126 (2d Cir. 1972)...........................................................................40

*Wright v. Yacovone*,
    No. 5:12-cv-27, 2014 WL 1165834 (D. Vt. Mar. 21, 2014)...................................45

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir. 2000)........................................................................17, 18

## STATUTES

42 U.S.C. ¶ 1983 ................................................................................... passim

## RULES

Fed. R. Civ. P. 12 ................................................................................... passim

Fed. R. Evid. 201 ...........................................................................................2

V.R.E. 201....................................................................................................2

V.R.C.P. 12 ..................................................................................................2

## OTHER AUTHORITIES

FOURTEENTH AMENDMENT ........................................................................ passim

FOURTH AMENDMENT ............................................................................... passim

Restatement (Second) of Torts § 674 cmt. J (1997) .....................................20

Plaintiff John C. Grega, through counsel, respectfully submits this Opposition to the Motions To Dismiss filed by the State of Vermont on behalf of Defendants Pettengill, Davis, Cutting and Holden (collectively "the State"), and the Town of Dover ("Dover").  Section IV.A addresses the State's Motion and Section IV.B addresses Dover's Motion.

## <u>MEMORANDUM</u>

## I.     INTRODUCTION.

Although most of the arguments set forth in the State's and Dover's Motions to Dismiss lack merit, not all of them do.  Accordingly, Mr. Grega revises his claims as follows:

- Mr. Grega does not oppose dismissal of Count XIII;

- Mr. Grega does not oppose dismissal of Defendant Davis from Counts II, IV and V; and

- Mr. Grega moves, in a separately filed Motion To Amend, to add a limited number of allegations to provide further factual support for Claims V and VI.

These revisions are embodied in a proposed Amended Complaint, filed herewith, along with a motion seeking leave to amend.[1]

As to all other counts, Mr. Grega's claims are legally sound and sufficiently pled in the original Complaint.

## II.    FACTS.

The State begins its dismissal arguments not by challenging the sufficiency of the Complaint, but by attacking Mr. Grega's character with allegations outside the Complaint.  The goal of this approach is presumably to cast a cloud of suspicion over Mr. Grega's civil claims by suggesting that, despite the discovery of exonerative DNA in 2012, release from prison, and two

---

[1]      In light of the new allegations proposed to support Counts V and VI, the sections of this pleading that address those Counts (Sections IV.A.5 and IV.A.6) refer to the Paragraphs in the proposed Amended Complaint ("Am. Compl.").  Section IV.B, in part, refers to Paragraphs in the proposed Amended Complaint.  References in all other sections are to the original Complaint.

failed prosecutions, Mr. Grega is nevertheless still somehow guilty of murdering his wife.  Under

Rule 12(b)(6) this strategy is improper and distracts from the narrow analysis required by the

law.  The State's improper treatment of facts in its Motion requires a brief response at the outset

of this brief, and falls into three general categories.

First, the only question under Rule 12(b)(6) is whether the Complaint contains allegations

which, *when taken as true*, state viable causes of action.  While the State pays lip service to the

proper legal standard early in its brief, *see generally* Mot. at 10 ("Legal Standards" section), the

State's actual arguments repeatedly fail to follow that narrow standard.

Second, in a further effort to improperly broaden the factual discussion, the State

overextends the doctrine of judicial notice by asking the Court to consider facts and law from

eight prior adverse rulings against Mr. Grega in unrelated proceedings.  *See* Mot. at 3 (noting

that "Vermont state and federal courts upheld Grega's conviction against a host of legal

challenges, including, *as discussed at various points below*, challenges implicating many of the

issues raised in the present complaint." (emphasis added)).[2]  In an attempt to legitimize its

reference to these past decisions, the State erroneously comingles V.R.C.P. 12 and V.R.E. 201 as

follows:

> The Court's inquiry in deciding a Rule 12(b)(6) motion is limited to the facts set
> forth in the Complaint *and* any attachments thereto or documents that are
> incorporated by reference or "integral" to the allegations in the Complaint, as well
> as any factual inferences and matters the Court may judicially notice.

Mot. at 11 (emphasis in original).  This is not an accurate statement of law.  While it is true that

under Rule 12(b)(6) courts can consider attachments or documents incorporated by reference into

a *Complaint*, they cannot consider attachments or documents incorporated by reference into a

---

[2]      It should be noted that these prior adverse rulings all pre-date the discovery of the exonerative unknown
male DNA that led the Vermont Superior Court (Wesley, J.) to vacate Mr. Grega's conviction.

*Motion to Dismiss*, especially where, as here, the attachments are not relied upon by the plaintiff or integral to the complaint, but merely offered by the defendant to color the court's view of the case, the latter being what the State seeks to do here.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.") (italics in original).  Likewise, while the court can judicially notice the *existence* of prior judicial decisions, it cannot consider or discuss "factual inferences" or conclusions of law from those decisions, the latter again being what the State seeks to do here.[3] In sum, the State's contamination of this Rule 12 analysis with facts and law from past decisions must be weeded out and disregarded.

Third, many of the facts proffered by the State are simply incorrect.  Here are three particularly noteworthy examples:

On page 1 of its Motion, the State claims that "[i]n the summer of 2013, the State withdrew the charges against Grega *in order to allow for further DNA testing and investigation.*"  *Id.* at 1 (emphasis added).  That is not so.  Starting in 2012 and continuing into 2013 the State sought *four* continuances of its re-prosecution of Mr. Grega, all based on a purported desire to conduct additional DNA tests that the State claimed were necessary to support its case.  In granting the last of these continuances, Judge Wesley admonished the State: "this is a deadline that's not going to be moved again."  And yet, by the time the fourth continuance was about to lapse, not only had the state not completed any additional DNA testing,

---

[3]     The Second Circuit has repeatedly rejected such attempts.  *See, e.g.*, *Liberty Mutual Ins. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (reversing summary judgment because of district court's improper use of judicial notice, observing that "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (citations omitted)); *International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (overturning district court findings of fact based on judicial notice, observing "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b).").

it hadn't even *begun* any such testing.[4]   Unable to produce any testing to counter the exonerative

impact of the unknown male DNA discovered inside of Christine Grega's rectum in 2012, the

State's Attorney (in a notice of dismissal co-signed by the Chief of the Criminal Division of the

Vermont Attorney General as well) abandoned its second prosecution of Mr. Grega on August

21, 2013.  The claim that the Windham County State's Attorney and Attorney General dismissed

the case so they could perform "additional testing" was a quintessential fig leaf used to conceal

embarrassment over (and avoid civil liability for) a rashly commenced and ill-conceived effort to

re-prosecute an innocent man.[5]

Next, when describing the unknown male DNA that led to Mr. Grega's exoneration and

release, the State claims, with an unjustified air of suspicion, that "Grega's own DNA" was also

found on the biological samples taken from Christine.  Mot. at 1.  This assertion is misleading.

Mr. Grega's DNA was <u>not</u> identified on the rectal swab where the Perpetrator's DNA was found;

a partial second DNA profile from which no identification could be drawn was found, and the

data was so incomplete that Mr. Grega could neither be matched nor excluded from the potential

pool of donors of that partial profile.  That is quite different from what the State suggests in its

brief.  Moreover, even if Mr. Grega's DNA were found on the rectal swab (and it was in fact

found on other biological samples from the crime scene), that was expected by every expert who

was asked about it.  Mr. Grega had been living in the Unit with his family for two days, and had

had sexual relations with Christine both the day before and the day of her death.  As the experts

---

[4]      The disconnect between what the State said, versus what it did, with respect to testing remains one of the most puzzling aspects of the re-prosecution.

[5]      Further underscoring the State's disingenuous claim of future testing, one expert explained that the amount of DNA remaining from the biological swab in question was so miniscule that it defied scientific reason to argue it could potentially produce a useful DNA profile in subsequent testing.  The DNA that remained on the relevant biological swab was approximately **1/75th** of the amount of DNA for recommended use in a single amplification test designed to obtain a CODIS eligible DNA profile.  Thus, it was, and still is, virtually inconceivable that a CODIS eligible profile could be obtained from the miniscule amount of DNA that remains on the crucial swab.

explained, it would have been shocking if his DNA had *not* been found on his wife's intimate biological swabs.[6]

Finally, the State's characterization of Mr. Grega's allegations of evidence destruction is inaccurate as well.  The State writes: "Grega highlights what he characterizes as an 'egregious' error on the part of investigators in failing to collect and preserve a pool of blood on the backboard used to transport Christine at the scene."  Mot. at 6, citing Compl. ¶ 77.  That statement reflects only half of Paragraph 77.  The other half of that Paragraph explains that "EMT's ***wiped down*** and ***cleaned up*** the area where Christine's body was found and treated before any biological evidence was collected from that area."  *Id*. (emphasis in original).  This was a far more egregious act of evidence destruction, and the one that violates the most basic principles and policies of evidence collection as well as common sense.  Moreover, the State simply ignores allegations that Defendants failed to secure the crime scene in a timely manner and take such basic steps as fingerprinting the crime scene.  *See, e.g.,* Compl. ¶¶ 75, 92.  The State leaves these allegations out of its description in an apparent attempt to distract from the strength of Mr. Grega's claims of evidence destruction.

These are just some examples of the factual misstatements found in the State's Motion. In the aggregate, the State's mischaracterization and misuse of facts in its Motion seem designed to mischaracterize relevant events and divert the Court's attention from the well plead Complaint, while trying to cast Mr. Grega in an unjustifiably culpable light.  The Court should not reward these tactics.

---

[6]      By contrast, even the State's lead investigator admits that there is *no* plausible explanation for how the DNA from an unidentified male ended up where it was found inside Mrs. Grega's rectum, other than it being deposited there by the Perpetrator.

III.    **LEGAL STANDARD.**

The Rule 12 legal standard is well known.  It can be spun from the moving and non-moving parties' perspective, and the State does the former on pages 10 and 11 of its Motion.  Mr. Grega will not offer a countervailing pitch, other than to note one element of the legal standard that the State most frequently fails to honor in its Motion – namely, that in addition to accepting as true all facts alleged in the complaint, Rule 12 also requires the Court to "draw all reasonable inferences in favor of [the plaintiff.]"  *One Source Environmental, LLC v. M %8F W Zander, Inc.*, 13 F. Supp. 3d 350, 358 (D. Vt., April 14, 2014) (Sessions, J.) (*citing* ADDIN BA \xc <@cs> \xl 71 \s YPSNCI000008 \xhfl Rep \xqt \xpl 1 \l "Kassner v. 2nd Ave. Delicatessen Inc.,<SoftRt> 496 F.3d 229 (2d Cir. 2007)" Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  The State repeatedly, and improperly, does the opposite.

IV.    **DISCUSSION.**

A.    **The State's Arguments.**

1.    **Count I states a viable claim for failure to investigate and destruction of exculpatory evidence.**

On pages 12 to 18 of its Motion, the State seeks to separate the failure to investigate claim from the destruction of exculpatory evidence claim (both asserted in Count I) and offers different reasons for the dismissal of each.  For failure to investigate, the State first argues there is no independent cause of action under the Fourteenth Amendment, and even if there was, Defendants Davis and Pettengill are shielded from it by qualified immunity.  Second, the State claims Mr. Grega has not alleged "conscience-shocking" behavior.  For destruction of exculpatory evidence, the State ignores the allegations in the Complaint and argues that no exculpatory evidence was destroyed and that Mr. Grega failed to allege bad faith.  Each of these arguments is mistaken.

       **a.**    **Failure to investigate is an independent cognizable claim, and neither Pettengill nor Davis is immune from it.**

           **i.**    **Failure to investigate is an independent cognizable claim under the Due Process Clause.**

Although the State begins its challenge to Count I by claiming that "the Due Process Clause does not encompass an independent 'failure to investigate' claim," Mot. at 13, it then retreats from that position, as it must, by acknowledging that the circuits are split on this question, and that the Second Circuit has not yet decided this question.  Mot. at 13-14.  As explained below, the great weight of relevant case law, virtually none of which is cited by the State, supports finding Count I as cognizable.

*Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001) is directly on point.  That case, like this one, involved Section 1983 claims – including a failure to investigate claim based on law enforcement's reckless failure to pursue alternate potential perpetrators – brought by a man who, like Mr. Grega, had his conviction overturned after spending years in prison for a murder he did not commit.  In allowing his independent failure to investigate claim under the Due Process Clause of the Fourteenth Amendment, the Eighth Circuit explained that the "liberty interest in obtaining fair criminal proceedings ***before*** being denied one's liberty" is infringed by a "reckless investigation."  *Id.* at 956 n.8 (emphasis added).  *Wilson* has particular resonance here not just because of its factual similarity, but also because it recognizes that while a failure to investigate may bear on probable cause and malicious prosecution – areas typically viewed as aligning with the search and seizure gravamen of the Fourth Amendment – it extends beyond that to a defendant's right to a fair trial and "the reliability of any criminal verdict," which are areas typically protected by the Due Process Clause of the Fourteenth Amendment.  *Id.*; *see also U.S. v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (recognizing "the reliability of any criminal

verdict" as an "essential purpose" of the Fourteenth Amendment); *Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012) (failure to investigate claims relate to the "liberty interest in fair criminal proceedings.").  Because Mr. Grega's failure to investigate claim arises from events that occurred at the very outset of the investigation and several months before probable cause was even contemplated, the claim falls much more squarely under the Due Process Clause (*i.e.*, the botched investigation destroyed any hope that Mr. Grega could mount a proper defense at trial) than under the Fourth Amendment (*i.e.* he was improperly seized).

Other federal district and circuit courts have similarly ratified independent failure to investigate claims asserted under the Due Process Clause.  *See, e.g.*, *Martin v. Anderson*, No. 07-CV-2965, 2008 WL 4761734, at *9 n.8 (E.D. Pa. Oct. 29, 2008) ("To establish a due process violation for failure to investigate, the plaintiff must show the defendant acted intentionally or recklessly . . . .");  *Eckman v. Lancaster City*, 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), *aff'd*, 515 F. App'x 93 (3d Cir. 2013), *and* 529 F. App'x 185 (3d Cir. 2013) ("To bring a successful due process claim for failure to investigate, a plaintiff must show that a police officer acted intentionally or recklessly, in a manner that shocks the conscience, in failing to investigate.") (internal citation omitted); *Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995) (to succeed on a claim of an unreasonable investigation in violation of the Fourteenth Amendment a Plaintiff "must assert facts that, at a minimum, demonstrate Defendants acted with deliberate or reckless intent.") (internal citations omitted); *Lowery v. Cnty. of Riley*, No. 04-3101-JTM, 2006 WL 2663480, at *1 (D. Kan. Sept. 15, 2006) (*citing Wilson* and acknowledging that "reckless or intentional failure to investigate other leads offends a defendant's due process rights") (internal quotations and citations omitted).

Overlooking this body of supportive case law, the State maintains that a failure to investigate claim can only be brought as a subset of a Fourth Amendment malicious prosecution claim.  However, the relevant jurisprudence, including even some of the cases cited by the State, does not support this proposition.

The State relies heavily on *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) to support the proposition that the Second Circuit would likely disfavor a claim like Count I. *Russo*, however, only analyzed claims stemming from a failure to investigate under the Fourth Amendment; it did not consider whether such a claim might also impact a defendant's constitutional right to a fair trial.  This makes sense because the facts in *Russo* were different in several key respects from those of the present case.  First, unlike here, the charges against the plaintiff in *Russo* were dismissed prior to any trial.  As a result, the plaintiff's claims were rooted in an unconstitutionally prolonged pre-trial detention that ended when the prosecution dismissed its case.  The court correctly noted that such allegations "fit[] comfortably under the coverage of the Fourth Amendment" because the allegations dealt with an unlawful detention.  *Id.* at 208. Here, in contrast, Mr. Grega's rights were infringed by Defendants' failure to investigate not in connection with his detention, but in the unreliability of his criminal trial due to the loss of evidence resulting from errors in the initial moments and days of the investigation.  The right to a fair trial is a matter of due process, not search and seizure.  *Coppa*, 267 F.3d at 139 (recognizing the due process "right to a fair trial by ensuring the reliability of any criminal verdict"); *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010) ("The right to a fair trial is guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment.") (internal quotation and citation omitted).  *Russo* therefore does not provide a persuasive analogy here.

*Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007), also cited by the State, is even less helpful.  There, the plaintiff did not even plead an independent cause of action for failure to investigate; instead he subsumed his complaints about the investigation into his malicious prosecution claim under the Fourth Amendment.  *Blake*, 487 F. Supp. 2d at 196.   Not only did *Blake* not involve a claim like Count I here, it did not even involve specific allegations of improper investigation, but only "general deprivation of due process."  *Id.*  The dissimilarity of *Blake* to the present case is self-evident.  *McCaffrey v. City of New York,* No. 11Civ.1636 (RJS), 2013 WL 494025 (S.D.N.Y. Feb. 7, 2013), cited by the State on page 13 of its Motion, is the least helpful of all.  The plaintiff in that case, unlike Mr. Grega, was arrested almost immediately and detained thereafter, and the constitutional claims asserted in that case were general, undifferentiated, and all pled in a single paragraph listing five constitutional sources and four causes of action.  *Id*. at *3; *see also id.* at *5 ("Although Plaintiff alleges that Diaz and Arbuiso "failed to investigate, obtain and/or follow up on exculpatory evidence" (Am.Compl.¶ 133), from the face of the Amended Complaint, ***it is unclear to which specific constitutional right the allegation is tethered***." (emphasis added).  *McCaffrey* offers no examination whatsoever of the constitutional source for a failure to investigate claim; it merely cites to *Blake* for the general proposition that failure to investigate should not exist as a stand-alone claim.  *Id*. at *5.

As the cases above collectively show, malicious prosecution claims brought under the Fourth Amendment address a fundamentally different concern than failure to investigate claims brought under the Due Process Clause.  The former typically turn on a lack of probable cause and thus focus on claims of harm arising in the prosecutorial process itself.  The latter, like Count I here, involve a different harm – specifically, a former criminal defendant's ability to mount a defense – which is not tied to probable cause or anything relating to the prosecutorial

process.  Mr. Grega's claim in Count I falls squarely in the latter category; the harm Mr. Grega alleges in Count I occurred in the first few days of the investigation of his wife's death – long before probable cause was ever sought or even contemplated.  Given the nature and timing of that harm, the failure to investigate claim is more analogous to other due process claims such as destruction of evidence (with which it is pled here) and failure to disclose exculpatory evidence than it is to malicious prosecution.  *See Wilson*, 260 F.3d at 957 (recognizing the similarity between failure to investigate and destruction of evidence claims, stating that "[l]aw enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly as illustrated by the *Brady* line of cases requiring the state to disclose exculpatory evidence to the defense"); *see also U.S. v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000) ("To establish a violation of the right [to prepare a fair defense], a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means.").

In sum, because the great weight of the federal case law supports the viability of Mr. Grega's failure to investigate claim, the State's argument to the contrary should be rejected.

### ii.   Pettengill and Davis are not entitled to qualified immunity.

Next, the State argues that even if a failure to investigate is independently cognizable, Pettengill and Davis are shielded from it by qualified immunity because Mr. Grega has not asserted a violation of "clearly established law."  Mot. at 15.  This argument misunderstands the "clearly established law."

Whether a right is clearly established does not turn, as the State contends, on whether courts agree on which amendment gives rise to that right; rather, it turns on "'whether it would be clear *to a reasonable officer* that his conduct was unlawful in the situation he confronted.'"

11

*Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (*quoting Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added by *Walczyk*).  It is therefore irrelevant that the Second Circuit has not yet decided whether a "failure to investigate" claim can be brought under the Fourth or Fourteenth Amendment, or both.

Controlling case law confirms this.  *See, e.g.*, *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 253 (2d Cir. 2001) (rejecting qualified immunity argument that "no case from this circuit or the Supreme Court has expressly held that a student has a substantive due process 'entitlement ... not to be struck by a teacher,'" because it "construe[d] the right too narrowly," where the right to be free from excessive force was clearly established).  The Second Circuit has long recognized that the right to a fair criminal proceeding and fair trial are clearly established.  *Coppa*, 267 F.3d at 139 (recognizing the due process "right to a fair trial by ensuring the reliability of any criminal verdict"); *Ramchair*, 601 F.3d at 73 ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." (citations omitted)).  It has also long been established that governmental actors are not permitted to recklessly ignore or destroy exculpatory evidence.  *See Russo,* 479 F.3d at 209 (recognizing failure to investigate infringed upon clearly established Fourth Amendment rights where police held defendant in jail for months without viewing exculpatory video evidence and releasing defendant before trial).

In sum, the right at issue – Mr. Grega's right to a constitutionally adequate investigation – is "clearly established" for purposes of evaluating qualified immunity.  The State's argument to the contrary is unpersuasive.

        **b.**      **The Complaint sufficiently alleges conscience shocking behavior.**

The State next argues that Mr. Grega's failure to investigate claim fails because "Grega has not alleged conscience-shocking behavior." Mot. at 14-15. The flaw in this argument is that it relies upon the State's *opinion* of whether the conduct at issue shocked the conscience, not on whether the allegations in the Complaint meet the standard for conscience shocking behavior described in pertinent case law.

Relevant jurisprudence confirms the allegations in the Complaint meet the "conscience-shocking" standard. As courts have recognized, a reckless investigation is "egregious enough to violate due process." *See Wilson*, 260 F.3d at 956-7; *see also Romero v. Fay*, 45 F.3d 1472, 1478 (reckless investigation violates due process). Here, Mr. Grega has alleged:

> The Count I Defendants, who were charged with responding to and investigating Christine's murder in 1994 and 1995, acting under the color of law, deliberately and/or recklessly failed to investigate adequately, as any minimally competent officer would have, whether someone other than Mr. Grega was the Perpetrator by, *inter alia*: (a) failing to fully and appropriately investigate the evidence of the death of Christine Grega; (b) failing to discover and preserve the vast majority of evidence present at the crime scene, including any exculpatory evidence, even though Mr. Grega's Innocence Protection Act proceedings clearly demonstrate that such exculpatory evidence existed at the time; (c) destroying exculpatory evidence of the Perpetrator by failing to follow procedures with regard to securing the scene, avoiding contamination of the scene, preserving evidence, collecting evidence, and conducting an adequate canvass of potential witnesses and/or suspects; and/or (d) failing to follow through on obvious leads into suspects other than Mr. Grega. Moreover, they prematurely ended their investigation even though another person with a history of violence confessed to being involved in the murder.

Compl. ¶ 241. Though the State may not think the alleged conduct is reckless or demonstrates "indifference to exculpatory evidence," Mot. at 15, a jury might. *See Winslow v. Smith*, 696 F.3d 716, 732-734 (8th Cir. 2012) (denying summary judgment on failure to investigate claim because while a jury might find investigation merely negligent, it also might find it reckless).

In addition, Defendants' failure to investigate is intimately tied to their destruction of exculpatory evidence, which plainly shocks the conscience. Numerous courts have held that

13

evidence destruction similar to what is alleged here shocks the conscience.  For example, in *Masters v. Gilmore*, 663 F. Supp. 2d 1027 (D. Colo. 2009), the court denied the defendant's Rule 12 motion to dismiss a Section 1983 claim based on destruction of exculpatory evidence, noting that the plaintiff's allegations regarding evidence destruction by the prosecutor, when "taken as true, 'shocks the conscience' of this Court and, therefore, support a claim for violation of his substantive due process rights."  *Id.* at 1046.

Likewise, in *United States v. Elliott*, 83 F. Supp. 2d 637 (E.D. Va. 1999), a case that bears significant factual resemblance to this one, the Court concluded that the accused DEA agent exhibited conscience shocking behavior when he:

> . . . authorized the destruction of valuable evidence within hours of its seizure, based on his unsubstantiated assumption that the items were contaminated, and without first conferring with a chemist and in contradiction to the rather plainly worded regulations requiring the preservation of evidence for due process purposes. Where, as here, there is no evidence of an established practice which was relied upon to effectuate the destruction, where the applicable documents teach that destruction should not have occurred, and where the law enforcement officer acted in a manner which was either contrary to applicable policies and the common sense assessments of evidence reasonably to be expected of law enforcement officers or was so unmindful of both as to constitute the reckless disregard of both, there is a showing of objective bad faith sufficient to establish the bad faith requirement of the *Trombetta/Youngblood* test. A contrary holding would permit law enforcement officials to ignore the clear text of the governing regulations on which they say their policy is predicated and to act inconsistently with it.

*Id.* at 647-648.

By the standards articulated in *Masters* and *Elliot*, the facts alleged by Mr. Grega easily meet the definition of conscience shocking behavior.  First, Pettengill "concluded almost immediately that Christine's death was a homicide, but did not communicate this to anyone else at the scene of the crime" on the night of Christine's death.  Compl. ¶ 71.  He and Davis, in the first hours and days of the investigation, then failed to take routine steps to ensure that evidence

was preserved, instead focusing solely on Mr. Grega as the lone suspect, never considering the possibility that someone else committed the crime.  Compl. ¶¶ 100-101, 111-115.  As a result of this tunnel vision, within hours of the emergency call, and in the first days of the investigation, Pettengill allowed evidence to be destroyed and failed to collect other evidence that could have been used to establish the Perpetrator's identity and guilt, and by extension Mr. Grega's innocence.  All of this violated applicable procedures and common sense.  *Id.* ¶¶ 75-78, 89-94, 102-110.

Finally, when the foregoing allegations are placed in the broader context of Defendants' conduct (such as Pettengill's and Davis' conspiracy to fabricate evidence of the Long Trail Ale bottle and Davis' refusal to grant Brice immunity so she could testify as to Comi's confession, Compl. ¶¶ 122-130), these allegations sufficiently establish "conscience shocking" behavior.

### c.   The Complaint sufficiently alleges destruction of exculpatory evidence and bad faith.

The State next argues that Mr. Grega fails to state a claim for destruction of exculpatory evidence because the State believes the evidence destroyed was not exculpatory and the destruction was not done in bad faith.  Mot. at 16-18.  The State bases this argument on its *opinion* that the evidence destroyed was as likely to inculpate Mr. Grega as it was to exculpate him.  Mot. at 16-18.  This argument overlooks the plain language of the Complaint and lacks common sense.

Given that biological evidence of the Perpetrator's presence at the crime scene was found inside Mrs. Grega's rectum on 18 year old rape kit swabs, one cannot argue, without accepting impermissible inferences in the State's favor, that additional biological evidence would not also have been obtained from the copious amounts of blood (all of which came from rectal bleeding) and other bodily fluids that were wiped up and discarded in the premature cleanup of the crime

15

scene.  The fact that Mr. Grega's DNA would likely also have been found in those fluids – a point the State illogically highlights – is not surprising.  As the Complaint explains, Mr. Grega had been living in the condo unit for two days, had sexual contact with his wife and had contact with her body immediately before and after he called the police as he was trying to save her life.  His DNA, as well as his fingerprints and other biological evidence, would have been all over her and her surroundings.  Evidence of an *unknown man's* presence, by contrast, especially with his DNA found inside Christine's body as it was, is plainly exculpatory under these circumstances, as it indicates another person had contact with Christine, including sexual contact.  In other words, while additional biological evidence of Mr. Grega's presence would not have been unusual or probative, additional evidence of the presence of a stranger would have been highly exculpatory, especially if it matched the recently discovered DNA.  Destruction of such evidence that contained DNA in volumes that could have been used to positively identify him, in violation of clearly established investigative procedure, violated Mr. Grega's due process rights and constituted bad faith.  *Elliott*, 83 F. Supp. 2d at 647-648 (bad faith sufficiently alleged where defendants recklessly destroyed residue on a container police claim was used to manufacture methamphetamine because reasonable officer would know that residue testing of residue could be exculpatory).

*Arizona v. Youngblood*, 488 U.S. 51 (1998), cited by the State, is inapposite.  There, the police were alleged to have failed to refrigerate a jacket that may have had forensic evidence on it.  *Id.* at 53-54.  Here, the entire crime scene was left unsecured, and the location of the body was wiped down and cleaned up.  Fingerprints were not taken, numerous critical biological samples, including blood where the body was found, were destroyed, against all investigative reason and common sense.  This easily clears the bad faith threshold.  Compl. ¶¶ 75, 100; *see*

16

*Elliot*, 83 F. Supp. 2d at 647 ("[F]ailure to follow established procedures is probative evidence of bad faith.").

For all of the foregoing reasons, dismissal of Count I under Rule 12(b)(6) is unwarranted.

### 2. Count II[7] states a viable claim for falsification of evidence and/or failure to disclose false evidence.

On pages 18 to 20 of its Motion, the State presents two arguments for why Count II should be dismissed. First, the State claims Pettengill is protected by absolute immunity. Mot. at 18-19. Second, the State claims that Mr. Grega has failed to allege a viable falsification of evidence claim. Mot. at 20. Both of these arguments are mistaken.

### a. Pettengill is not absolutely immune from Count II.

The Second Circuit has held that while a police officer may be absolutely immune to claims arising from his testimony, he is not absolutely immune from an allegation that he participated in an extra-judicial conspiracy to fabricate evidence, and the latter is what Count II of the Complaint alleges. In *Dory v. Ryan*, the Second Circuit explained that while in *Buckley v. Fitzsimmons,* 509 U.S. 259 (1993), the U.S. Supreme Court extended absolute immunity for prosecutors to extra-judicial conspiracies, it did not do the same for police officers. *Dory*, 25 F.3d 81, 83-84 (2d Cir. 1994) ("There is no reason . . . to distinguish police officers from other witnesses with regard to the 'extra-judicial conspiracy exception' to absolute immunity." (citations omitted)). *See also id*. ("In *San Filippo* [*v. United States Trust Co.*, 737 F.2d 246, 255 (2d Cir. 1984)], we were clearly aware that the exception for extra-judicial conspiracies would apply in the context of police officer witnesses, and *San Filippo stands as the law of this Court*." (citations omitted) (emphasis added)).

---

[7]      As explained in the contemporaneously filed Motion to Amend, Defendant Davis has been removed from this count.

Likewise, in *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), the Second Circuit held that "there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, ***at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty***." *Id.* at 344 (emphasis added). The U.S. District Court in Massachusetts has ruled similarly, holding that "witnesses may be sued under § 1983 for their testimony if the testimony they gave was part of a conspiracy consisting of their testimony ***and other non-testimonial acts***." ADDIN BA \xc <@cs> \xl 58 \s YPSNCI000029 \xhfl Rep \l "Cignetti v. Healy,<SoftRt> 89 F. Supp. 2d 106 (D. Mass. 2000)" Cignetti v. Healy, 89 F. Supp. 2d 106, 117 (D. Mass. 2000) (emphasis added).

Here, the Complaint alleges that Pettengill, together with Davis (who, no longer a named defendant on this count, effectively plays the part of an unindicted co-conspirator) "knowingly or recklessly created false evidence that Mr. Grega had used the Long Trail Ale bottle to perpetrate Christine's aggravated murder, used that evidence to convict Mr. Grega, and then, after trial, failed to disclose this materially exculpatory and impeachment material." Compl. ¶ 185. Taken as true, this language sufficiently alleges "the fabrication of evidence by a government officer acting in an investigatory capacity" where the officer "foresees that he himself will use the evidence with a resulting deprivation of liberty." *Zahrey*, 221 F.3d at 344.

Pettengill is therefore not entitled to absolute immunity from Count II.

> **b.    The Complaint alleges a claim for falsification of evidence.**

Next, the State argues that even if Pettengill were not protected by absolute immunity, Count II would still fail because "Grega has not alleged any *materially* false evidence, or evidence that was the proximate cause of his conviction." Mot. at 20. This argument is based on

opinion and inference, not the Complaint's allegations taken as true, and therefore provides no grounds for Rule 12 dismissal.

Reduced to its essence, this argument amounts to the State's subjective belief that it is unreasonable – to the point of not being actionable – to argue that the evidence used to suggest the beer bottle was the assault weapon materially affected the jury's verdict.  The State opines:

> It hardly matters . . . whether the beer bottle was inside or outside of the six-pack holder for purposes of determining whether it could have been used as an instrument of sexual assault.  Indeed, it strains reason to conclude that that piece of evidence was in any way determinative of the ultimate question of whether it was *Grega* who committed the crime.

*Id*.  Because this is merely the State's self-serving perspective on the significance of a particular piece of evidence – a perspective, importantly, that is contrary to the allegations in the Complaint – it fails to provide a basis for Rule 12 dismissal.  As noted in Section III above, Rule 12 requires the court to "draw all reasonable inferences in favor of [the plaintiff]." *One Source*, 13 F. Supp. 3d at 358.  Here, the State is attempting to advance a materiality argument by asking the Court to infer how the jury might have weighed the false evidence advanced by the State concerning the assault weapon.  The State's opinion that this evidence was not "material" is not valid grounds for Rule 12 dismissal.

Moreover, State's argument about the materiality of the beer bottle is also undercut by State's Attorney Davis' decision to prominently feature the beer-bottle/weapon theory in his closing.  Davis obviously thought this detail was sufficiently important that he singled out Exhibit 86 (the misleading photo of the contents of the refrigerator) for special attention in his closing.  *See* Compl. ¶ 123-124.  He did not mention, much less highlight, dozens of other exhibits in this same way.

In sum, each of the State's arguments for dismissal of Count II fall short.

19

### 3.     Counts III, VII, and IX state viable claims for malicious prosecution.

On pages 21 to 29, the State challenges Mr. Grega's claims for malicious prosecution, found in Counts III, VII, and IX.  The State begins this argument by correctly noting that both Mr. Grega's state and federal malicious prosecution claims are governed by state law.  *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).  Accordingly, Mr. Grega must allege the following elements to state each of his malicious prosecution claims:  (1) malice, (2) lack of probable cause, (3) favorable termination, and (4) damages.  *Condosta v. Grussing*, 144 Vt. 454, 458 (1984).  Because the State challenges only the favorable termination and lack of probable cause elements, only those two elements are discussed below.

### a.     The criminal proceedings terminated in Mr. Grega's favor.

Both the initial prosecution of Mr. Grega and the more recent re-prosecution of him terminated in his favor.  The first prosecution terminated in Mr. Grega's favor when, on August 21, 2012, the Vermont Superior Court vacated Mr. Grega's original conviction and released him from prison.  The second prosecution terminated in his favor when the State – the State's Attorney and the Attorney General's Office – dismissed the case and publicly admitted it could not successfully prosecute him a second time given the state of the evidence.

Although the State cites *Siliski v. Allsate Ins. Co.*, 174 Vt. 200 (2002), for the proposition that voluntary dismissal is not tantamount to favorable termination, that is not what *Siliski* holds.  *See id.* at 203.  In *Siliski*, the Vermont Supreme Court in fact *rejected* the notion "that a voluntary dismissal simply cannot constitute a favorable termination for purposes of a malicious prosecution claim," *id.* at 203-204, and instead held that "if the manner of termination, including dismissal, reflects negatively on the merits of the case, it ***will be considered favorable to the defendant***."  *Id.* at 204 (emphasis added) (adopting the approach of the Restatement (Second) of Torts § 674 cmt. J (1997)).

20

Here, Mr. Grega has adequately pled "favorable termination" by alleging that the dismissal "reflect[ed] negatively on the merits of the case," exactly as *Siliski* requires.  *See id.* Pertinent allegations are as follows:

- "After a year of pre-trial litigation in Defendants' ill-conceived re-prosecution of Mr. Grega, in which Defendants . . . tried but failed to undermine the evidentiary significance of the Perpetrator's DNA, and failed to identify an alternative theory supporting Mr. Grega as a suspect or justify their decision to re-prosecute Mr. Grega in light of the discovery of the Perpetrator's DNA, on August 21, 2013, the State of Vermont . . . dismissed the Information against Mr. Grega …."  Compl. ¶ 6.

- "[Dismissal] was filed because Defendant lacked probable cause to prosecute Mr. Grega for Christine's murder."  Compl. ¶ 168.

- State's Attorney Shriver "confirmed in her own words the State's inability to prosecute Mr. Grega for lack of evidence . . . when she stated during a televised interview with WCAX: 'What I believe or do not believe is not relevant.   What's relevant is what I could prove in a court of law . . . .'"  Compl. ¶ 169.

- "The criminal action ultimately terminated in favor of Mr. Grega on August 21, 2013, when the State of Vermont dismissed the aggravated murder charge against him, due in part, to the discovery of the unknown male's DNA and the falsified evidence of the Long Trail Ale bottle, and the State's implicit recognition, on information and belief, that it lacked probable cause to maintain the charges against him, much less support a conviction."  Compl. ¶ 189.

These allegations, when taken as true, sufficiently allege favorable termination.

Numerous courts, including the Second Circuit, have discussed favorable termination in terms that confirm it has been sufficiently pled here.  For example, in *Waste Mgmt. of Louisiana, L.L.C. v. Parish of Jefferson ex rel. Jefferson Parish Council*, 947 F. Supp. 2d 648 (E.D. La. 2013), the court held that a plaintiff adequately alleges a favorable outcome if he alleges that in the prior action, the opposing party "concede[d] that it could not possibly succeed on its claim." *Id.* at 661.  Even if "the termination of a case is indecisive because it does not clearly address the merits of the charge," the § 1983 action should not be dismissed, because it must be left to the jury to examine "the underlying facts . . . to determine 'whether the failure to proceed implies a

lack of reasonable grounds for the prosecution.'"  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (*quoting Rounseville v. Zahl*, 13 F.2d 625, 629 (2d Cir. 1994)); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 200 (2d Cir. 2014) (finding favorable termination where DA's office dismissed because "the People conclude[d] that the case [could] not be proven beyond a reasonable doubt" and therefore declined to prosecute "at this time"); *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 666 (N.Y. App. Div. 2004) (finding dismissal without prejudice constituted favorable termination where the "record demonstrate[d] that the prosecution undertook a full investigation and elected not to proceed with the charges because it determined that the allegations against the plaintiff were not supported by the evidence").[8]  Here, both the 2012 vacation of Grega's original conviction and the 2013 dismissal of the second case against him reflected poorly on the merits of the state's case against Grega.

Even Judge Wesley acknowledged that the merits of the State's case had been called into serious doubt, noting that:

> Defendant raises a reasonable concern that the dismissal without prejudice was designed to avoid proceeding to trial without evidence deemed necessary. . . .
>
> Admittedly, ***the State as much as concedes that in the absence of a better scientific explanation for the unknown male DNA, its case based on the circumstantial evidence presented at the first trial is unlikely to convince a jury of Defendant's guilt beyond a reasonable doubt.***

---

[8]     The indications of Grega's innocence—including the exculpatory DNA evidence and the State's Attorney's admission that she could not prove the case—place his case in sharp contrast to the cases cited by Defendants in support of their argument that the voluntary dismissal should not constitute a favorable termination.  As opposed to the voluntary dismissal in Grega's case, which reflected on the merits of the state's case, the dismissal in *Siliski* was grounded in technical, not substantive concerns.  *See* 174 Vt. at 204 (dismissal based on potential conflict of interest arising from dual representation of parties).  In *Russell v. Smith*, 68 F.3d 33, 35-36 (2d Cir. 1995), the trial court's dismissal of the criminal indictment based on recanted grand jury testimony was not a favorable termination because the recanted testimony implicated the witness' brother and was corroborated by substantial other evidence and witness testimony, calling the recantation into doubt.  Here, on the other hand, when it voluntarily dismissed the charge against Grega, the state admitted that it could not prove its case, which, in combination with the exculpatory DNA evidence that caused the vacation and remand in the first place, provides a clear indication of Grega's innocence.

*State v. Grega*, No. 1526-12-94, slip op. at 3 (Vt. Super. Ct. Oct. 21, 2013) (emphasis added).

Even if there was a question whether the dismissal addressed the merits of the charge, *Ricciuti* suggests that dismissal would be inappropriate when "the reasons for a dismissal of charges are in dispute." 124 F.3d at 131.  When this is the case, a jury should examine the underlying facts in order "to determine 'whether the failure to proceed implies a lack of reasonable grounds for the prosecution.'"  *See id.* (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994)).  Here, at the Rule 12 stage, dismissal would thus be inappropriate because the reasons for dismissal are in fact in dispute and Mr. Grega has properly alleged that the state did not have probable cause to prosecute him, as described in more detail below.[9]

Finally, as a public policy matter, the court should reject the State's argument that voluntary dismissal does not qualify as a favorable termination.  If that were the case, police and prosecutors could, with impunity, force a former defendant in a homicide case to remain endlessly on guard against the threat of future prosecution, even where the evidence did not support the charges, simply by dismissing without prejudice before the defendant had a chance to put the government to its proof.  In *R.A. Nelson, M.D. v. Miller*, 227 Kan. 271 (1980), the court recognized that a voluntary dismissal must be a favorable termination in some circumstances to avoid this unacceptable scenario:

> Suppose that the party commences an action maliciously, and without probable cause, and then, for the purpose of harassing the defendant [puts defendant to inconvenience and expense by noticing several depositions without intending to take them;] can the plaintiff relieve himself from liability . . . for malicious prosecution by simply dismissing his action? Will the defendant have no remedy in such a case?

*Id.* at 281 (*quoting Marbourg v. Smith*, 11 Kan. 554, 562-63 (1873)).  Such a result would be intolerable.  Thus, voluntary dismissal should be deemed a favorable termination where, as here,

---

[9]   *See also* Compl. ¶ 169 ("What I believe or do not believe is not relevant.  What's relevant is what I could prove in a court of law, and right now it's an ongoing investigation.").

it is clearly intended to indefinitely table a case where the state is unable to win, but equally

unwilling to admit defeat and let the formerly accused move on.

>    **b.    The Complaint sufficiently alleges lack of probable cause in the
>          original prosecution.**

Mr. Grega has sufficiently alleged lack of probable cause in the original prosecution by

describing how the flawed investigation led to misleading and omitted evidence in the warrant

affidavit.  Although the State attempts to hide behind a presumption of probable cause since a

warrant was originally obtained for Mr. Grega's arrest, that presumption is rebutted where "a

plaintiff . . . demonstrate[s] that the earlier finding of probable cause was based on misleading,

fabricated, or otherwise improper evidence."  *Lay v. Pettengill*, 191 Vt. 141, 153 (2011)

(citations omitted).  Such is the case when an affidavit asserting probable cause omits material

information.  As the Second Circuit has explained:

> A plaintiff can demonstrate that [his] right not to be searched [or seized] absent a
> search warrant supported by probable cause was violated where the officer
> submitting the probable cause affidavit . . . with reckless disregard for the truth . .
> . omitted material information, and that such . . . omitted information was
> necessary to the finding of probable cause.  Recklessness is inferred when the
> omitted information was clearly critical to the determination of probable cause.

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (internal quotation marks and

citations omitted).[10]  Dismissal is inappropriate when there is any doubt as to the materiality of

the misleading or omitted information, and even more so when such materiality is clear.  *Cf. id.*

("[T]he weight that a neutral magistrate would likely have given such information [in

---

[10]      Though *McColley* discusses probable cause for a search warrant, it is equally applicable here because both issues are governed by the Fourth Amendment, and indeed, *McColley* relies upon cases dealing with both search and arrest warrants.  *See id.* (*citing Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (arrest warrant (*quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (arrest warrant))); *Rivera v. United States*, 928 F.2d 592, 597, 604 (2d Cir. 1991) (search warrant)).

determining probable cause] is a question for the finder of fact, so that summary judgment [and even more so dismissal on 12(b)(6) grounds] is inappropriate in doubtful cases.").  Furthermore, "where plaintiff asserts that a ***reasonable pre-prosecution investigation would have revealed exculpatory facts*** and there is evidence to support the allegation, the jury is to determine the facts a reasonable investigation would have disclosed, and then make its probable cause determination considering those facts."  *Day v. Ingle's Markets, Inc.*, 2006 WL 239290, at *2 (E.D. Tenn. 2006), *aff'd*, 227 F. App'x 486 (6th Cir. 2007) (emphasis added) (*citing Roberts v. Federal Express Corp.*, 842 S.W.2d 246, 249 (Tenn. 1992).

Here, Mr. Grega has alleged that the probable cause finding was based on misleading evidence—namely, that material information was omitted from the affidavit supporting the Information filed against him.  For instance, Mr. Grega alleges that the flaws in the investigation led Defendants and other investigators to destroy evidence of the Perpetrator that even a minimally competent investigation would have yielded.  *See* Compl. ¶¶ 70-79, 91-95.[11]

Even more directly addressing probable cause, Mr. Grega alleges as follows:

### Without Having Fully Investigated Christine's Murder, Defendants Filed Charges Against Mr. Grega

111.    Despite a lack of physical evidence or witnesses, in a matter of hours, Defendants focused in on Mr. Grega as their only suspect.

112.    Defendant Pettengill testified that he never considered the possibility that someone other than Mr. Grega had entered Unit 69 and killed Christine.

113.    Defendant Pettengill reached this conclusion despite the fact that a key to Unit 69 had recently gone missing, the locks to Unit 69 were apparently not secure (they could be opened with keys not meant for the lock), multiple, yet-to-be-identified workers had

---

[11]    For example, responding officers recognized the condo Unit as a potential crime scene but failed to take routine steps, prescribed by department policy, to preserve the evidence and avoid contamination of the scene. Compl. ¶¶ 70-79.  They also failed to collect basic evidence (such as fingerprints from virtually any surfaces in the Unit, including ingress and egress points, and biological evidence from the area near the victim), thus allowing the destruction of crucial crime scene evidence. *Id.* ¶¶ 92-94.  These errors are just the tip of the iceberg that was the irretrievably compromised crime scene and flawed investigation.

access to a lock box of keys to the condos, and other condos had recently been broken into.

114.    Despite destroying evidence and failing to fully investigate Christine's murder, Defendants never wavered from their initial judgment that Mr. Grega was the one and only suspect.

115.    After doing little to explore the possibility of alternative perpetrators, Defendant Davis and Defendant Pettengill, on December 19, 1994, *without probable cause*, filed an Information against Mr. Grega charging him with the murder of Christine.  That same day, *again, without genuine probable cause*, Davis and Pettengill obtained an arrest warrant for Mr. Grega.

Compl. ¶¶ 111-115 (emphasis added).  Even more specifically, Mr. Grega has alleged that the

Perpetrator (and any others with him) left evidence that Defendant Pettengill and other

investigators would have found had they bothered to conduct a reasonable investigation before

wiping down and otherwise contaminating the crime scene.  Compl. ¶¶ 45-46, 70-79, 91-94.

These allegations are supported by the fact that the Perpetrator's DNA was later found on swabs

taken from the victim, *Id*. ¶ 144, and that the investigators involved contaminated the crime

scene and failed to collect crucial evidence, in violation of established crime scene investigation

procedure.  *Id*. ¶¶ 70-79, 91-94.

These facts regarding the investigation were omitted from the affidavit supporting the

Information filed against Mr. Grega, even though, in combination, they undercut the probable

cause finding for Mr. Grega's arrest and prosecution.  *See Lay*, 191 Vt. at 153 ("[a] plausible

suggestion that the finding of probable cause would not have been reached were it not for some

irregularity or impropriety" overcomes a presumption of probable cause); *Day*, 2006 WL

239290, at *3 (considering allegations that witness "intentionally failed to inform the grand jury

of relevant, [largely exculpatory] material facts, … [the] Court [could not] find as a matter of law

that plaintiff's indictment was not procured through fraud, false testimony or other corrupt

means").

26

Accordingly, the jury should be left "to determine [what] facts a reasonable investigation would have disclosed" and whether there was probable cause based on those facts. *See Day*, 2006 WL 239290, at *2; *see also Ricciuti*, 124 F.3d at 128 (denying summary judgment on malicious prosecution claim because there were disputed material facts as to whether the police report had been falsified to support aggravated charges).[12]

Mr. Grega has alleged sufficient evidence to demonstrate that any probable cause finding during the original prosecution was based on misleading and omitted material information. Discounting the misleading information, and including the omitted evidence, no reasonable investigator could have found probable cause to arrest and prosecute Grega.[13]

        **c.**     **The Complaint sufficiently alleges lack of probable cause in the re-prosecution.**

---

[12]     The cases Defendants cite in which the probable cause finding was upheld are inapposite. For instance, in *Lay*, 191 Vt. at 154; *Fulton v. Robinson*, 289 F.3d 188, 198 (2d Cir. 2002); and *Fabrikant v. French*, 691 F.3d 193, 201 n.5 (2d Cir. 2012), unlike the present case, there was no allegation that the finding was based on false or misleading evidence. In *Virgil v. Town of Gates*, 455 Fed. Appx. 36, 38-39 (2d Cir. 2012), and *Panetta v. Crowley*, 460 F.3d 388, 397 (2d Cir. 2006), the probable cause finding was based on eyewitness testimony that was corroborated by other evidence—which is not the case here either. Finally, in *Celestin v. City of New York*, 581 F. Supp. 2d 420, 423-427 & n. 2 (E.D.N.Y. 2008), and *Benjamin v. United States*, 554 F. Supp. 82, 83-85 (E.D.N.Y. 1982), the suspects were arrested shortly after the alleged crime, based on reasonable initial probable cause findings which were ultimately undercut by later investigation. In both of these cases, upon reasonable investigation turning up exculpatory evidence, the charges were dismissed and the suspects were released. *See Celestin*, 581 F. Supp. 2d at 423, 427 & n.2 (describing how suspect was arrested the day after the shooting and released one year later after suspect finally submitted to DNA testing showing he was not the perpetrator); *Benjamin*, 554 F. Supp. at 83-85 (describing how suspect was arrested one month after alleged crime based on creditable positive identification and released after only fourteen days in jail once alibi and claims of innocence were fully investigated). Here, by contrast, Grega was arrested more than three months after the murder, Compl. ¶¶ 38, 45, 116, during which time the investigators had ample time in which to conduct a reasonable investigation, including following up on the mounting evidence indicating someone other than Grega was responsible for the crime. *See id.* ¶¶ 100-14. In addition, in *Benjamin*, a misstatement in the arrest warrant was found to be legally irrelevant. 554 F. Supp. at 85-86 (holding that a misstatement in arrest warrant that suspect had been identified directly to investigating FBI agent when it had actually been reported through another FBI agent was irrelevant because probable cause is evaluated in light of law enforcement's collective knowledge). Here, as discussed above, the misstatements and omissions upon which the probable cause finding rested were material.

[13]     "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle,* 540 U.S. 366, 371 (2003). It therefore follows logically that even if the Court does not find that the material omissions described here are "misleading" per se, Mr. Grega's allegations of alleged (a) destruction of evidence, (b) failure to reasonably consider other evidence, (c) failure to conduct a reasonably adequate investigation, and (d) hasty and prejudicial focus on Grega to the exclusion of other potential perpetrators are sufficient to defeat a presumption of probable cause. *Cf. id.*

Mr. Grega has likewise sufficiently alleged a lack of probable cause in the 2012 re-prosecution.  There are two reasons why this is so.

First, the more recent re-prosecution relied upon virtually the same Information as the original prosecution and thus the probable cause determination was deficient for at least the same reasons as in the first instance.  *See* Def.'s Mot. for Bill of Particulars at 1, *State v. Grega*, No. 1526-12-94, (Vt. Super. Ct. Mar. 5, 2013) ("The operative charging document in this 18-year-old case is an Amended Information, dated May 5, 1995").[14]  Compounding the deficiencies in the first prosecution, the state proceeded with the second prosecution without reexamining the original investigation[15] or pursuing any new leads.  Compl. ¶ 152-153.  Accordingly, the Court hearing the second prosecution never had the opportunity to evaluate probable cause in light of the material facts that had been omitted from the Information in 1995.  This cast significant doubt on the probable cause finding, especially when combined with the new exculpatory DNA evidence.  *See* Compl. ¶ 144.

Second, based on the newly-discovered DNA evidence, the lack of probable cause to re-prosecute Mr. Grega is even more glaring than in the original prosecution.  As the Complaint explains, the lead case officer testified that there were only three possible explanations for the presence of unknown male DNA inside Christine Grega: it belonged to the Perpetrator, it was the result of contamination, or it was the result of inadvertent transfer from the object used to assault

---

[14]     The State ultimately amended the charging document twice before the trial court was satisfied that it had alleged sufficient probable cause to proceed with the aggravated murder charge.  *See State v. Grega*, No. 1526-12-94, at 1 (Vt. Super. Ct. May 31, 2013) (order denying defendant's motion to dismiss).  Although the court denied Grega's motion to dismiss the final charging document, the Third Amended Information, the court made that determination based on almost entirely the same information upon which the prior probable cause finding rested.  *Id.* (noting Third Amended Information was "a verbatim restatement of the original information, supplemented by a one page affidavit by Detective Richard Holden").

[15]     Including issues that came to light during the 1995 trial (after the 1995 charging document was submitted to the court), such as testimony that Bryant Comi confessed to the murder.  *See* Compl. ¶¶ 103-04.

Mrs. Grega.  Compl. ¶¶ 156-157.  Because the latter two theories were effectively disproven by the State's own investigation, the DNA could only have been left by the Perpetrator, which by definition means there was no probable cause to re-prosecute Mr. Grega.  *See id.* ¶ 157(a) (noting that Holden had eliminated virtually all investigatory and medical personnel as sources of the unknown DNA); *id.* ¶ 157(b)-(c) (demonstrating Holden did not believe the transfer theory supported probable cause, as he described it as a "long shot"); *see also id.* ¶ 149 (quoting State's Attorney: "[I]f it's mystery sperm, he gets a dismissal").[16]

Thus, the state initiated and pursued the re-prosecution despite knowledge of exculpatory DNA evidence, misleading and fabricated evidence, and material information omitted from the Information against Grega.  Holden in particular had access to all evidence, reports, and Information from the original prosecution.  *Id.* ¶¶ 153-54.  His knowledge of the serious flaws in the first investigation that led to material omissions from the information, in combination with the benefit of hindsight, as well as the significant discovery of the exculpatory DNA evidence would have been enough for any reasonable officer to determine that there was no probable cause to pursue the re-prosecution of Grega, especially without thoroughly reexamining the original investigation.  *See Ricciuti*, 124 F.3d at 128 (no probable cause if no reasonable officer could have found probable cause on the facts available).

### d.    Pettengill and Holden are not entitled to qualified immunity from malicious prosecution.

Defendants are not entitled to qualified immunity from Mr. Grega's malicious prosecution claims unless they can show it was objectively reasonable for them to believe their

---

[16]    What's more, the transfer theory—the most far-fetched—was based in part on fabricated evidence.  The state improperly argued that the staged Long Trail Ale beer bottle was a likely murder weapon—and thus, a likely mechanism for the "DNA transference"—based solely on its alleged placement outside its six-pack.  *Id.* ¶¶ 122-28, 157; *see Lay*, 191 Vt. at 153 (citations omitted) (holding a probable cause presumption rebuttable if "earlier finding of probable cause was based on misleading, fabricated, or otherwise improper evidence").

acts were lawful.  *Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir. 1992) ("[T]he defense of

qualified immunity will [only] protect a government official if it was 'objectively reasonable' for

him to believe his acts were lawful.").  "Usually, the defense of qualified immunity cannot

support the grant of a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim upon which

relief can be granted."  *Green v. Maraio*, 722 F.2d 1013, 1019 (2d Cir. 1983).  "Not only must

the facts supporting the defense appear on the face of the complaint, but, as with all Rule

12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *See*

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal quotation marks and citations

omitted).  Here, Mr. Grega has alleged facts calling Defendants' qualified immunity into

question.

As described above, if the probable cause affidavit supporting the Information against

Mr. Grega had been amended to include the misleading and omitted evidence, no reasonably

competent investigator could have found probable cause to support the arrest and prosecution of

Mr. Grega, in either 1995 or 2012.  *See supra* at Section IV.A.3.b.; *see also Daniels v. Bango*,

487 Fed. Appx. 532, 539-40 (11th Cir. 2012) (affirming denial of qualified immunity where

arresting officer made false statements and omitted material facts from arrest warrant);

*McColley*, 740 F.3d at 823 (materiality of omitted evidence to probable cause finding is question

of fact for jury).  Defendants Pettengill and Holden, who had access to all relevant evidence and

information, including that which was misleading in or omitted from the affidavit, certainly

could not have had an objectively reasonable belief that their actions were lawful.[17]

---

[17]     Moreover, Defendant Holden did not even have a *subjectively* reasonable belief that he had probable cause
to pursue the investigation and prosecution of Grega.  *See* Compl. ¶¶ 156-157, 162 (noting Defendant Holden's
testimony that the unknown male DNA could have come only from the Perpetrator, contamination, or transfer, and
describing how the latter two theories were effectively disproven).

The cases cited by the State in its qualified immunity argument were decided on summary judgment and do not apply to the facts of this case.  In *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990), "the numerous eyewitness accounts which contradicted [plaintiff's] version of the [facts] and the lack of physical evidence in support of his claims" supported probable cause, and thus qualified immunity.  And in *Cartier*, the court found that the warrant in question supported a probable cause finding, even setting aside disputed facts.  955 F.2d at 844-847.  In contrast, here, the warrant was facially valid only because of misleading and omitted evidence, of which Defendants Pettengill and Holden had full knowledge.  *See supra* at Section IV.A.3.b.  And where, as here, an arrest warrant is based on omitted facts, the case must survive a motion to dismiss because it is for the jury to decide what facts may have turned up in a reasonable investigation and whether those facts were material to the probable cause finding.  *See supra* at Section IV.A.3.b.; *Day*, 2006 WL 239290, at *2; *McColley*, 740 F.3d at 823.  Accordingly, Mr. Grega has alleged facts sufficient to survive the defense of qualified immunity at the motion to dismiss stage.  *See McKenna*, 386 F.3d 432, 436 (2d Cir. 2004) (denying motion to dismiss based on qualified immunity because availability of qualified immunity could not be determined as a matter of law based on the allegations in the complaint).

### 4. Counts IV, VIII, X and XII state viable claims for false imprisonment.

On pages 29 to 32 of its Motion, the State argues that Counts IV, VIII, X, and XII, alleging various state and federal claims for false imprisonment against Davis, Pettengill, and Holden should be dismissed for three reasons.  First, as to Pettengill (Counts IV and X), the State argues that Grega's original arrest and confinement were "the result of a facially valid process."  Second, Davis (Count IV only) is protected by absolute immunity.  Third, as to Holden (Counts VIII and XII), the State argues that Mr. Grega fails to allege that Holden confined him, and that

any confinement was unsupported by facially valid legal process. *Id*. Because Davis has been withdrawn from this Count, only the first and third arguments are addressed below.

>    a.    **Mr. Grega sufficiently alleges that his original arrest and confinement were not the result of a facially valid legal process.**

While the State correctly notes that a facially valid warrant generally provides a complete defense to a claim for false arrest or false imprisonment under § 1983, the State incorrectly argues that the Complaint fails to allege that the original warrant was facially invalid. Fundamentally, the State's reliance upon what it describes as a "facially valid warrant" in this argument is the same as its reliance on prior findings of probable cause in its arguments regarding malicious prosecution. These arguments are addressed in Section IV.A.3.a above. Rather than rehash why prior findings of probable cause do not shield Defendants from their unconstitutional conduct, Mr. Grega refers the Court to that prior section.

>    b.    **The Complaint sufficiently alleges that Richard Holden confined Mr. Grega and that his confinement was not supported by facially valid legal process.**

The State contends that Counts VIII and XII, which assert false imprisonment claims against Defendant Holden in the re-prosecution, should be dismissed because Mr. Grega "fails to explain how exactly Defendant Holden 'confined' him, as required for a false imprisonment claim, aside from his vague allegation that Holden somehow 'acted to secure Mr. Grega's arrest and detention.'" Mot. at 32. The State further argues that even if Holden somehow participated in Grega's confinement, that confinement was justified by facially valid legal process. These arguments fail because: (1) Mr. Grega was "confined," as that term is defined in the relevant jurisprudence; (2) Holden was not just involved in, but instrumental to, that confinement; and (3) that confinement was not supported by facially valid legal process.

i.      **Mr. Grega was confined in connection with his
re-prosecution.**

Second Circuit case law explains that, for purposes of this type of constitutional analysis,

Mr. Grega was confined during his re-prosecution.  *See, e.g.*, *Murphy v. Lynn*, 118 F.3d 938, 945

(2d Cir. 1997) (holding that releasing the defendant on his own recognizance on the condition

that he return to court and not leave the state while criminal charges were pending constitutes

seizure under the Fourth Amendment).  As the Complaint explains, Mr. Grega's freedom was

restricted by conditions of his release (including travel restrictions as well as daily – initially

twice daily – check in calls that had to be made from his mother's house).  Compl. ¶¶ 147, 158.

He was therefore effectively under curfew/house arrest, and thus seized for purposes of Fourth

Amendment analysis.

ii.      **Holden was involved in Mr. Grega's confinement.**

The Complaint also explains that Holden was directly involved in Mr. Grega's

confinement.  Holden was the lead investigator, allegedly reviewed the case and conducted

follow up investigation, and made the recommendation that Grega be re-prosecuted.  The

relevant allegations on this point are described exhaustively in Paragraphs 152 through 162.  *See,*

*e.g.*, *id*. at ¶ 152 (accusing Holden of "[i]gnoring the lessons that should have been learned from

the discovery of the unknown male's DNA" and noting that Holden "rushed to re-prosecute Mr.

Grega without undertaking a reasonable and adequate investigation, and ***without probable***

***cause***") (emphasis added); *id.* ¶ 153 (accusing Holden of failing to re-examine the original

prosecution, noting that he "did not pursue any leads pointing to suspects other than Mr. Grega,

33

and did not conduct (or even seek) appropriate further forensic testing, including additional testing of the swab with the unknown male's DNA"); *id*. ¶ 153(a) – (b) (noting that despite being the lead officer, Holden failed to review all of the original police reports and accepted those he did read as true, failed to discover or consider the Attorney General's destruction of a critical DNA sample that showed signs of sperm); *id*. ¶ 154 (accusing Holden of failing to discover the misuse of the Long Trail Ale bottle in the original prosecution): *id*. ¶ 155 (accusing Holden of focusing on defending the original prosecution, not conducting his own independent investigation); *id*. ¶¶ 156-157 (noting Holden admitted that the State's "transfer" and "contamination" theories of the discovered DNA were "long shots"); *id*. ¶ 161 (noting Holden had a duty to investigate whether the beer bottle theory was accurate, but took no steps to do so); *id*. ¶162 (noting that Holden himself admitted that neither he nor the Windham County State's Attorney had probable cause to-prosecute Mr. Grega). These allegations, when accepted as true, are sufficient to establish that he was "involved" in Mr. Grega's confinement. In fact, he was in charge of all the work that led to it and personally recommended it.

### iii. Mr. Grega's confinement during the re-prosecution was unsupported by facially valid legal process.

This argument overlaps with the discussion of facially valid legal process and probable cause contained in Sections IV.A.3.b.4 above. For reasons already explained, Mr. Grega's confinement was not supported by facially valid legal process.

### 5. Count V states a viable claim for conspiracy.

On pages 32 to 35 of its Motion the State argues that Count V should be dismissed for three reasons. First, the State claims Mr. Grega fails to allege a viable underlying constitutional claim to support the conspiracy allegation. Second, the State claims Mr. Grega fails to allege a plausible conspiratorial agreement. Third, the State argues that Davis is absolutely immune from

such a claim.  Because Mr. Grega's underlying constitutional claims are addressed elsewhere in this brief, and because Mr. Grega agrees that Defendant Davis may enjoy absolute immunity from such a claim,[18] Mr. Grega needs only address the existence of a conspiratorial agreement (the second argument above) needs to be addressed here.  This argument fails for two reasons.

First, in attempting to make its point, the State once again resorts to attorney argument, thereby failing to simply accept the allegations in the Complaint on their face.  For example, the State writes: "[i]t *simply defies logic* to conclude that Pettengill's alleged misidentification of the location of a beer bottle . . . was the result of a conspiracy between Davis and Pettengill to circumvent Grega's due process rights rather than a simple mistake by Pettengill . . . ."  Mot. at 34 (emphasis added).  Whether or not the State believes Pettengill's conduct was a "simple mistake" rather than an intentional conspiracy is irrelevant under Rule 12(b)(6).  It has been pled as intentional, and sufficient facts are alleged to support that contention.  *See One Source*, 13 F. Supp. 3d at 358 ("the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of [the non-moving party]").  The State's unwillingness to accept the plausibility of such a conspiracy is a matter of opinion, not a basis for Rule 12 dismissal.  *See Veggian v. Camden Bd. of Educ.*, No. 05-70 (NLH), 2007 WL 2900413, at * 5 (D.N.J. Oct. 2, 2007) ("Defendant's interpretation of the events surrounding [the alleged conspiracy] may not be considered on a motion to dismiss, where the Court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to Plaintiff.").

Second, the State's claim that the Complaint contains "only conclusory, vague or general allegations that the defendants have engaged in a conspiracy," Mot. at 33 (citation omitted), is

---

[18]     As a result, in the proposed Amended Complaint, Mr. Grega has removed Davis as a defendant on Count V.  Additionally, while Mr. Grega believes that the Complaint sufficiently alleges a conspiracy between Davis and Defendant Pettengill, in the Amended Complaint, Mr. Grega has provided additional allegations that further bolster the conspiracy claim.

incorrect.  Mr. Grega has alleged not only an agreement between Pettengill and Davis, but numerous overt actions taken in furtherance of that conspiracy.  For example, the Complaint contains the following allegations:

- Davis[19] was responsible for investigating the murder and had supervisory responsibility over law enforcement investigators.  Compl. ¶ 13;

- Davis was "intimately involved in all aspects of the investigation."  Compl. ¶ 89;

- "Davis and Defendant Pettengill, on December 19, 1994, without probable cause, filed an Information against Mr. Grega charging him with the murder of Christine. That same day, again, without genuine probable cause, Davis and Pettengill obtained an arrest warrant for Mr. Grega."   Compl. ¶ 115;

- "at least [] Pettengill and Davis, and perhaps others, agreed to introduce evidence of a single Long Trail Ale bottle – which, in the photograph introduced at trial was not in the six pack container – in the refrigerator of Unit 69 as the assault weapon, even though they had no basis whatsoever for believing that the Long Trail Ale bottle was the assault weapon."  Compl. ¶ 122, 128;

- "At trial, [] Davis, through Defendant Pettengill, introduced a picture of the Long Trail Ale bottle," specifically asking if it was how the bottle appeared on September 19, 1994, not how it appeared when investigators first observed it on September 12, 1994 or September 13, 1994 Compl. ¶¶ 119, 123;

- Davis improperly argued that the Long Trail Ale bottle was used  to sexually assault Christine Grega.  Compl. ¶ 124;

- Davis and Defendant Pettengill did this despite the report of the Detective Sergeant who was in charge of evidence collection "describ[ing] the Long Trail Ale six pack he observed in the refrigerator [on September 13, 1994] as follows: 'There was a full six pack of Long Trail Ale bottles *in their container*."  Compl. ¶¶ 125-126;

- "Davis, with the assistance of Defendant Pettengill and perhaps others, therefore used a photograph of evidence staged by Defendants to advance a theory of the assault that was false."  Compl. ¶ 128.

- "None of the[] Defendants, however, ever disclosed the fact that it was staged, either during the trial or at any point during the time Mr. Grega was imprisoned or even during the year in which he was subject to pretrial conditions during his unlawful re-prosecution."  Compl. ¶ 129.

The State overlooks all of these allegations.[20]  It also overlooks the allegation that, in presenting the false evidence, both Pettengill and Davis knew that Detective Sergeant Holden (the officer in

---

[19]     While Davis remains a defendant on other counts, at least for the conspiracy count, Mr. Grega has removed references to "Defendant Davis," instead simply referring to him as "Davis."

charge of the collection of evidence from Unit 69, not the "Holden" named as a defendant here) submitted a report that contradicted the testimony and arguments concerning the location of the Long Trail Ale bottle.  Compl. ¶¶ 122-129, 200.[21]  Thus, at the time Pettengill testified to the accuracy of the photographed evidence, as it existed on September 19, 1994, Compl. ¶ 123, both he and Davis knew that the evidence had been manipulated.  Defendant Davis then argued that Mr. Grega placed the bottle on the shelf of the refrigerator after using it to assault Christine. Compl. ¶ 124.  Mr. Grega's allegations therefore amount to much more than "a simple mistake." As discussed above, Defendants' argument that the location of the bottle is irrelevant is belied by the prosecution's reliance on that detail in its closing argument, including telling the jury to "[a]sk yourself why is the one beer off to the side there?"  Compl. ¶ 124.

Moreover, while Mr. Grega believes that the Complaint sufficiently alleges a conspiracy between Davis and Pettengill, in the Amended Complaint, he has provided additional details to further bolster the conspiracy claim.  Namely, Mr. Grega has added the following allegations:

- "On information and belief, [] Davis knew the Long Trail Ale bottle was removed from its six pack by the Search Detective prior to eliciting testimony to the contrary from Defendant Pettengill."  Am. Compl. ¶ 177;

- "The Search Detective testified at Mr. Grega's original trial.  Am. Compl. ¶ 178;

- "Defendant Davis conducted the direct examination of the Search Detective."  Am. Compl. ¶ 179.

---

[20]      The State's gripe that some of these allegations are made "on information and belief" is misplaced.  At this stage of the litigation, Mr. Grega may plead factual allegations on information and belief.  As the Second Circuit has explained:  "The *Twombly* plausibility standard, which applies to all civil actions, ***does not prevent a plaintiff from pleading facts alleged upon information and belief*** where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible . . . ."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis added) (internal citations and quotations omitted);  *see also McGee v. Doe*, 568 Fed. Appx. 32, 36 (2d Cir. 2014) (Summary Order) (finding complaint stated claim for conspiracy based on allegations of overt actions plus allegations that defendants had met and "on information and belief" conspired to manufacture false criminal claim against plaintiff).

[21]      Although Detective Sergeant Holden testified at trial, he was not asked about the location of the beer bottle, even though he viewed and photographed that evidence on September 13.  Am. Compl. ¶¶ 178-184.

- "On information and belief, in preparing witnesses to testify at trial, [] Davis reads all of the witness' reports and/or prior statements."  Am. Compl. ¶ 180;

- "During this direct examination, [] Davis offered a video tape and several photographs of the Gregas' VW and the interior of the Unit, all of which had been take on September 13, 1994 under the supervision of the Search Detective."  Am. Compl. ¶ 181;

- "Additionally, the Search Detective testified, *inter alia*, "[t]here was a 6 pack of Long Trail Ale bottles."  Am. Compl. ¶ 182;

- "Davis did not offer Trial Exhibit 84 – a photograph taken on September 13, 1994 by a civilian laboratory technician from the VFL under the supervision of the Search Detective – during his direct examination of the Search Detective."  Am. Compl. ¶ 183;

- "Instead, [] Davis offered Trial Exhibit 84 through Defendant Pettengill, who was not even present on September 13, 1994, the day the photograph was taken."  Am. Compl. ¶ 184;

- "Davis asked Defendant Pettengill if the photograph accurately depicted the contents of the refrigerator as he observed them on September *19*, not September 13, when the photograph was actually taken."  Am. Compl. ¶ 185;

- "Davis and Pettengill did this despite the facts that the Search Detective was present on September 13, 1994, had viewed the contents of the refrigerator prior to the photograph being taken, had accurately recorded in his report that all six Long Trail Ale bottles were in the six-pack container, and had testified at trial through direct examination by [] Davis that he had observed a six pack of Long Trail Ale beer in the refrigerator."  Am. Comp. ¶ 186.

In sum, while the specific details of the agreement between Pettengill and Davis are within the State's possession and control and are yet to be discovered, the allegations cited above in the Complaint, based on Defendants' observed conduct, are sufficient to support Count V.  If the Court agrees with the State's argument that the Complaint does not contain sufficiently detailed allegations, Mr. Grega believes that the added allegations of the Amended Complaint address that concern.

### 6.    Count VI states a viable claim for failure to train/supervise against Cutting and Pettengill.

On pages 35 to 38 of its Motion the State argues that Mr. Grega's federal law failure to train/supervise claims against Defendants Cutting and Pettengill (Count VI) should be dismissed because, first, Mr. Grega fails to allege a violation of his constitutional rights, and second, the

Complaint alleges insufficient facts as to Cutting's personal involvement in the lack of training and supervision.

As to the first argument, because Mr. Grega has in fact alleged a violation of his constitutional rights as explained above, this is not a basis for dismissal of these counts.

As to the State's second argument, Mr. Grega concedes that the original Complaint may not contain all factual allegations regarding Defendant Cutting's personal involvement;[22] Mr. Grega has addressed this through added allegations in the proposed Amended Complaint.

The State correctly observes that Mr. Grega cannot base a claim of failure to train/supervise against Defendant Cutting based solely on his position of authority, and that he must allege Cutting's personal involvement to establish liability. *See, e.g., Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

The following allegations in the proposed Amended Complaint sufficiently demonstrate Defendant Cutting's personal involvement and the basis for his § 1983 liability for failure to train/supervise those involved in the investigation of Christine Grega's death:

- Defendant Cutting's involvement started mere hours after the emergency call on the night of September 12, 1994. He testified that he was in charge of the Grega investigation and that Defendant Pettengill, as the case officer, was working under Defendant Cutting's supervision. Amended Complaint ("Am. Compl.") ¶¶ 92-93;

- Defendant Cutting, in the late hours of September 12, 1994/early hours of September 13, 1994, was one of the first officers to inspect Christine Grega's body and observe her injuries. Am. Compl. ¶ 95;

- Defendant Cutting then proceeded to the Unit, at which point he did not see any tape denoting the crime scene, observed that only the downstairs was considered the crime scene, did not observe anyone maintaining a log book, observed numerous individuals remaining in the upstairs of the Unit, and yet took no steps to remedy these failures to identify, secure, and preserve the scene. Am. Compl. ¶¶ 96-99;

---

[22]     Notably, while the State's heading VI.B purports to make this argument as to both Defendant Cutting and Defendant Pettengill, the entire argument focuses on Defendant Cutting and ultimately the State requests dismissal of Count VI only as to Defendant Cutting. *See* Mot. at 36-37.

- Instead, Defendant Cutting instructed VSP personnel to remain in the Unit to interview Mr. Grega; only after the lengthy interview concluded did Defendant Cutting declare the entire Unit to be a crime scene.  Am. Compl. ¶¶ 100-101;

- Defendant Cutting, at the briefing held on September 13, 1994, gave out various assignments to VSP and Dover Police investigators.  Am. Compl. ¶ 126;

- Despite being in charge of the investigation and despite being aware of the prior problems experienced with the civilian laboratory technicians from the VFL, Defendant Cutting was not present for the search of the Unit on September 13, 1994, thus leading him to testify that he did not know what parts of the Unit were actually processed for fingerprints but that he would like to think that the entire Unit was processed because that would be "good police practice."  Am. Compl. ¶¶ 128-131, 140; and

- Defendant Cutting testified that he had continual contact with the State's Attorney's Office regarding how to proceed with the investigation.  Am. Compl. ¶¶ 105, 124.

These allegations amply demonstrate Defendant Cutting's extensive personal involvement, and his § 1983 liability for failure to train/supervise is premised on the theory that he participated in the constitutional violations or, at the very least, acquiesced in the face of them, thus "approving" them and permitting a constitutionally deficient investigation into the death of Christine Grega. *See Wright v. McMann*, 460 F.2d 126, 135 (2d Cir. 1972) ("recovery should not be defeated by an attempt by the [supervisor] to shift responsibility to inferiors when there is every reason to believe that he was aware of the [constitutional violation] and when responsibility for permitting such [violations] was ultimately, in any event, squarely his.").

> **7.    Count XI states a viable claim for intentional infliction of emotional distress ("IIED").**

On pages 38 to 40 of its Motion, the State argues that Mr. Grega's claim for IIED fails for two reasons: first, because Defendant Davis is absolutely immune from liability on such a claim; and second, because the Defendants' "mistakes," "fail[ure] to follow some policies," "fail[ure] to reveal exculpatory evidence," and "fail[ure] to investigate" do not qualify as extreme and outrageous.  *Id*.  As explained below, these arguments lack merit.

### a.   Davis is not absolutely immune from Count XI.

Contrary to the State's first argument against Count XI, Davis, because he was involved in all aspects of the investigation of Mrs. Grega's death, Compl. ¶ 89, is not entitled to absolute immunity.  As the U.S. Supreme Court has explained:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.

*Buckley,* 509 U.S. at 273-274 (internal quotations omitted).  Thus, when a prosecutor performs investigative functions similar to those performed by detectives, he can only seek the limited protection that such a detective could potentially seek for such actions – namely, qualified immunity.  Mr. Grega's complaint contains multiple allegations that Defendant Davis engaged in precisely the kind of investigative conduct that does not allow him to evade responsibility on the basis of absolute immunity.  *See e.g.*, Compl. ¶ 13 (alleging Davis was responsible for investigating the murder and had supervisory responsibility over law enforcement investigators); Compl. ¶ 89 (alleging Davis was intimately involved in all aspects of the investigation and directed certain aspects of it up to the time Mr.Grega was formally charged); Compl. ¶ 115 (alleging Davis and Pettengill filed Information against Mr. Grega without probable cause).  Because Defendant Davis took part in investigative conduct, absolute immunity is unavailable to him.  *See Buckley,* 509 U.S. at 274-275 (holding conduct of prosecutor prior to convening grand jury – including conduct alleged to be part of a conspiracy to falsify evidence – was not entitled to absolute immunity); *Kalina v. Fletcher,* 522 U.S. 118, 122-123 (1997) (holding that a prosecutor who made false statements when certifying facts necessary to obtain a search warrant did not enjoy absolute immunity).

### b.  Mr. Grega has alleged extreme and outrageous conduct.

Contrary to the State's second argument against Count XI, Mr. Grega has alleged facts sufficient to show that all three defendants in this Count -  Davis, Pettengill, and Holden – engaged in extreme and outrageous conduct that they knew or should have known would cause Mr. Grega extreme emotional distress.

Although it is for the Court to decide in the first instance whether the conduct alleged is sufficiently extreme and outrageous as to permit recovery, if reasonable minds can differ, then the Court cannot dismiss the claim, but must instead leave the question to the jury.  *Thayer v. Herdt*, 155 Vt. 448, 455-56 (1990) (reversing trial court's dismissal of IIED claim because court could not find as a matter of law that the conduct alleged did not rise to the level of extreme and outrageous conduct).  Allegations of failure to investigate and falsification of evidence have been found to rise to the level of extreme and outrageous conduct necessary to prevail on a claim for IIED.  *See id.* at 455 (allegations of failure to investigate abduction of plaintiff's daughter, leading to daughter's rape and death, sufficient to state claim for IIED); *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996) (allegations that officer falsely claimed plaintiff bit officer in order to initiate criminal proceedings sufficient for jury to find for plaintiff on IIED claim); *Pitt v. District of Columbia*, 491 F.3d 494, 506 (D.C. Cir. 2007) (evidence of "glaring omissions and at least one false statement" in warrant affidavit and evidence tampering designed to link plaintiff to crime scene sufficient for jury to find for plaintiff on IIED claim).

Here, Mr. Grega has alleged conduct sufficiently extreme or outrageous conduct to survive the State's motion to dismiss.  The State's attempt to argue that the facts alleged merely suggest Pettengill and other investigators made "some" mistakes or failed to follow "some" policies is nothing more than attorney argument putting a diminutive spin on the allegations in

the Complaint.  The Complaint does not merely allege trivial or isolated mistakes or missteps by the Defendants; it alleges a systematically flawed investigation in which Defendants and others recklessly disregarded Mr. Grega's rights and failed to follow the most basic, common sensical investigation policies and procedures.  *See, e.g.*, Compl. ¶¶ 70-115; *see also Thayer*, 155 Vt. at 455-56 (failure to investigate can be sufficient to state a claim for IIED).

By way of specific example, the Complaint explains that Unit 69 was almost immediately recognized as a crime scene, but it was not secured and was contaminated in numerous preventable ways, despite procedures designed to avoid just such a problem.  *Id.* ¶¶ 70-79.  Later attempts at evidence collection were egregiously haphazard and incomplete, such as: evidence collection by untrained and unqualified personnel, *id.* ¶¶ 91-92, 95-97; failure to process most surfaces at the crime scene for fingerprints, *id*. ¶¶ 93-94; garbage thrown in with evidence, *id*. ¶ 75(1); toilet at the crime scene used and flushed, *id*. ¶ 75(g).  Defendants almost immediately focused on Mr. Grega as the sole suspect, not considering the possibility that someone else may have committed the crime.  *Id.* ¶¶ 82-87, 90-91, 100-01, 112, 114-15.  Moreover, investigators persisted with this strategy despite the fact that additional evidence came to light throughout the investigation (including evidence of a third party confession) suggesting that Mr. Grega was in fact not the true Perpetrator.  *Id.*  ¶¶ 102-09, 113.  Defendant Pettengill, as the case officer in charge of the investigation, was aware of these serious flaws in the investigation, and yet nonetheless single-mindedly pursued Mr. Grega in an effort to convict him.  *Id.* ¶¶ 71, 88, 90, 112.  Defendant Davis was intimately involved in the investigation, and thus was also aware of the egregious errors being made.  *Id.* ¶ 89.

In addition, Mr. Grega alleges that Pettengill and Davis engaged in a conspiracy to falsely convict him.  *See supra* section IV.A.5.  Conspiring to falsify evidence for the purpose of

convicting an innocent man, taking steps in furtherance of that conspiracy, and securing that conviction are beyond all possible bounds of decent and tolerable conduct.  *See, e.g., Bender*, 78 F.3d at 791 (jury could have found that officer had falsely claimed plaintiff bit officer in order to initiate criminal proceedings, which could rise to the level of extreme and outrageous conduct under New York law, which sets a high standard for IIED similar to Vermont).

Finally, following Mr. Grega's release in 2012, Defendant R. Holden decided to re-prosecute Mr. Grega despite knowing – in fact, admitting – that he did not have probable cause. Compl. ¶ 154, 162.  Defendant Holden knew or should have known that the investigating officer's report contradicted the State's argument that the beer bottle was used to assault Christine.  *See* Compl. ¶¶ 124-28 (detailing information from original investigation and trial to which Defendant R. Holden had access); *see also Pitt*, 491 F.3d at 506 (jury could have found for plaintiff on IIED claim based on false statements in arrest warrant and evidence tampering designed to link plaintiff to crime scene).  Holden's blind support for his predecessors' crusade to convict Mr. Grega was just as extreme and outrageous as the actions taken by Defendants Pettengill and Davis in the first prosecution.  Defendant R. Holden had plenty of reason to question their efforts, but chose not to do so.  *See, e.g.,* Compl. ¶¶ 152-155.

In sum, Mr. Grega has alleged more than mere mistakes in the investigations and prosecutions against him.  His allegations depict not just a flawed, but a reckless investigation and subsequent criminal proceeding.  As a result of Defendants' misconduct, Mr. Grega spent 18 years in prison for a murder he did not commit.  These allegations demonstrate more than sufficiently extreme and outrageous conduct to support Count XI.  *See, e.g.*, *Thayer*, 155 Vt. at 455-56; *Bender*, 78 F.3d at 791; *Pitt*, 491 F.3d at 506.

### 8.      Count XIV states a viable claim for defamation.

On pages 40 to 42 of its Motion, the State advances only one argument for dismissal of Count XIV, which alleges defamation by Davis.  The State contends that the statement at issue is a matter of opinion, not fact, and therefore cannot be shown to be false.  This argument mischaracterizes the statement in question, and overlooks controlling U.S. Supreme Court case law as recently applied within this district.

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) the Supreme Court explained that there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Id.* at 18, cited with approval in *Wright v. Yacovone*, No. 5:12-cv-27, 2014 WL 1165834, at *8 (D. Vt. Mar. 21, 2014).  The *Milkovich* court's rationale turns on the distinction between an opinion expressing an idea (which is protected speech) and a conclusion based on an interpretation of factual knowledge:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or in-complete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. at 18-19.  Whether a statement constitutes actionable defamation therefore turns not on whether it is couched in language suggesting it is an opinion, but on whether the statement itself is verifiable or implies facts that are verifiable.  *See id.* at 19-20; *see also Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 720 (D. Vt. 2012) (recognizing that the focus of defamation is on whether a statement is "susceptible of being proven true or false").  When a statement itself is not verifiable, the question "becomes whether a reasonable factfinder could conclude that the

statements … imply an assertion … sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21.

Davis's statement – "<u>the evidence clearly shows that [Grega] was responsible for the death of his wife,</u>" Compl. ¶ 163 – is an assertion of fact that is subject to verification and not tempered by any language indicating that this statement is merely his opinion. Only a jury can determine whether or not the evidence shows Mr. Grega killed his wife. *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1192-1193 (N.D. Ill. 2013) (statements by officers and prosecutor that plaintiff was as "guilty as the day is long," and "'I can tell you 100 percent that [plaintiff] did the murder' . . . not only lack[ed] the prefatory language that would even raise [the issue of opinion], but also assert[ed] facts:  that [p]laintiff committed the rape and murder" and therefore are not protected opinion);[23] *Harrington v. Wilber*, 353 F. Supp. 2d 1033, 1042 (S.D. Iowa 2005) ("[T]he statement that Plaintiff killed [the victim] is susceptible to being proved true or false, despite the difficulty that may be raised in doing so.").  Davis's statement not only directly asserts that Grega murdered his wife ("Grega was responsible for the death of his wife"), but also implies Davis's is aware of evidence which shows this to be true, despite the newly discovered exculpatory DNA evidence.

The State relies heavily on *Ferguson v. Short*, No. 2:14-cv-04062,  2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) to support its attack on Count XIV.  Mot. at 41-42.  *Ferguson* is not instructive here for several reasons.[24]  That case involved statements couched in language that

---

[23]    In *Rivera*, the statements at issue were made ***while the plaintiff was convicted of the alleged crime*** and prior to the time his sentence was vacated.  *Id.* at 1192.  Nevertheless, the court recognized the statements could be defamatory.  *See id.* at 1193.

[24]    As an initial matter, the State misreads *Ferguson* by incorrectly attributing statements to the prosecutor in that case that he did not make.  According to the State, "that prosecutor was quoted in a local newspaper article as saying 'that [the plaintiff] was guilty of the . . . murder' …," Mot. at 41, and that "I obviously think he was good for the offense or I wouldn't have prosecuted him." *Id.* at *12.   The first of these quotes was from plaintiff's

plainly reflected opinion: "'I obviously think,' 'I feel,' and 'judgment.'"  These phrases, none of

which appear in Davis' statement, rendered the allegedly defamatory statements in *Ferguson*

non-actionable opinion.  *Ferguson*, 2014 WL 3925512 at *12-15.[25]  In addition, contrary to what

the State argues, the court in *Ferguson* did not find the statement non-actionable because the

speaker was a former prosecutor offering the view that his original judgment was correct.

Rather, the statement was non-actionable because:

> Phrases such as "I obviously think," "I feel," and "judgment" suggest to
> the reader that [the former prosecutor]  was expressing his personal
> opinion on whether [the plaintiff] committed the murders, not whether it
> was an objective, verifiable fact."  *See* Pape [v. Reither], 918 S.W.2d
> [376] at 380 [Mo. Ct. App. 1996] ("The phrase 'it is my position' cannot
> be contorted to mean anything other than 'it is my belief' or 'I will attempt
> to prove'—glosses that likewise reflect the expression of an opinion.")

*Ferguson*, 2014 WL 3925512 at *12.  In contrast, Davis' claim that the evidence shows Mr.

Grega killed his wife is a specific assertion of fact, and is not tempered by language indicating

that his statement was mere opinion.

> *Ferguson* is distinguishable for the additional reason that, unlike here, the court found the

statements did not imply knowledge of inadmissible facts or facts otherwise unknown to the

public which establish the defendant's guilt.  *Ferguson*, 2014 WL 3925512 at *14.  In the instant

case, Davis stated that, "[t]he new DNA evidence should not change the guilty verdict that the

jury returned."  Mot. at 40.  Without offering details, Davis' comments imply that his familiarity

with the circumstantial evidence in the original case provided him with unstated information that

provided support for his conclusion that the newly discovered DNA evidence should have no

---

allegations *characterizing* the prosecutor's statements, not from the prosecutor himself.  *Compare Ferguson*, 2014 WL 3925512 at *12 (citing Doc. 35, ¶ 210) *with* Doc. 35, ¶ 210.

[25]     The statements at issue in *Ferguson* were, among others, "I obviously think he's good for the offense, or I wouldn't have prosecuted him," "they know how I feel," and of a separate defendant, "I still believe that the people responsible for this crime are the people we arrested."  *Ferguson*, 2014 WL 3925512 at *12, *14.

bearing on the question of guilt.  *See id.*  As recognized in *Harrington*, a case cited in *Ferguson*, if a prosecutor implies that his knowledge of the case gave him knowledge of facts to support his statements, then the statements are actionable.  *Harrington,* 353 F. Supp. 2d at 1404.  Here, as in *Harrington*, based on the prosecutor's representation of his knowledge of the evidence, "reasonable minds could find that the statements imply a knowledge by [the speaker] of information, unknown to the public, that supports the statements.  As such, the determination of whether [the] statements are defensible as opinion should be left to a jury."  *Harrington*, 353 F. Supp. 2d at 1042-43.[26]

For these reasons Count XIV is viable and cannot be dismissed under Rule 12(b)(6).

**B.    Town of Dover's arguments.**

**1.    Count VI states a viable failure to train/supervise claim against the Town of Dover.[27]**

In a separate Motion, Dover argues that it should be dismissed from Count VI, alleging failure to train/supervise, for two reasons.  First, Dover argues that the Complaint lacks sufficient allegations to substantiate the existence of a series or pattern of constitutional violations by untrained Dover officers.  Second, Dover argues the Complaint fails to identify the specific training that Dover should have provided that would have prevented the constitutional violations.

---

[26]    Defendants also argue that, here, as in *Ferguson*, because the court vacated plaintiff's conviction without finding the plaintiff innocent, Davis's statement was impossible to disprove.  Mot. at 42  However, as discussed above, Davis's allegations are indeed capable of being disproved.  *See, e.g.*, *Harrington*, 353 F. Supp. 2d at 1042.

[27]    While Mr. Grega believes the allegations in the Complaint establish a failure to train/supervise claim, in the proposed Amended Complaint, Mr. Grega has provided additional allegations regarding the actions of the Dover Chief [of police] and a Dover Detective in the first few hours of the investigation into the death of Christine Grega that bolster the current claim against Dover and establish additional bases for Dover's liability.  Am. Compl. ¶¶ 71-76, 80-91, 107.  These added allegations demonstrate that the First Dover Officer was not the only member of the Dover Police who failed in his duties to identify and secure the scene.  In fact, all three members of the Dover Police who responded to the Unit that night failed to identify and secure the scene in a timely manner; this, drawing all inferences in Mr. Grega's favor, similarly suggests a faulty training program and that it was obvious that more/difference training was necessary.

Dover Mot. at 5, 7.[28]  Dover's first argument fails because the law does not require Mr. Grega to allege a series or pattern of constitutional violations to state a claim for failure to train/supervise. Dover's second argument fails because Mr. Grega need not identify, at the pleading stage, the specific training that Dover should have provided.

> ### 2.    Mr. Grega need not allege a series or pattern of constitutional violations to state a claim for failure to train/supervise.

The Complaint contains numerous allegations relating to the many egregious mistakes made by an individual referred to as the First Dover Officer[29] in responding to the scene and that the mistakes were the result of a failure to train/supervise.  Specifically, Mr. Grega has alleged that: (1) First Dover Officer was the first officer to arrive at the Unit, Compl. ¶ 58; (2) the First Dover Officer immediately recognized that Christine Grega was beyond the point of resuscitation and thus informed dispatch of the fatality, Compl. ¶ 59; (3) the First Dover Officer, despite his determination that Mrs. Grega was beyond resuscitation, then permitted a rescue worker not only to enter the crime scene but also to disturb Mrs. Grega's body, Compl. ¶ 60; (4) the First Dover Officer was present when the EMTs wiped down and cleaned up the area where Christine's body was found and treated; which he later acknowledged was a breach of procedure

---

[28]      In a footnote, Dover Mot. at 3, n.1, Dover makes a side argument that a plaintiff may not lump defendants together.  Dover argues "[a] lumping of defendants is precisely what Plaintiff has done in Count VI" and continues by explaining that "the Complaint does contain numerous allegations specific to Defendants Pettengill, Davis and Holden … such that it is clear that the Complaint does not and could not allege that the Town has any authority to train or supervise VSP investigators or employees of the Vermont Forensic Laboratory."  Dover Mot. at 3, n.1. While, concededly, Mr. Grega could have been more precise in identifying Defendants in Count VI, it is clear – as demonstrated by Dover's argument in footnote 1 – that Dover understood, and thereby has fair notice, that it was only responsible for the First Dover Officer, and not for the VSP or VFL personnel.  Moreover, if the Court agrees with Dover that Mr. Grega has improperly lumped defendants together, Mr. Grega has provided more detail in his proposed Amended Complaint regarding the Dover personnel involved to address this issue.  Am. Compl. ¶¶ 71-76, 80-91, 107.

[29]      In its Motion Dover took issue with Mr. Grega's decision to use this generic label instead of identifying the officer by name.  Mr. Grega deliberately used the generic label out of respect because the officer, as a non-party, would not have the opportunity, as the named defendants do, to respond to the allegations.  If the Court believes Mr. Grega should identify the officer by name, Mr. Grega will do so.

and regretted allowing it to happen, Compl. ¶¶ 77-79; (5) the First Dover Officer, in violation of Dover Police Department policies, failed to secure the scene and thereby control the individuals within the Unit, Compl. ¶ 75(a); (6) the First Dover Officer, again in violation of Dover Police Department policies, failed to maintain a log book memorializing who entered/exited the Unit and the times of such movements, Compl. ¶ 75(m);[30] and (7) that Dover, with deliberate indifference to the rights of criminal suspects, failed to train and supervise the First Dover Officer, Compl. ¶ 203.  As explained below, under the relevant case law these allegations are sufficient to state a failure to train/supervise claim against Dover.

Mr. Grega is not required to plead a series of violations to state a claim for failure to train/supervise.  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  The Second Circuit has "discern[ed] three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens:"

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. . . .  Second, the plaintiff must show that the situation *either* presents the employee with a difficult choice of the sort that training or supervision will make less difficult *or* that there is a history of employees mishandling the situation. . . . [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

---

[30]     Admittedly the allegations in paragraph 75 are made regarding "law enforcement's failure" and do not specify the First Dover Officer.  That said, the Complaint makes clear that the First Dover Officer was the first officer on scene and that he was significantly involved in the first hours of the investigation.  The allegations in paragraph 75 relate to failures that occurred on the night of September 12/the morning of September 13, in the hours following the arrival of the First Dover Officer.  Drawing all inferences in favor of Mr. Grega, the Court should assume that the First Dover Officer, as the first responding officer, was amongst "law enforcement" present at the Unit in the hours following the emergency call.  *See, e.g.,* Compl. ¶¶ 70-75.

*Walker v. City of New York*, 974 F.2d 293, 297-298 (2d Cir. 1992) (internal citations omitted) (emphasis added).  By its clear language, *Walker* explains that demonstrating a pattern or series of violations is merely one manner by which a plaintiff can demonstrate deliberate indifference; it is not a requirement.  *See id.*  Mr. Grega's failure to train/supervise claim advances the theory that "the situation … presents the employee with a difficult choice of the sort that training or supervision will make less difficult."  Identifying and securing a scene – particularly one that includes a fatality – presents the responding officer with the very type of difficult choices which training or supervision would make less difficult, as demonstrated by Mr. Grega's allegations. *See, e.g.,* Compl. ¶¶ 58-79.

The First Dover Officer found himself in a difficult position: he had determined he had a fatality but he second-guessed himself – as most lay people might – and as a result permitted the scene to be irretrievably compromised.  *Id.* ¶¶ 58-60.  But the First Dover Officer was not a layman; he was a professional police officer who had responsibilities, had received training regarding his responsibilities, and yet failed to fulfill his responsibilities as a professional police officer when confronted with a potential homicide.  *See id.* ¶¶ 58-60, 75-79.  That the First Dover Officer later acknowledged that this was a breach of protocol, Compl. ¶ 79, demonstrates that more/different training was necessary to ensure that the First Dover Officer, as the first responding officer, actually fulfilled his responsibilities to identify and secure the scene in order to preserve as much evidence as possible to permit an adequate investigation.  *Id.* ¶ 79.

In addition to being able to meet the *Walker* requirements to show deliberate indifference, Mr. Grega's allegations demonstrate that Dover's deliberate indifference can be inferred under *City of Canton* – thus obviating the need to demonstrate the *Walker* requirements – because the need for more/different training was so obvious.  *See City of Canton*, 489 U.S. at 390.  The sheer

number of the First Dover Officer's mistakes permits the inference that the need for more/different training was obvious and thus that Dover acted with the requisite deliberate indifference in failing to train/supervise the First Dover Officer. *See* Compl. ¶¶ 58-60, 75-79. Had the First Dover Officer merely made a single mistake, that might be explained as a simple mistake or a failure of the officer to follow his training, both of which would be insufficient to state a claim for failure to train/supervise. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 129-130 (2d Cir. 2004) (*quoting City of Canton*, 489 U.S. at 390-391) ("the Supreme Court emphasized in *City of Canton* that plaintiffs must establish that 'the officer's shortcomings … resulted from … a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances."). Here, however, the First Dover Officer made a long series of mistakes and thereby completely failed to identify and secure the scene. *See, e.g.*, Compl. ¶¶ 58-60, 75-79. Such utter failure to execute his responsibilities in responding to a scene, drawing all inferences in Mr. Grega's favor, suggests a faulty training program and that it was obvious that more/different training was necessary to ensure that officers responding to crime scenes would know how to identify and secure them to preserve as much evidence as possible to allow for an adequate investigation.

Moreover, while Mr. Grega believes the allegations in the Complaint sufficiently establish a failure to train/supervise claim, in the proposed Amended Complaint, Mr. Grega has provided additional allegations regarding the actions of the Dover Chief of Police and a Dover Detective in the first few hours of the investigation into the death of Christine Grega that bolster the current claim against Dover and establish additional bases for Dover's liability. Am. Compl. 71-76, 80-91, 107. These added allegations demonstrate that the First Dover Officer was not the only member of the Dover Police who failed in his duties to identify and secure the scene. Am.

Compl. 71-76, 80-91, 107.  In fact, all three members of the Dover Police who responded to the Unit that night failed to identify and secure the scene in a timely manner, Am. Compl. 71-76, 80-91, 107; this failure, drawing all inferences in Mr. Grega's favor, similarly suggests a faulty training program and that it was obvious that more/different training was necessary.

### 3.    There is no need at this stage for Mr. Grega to identify the specific deficiency in Dover's training of its police officers.

Mr. Grega need not identify, at the pleading stage, the specific deficiency in Dover's training of its officers.  Dover relies on *Amnesty America* as well as *Bourn v. Gauthier*,  No. 1:09-cv-00212-jgm, 2011 WL 1211569 (D. Vt. Mar. 29, 2011) for the proposition that Mr. Grega must plead a specific deficiency in Dover's training program and explain how that deficiency was closely related to the constitutional violations.  Dover Mot. at 6.  Neither case, however, stands for this proposition.  *Amnesty America* and *Bourn v. Gauthier* were in a summary judgment posture and thus provide no guidance as to what is necessary at the pleading stage. *Amnesty Am.*, 361 F.3d at 130-31 (affirming summary judgment because plaintiff had "proffered no *evidence*" on training program and its connection to constitutional violations) (emphasis added); *Bourne*, 2011 WL 1211569, at *5-6 (granting summary judgment where court found no *record evidence* to support failure to train claim).  Moreover, just after the sentence from *Amnesty America* that Dover cites,[31] the court provides the following explanatory footnote:

> [I]n *Walker v. City of New York* … we held that the plaintiff should have an opportunity to prove, after discovery, that the city had failed to train its assistant district attorneys and police officers, and that the need for better training was so obvious that the failure to train would amount to deliberate indifference.  Because the district court had dismissed Walker's case at the motion to dismiss stage, rather than on summary judgment, we did not require him to identify a specific deficiency in the district attorney's training program or to establish a causal link between the lack of training

---

[31]    That "plaintiffs [must] identify a specific deficiency in the city's training program and establish that the deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Dover Mot. at 6 (quoting *Amnesty Am.*, 361 F.3d at 129).

> and the misconduct.  It is unlikely that a plaintiff would have information
> about the city's training programs or about the cause of the misconduct at
> the pleading stage, and therefore need only plead that the city's failure to
> train caused the constitutional violation.  After discovery, on the other
> hand, a plaintiff is expected to proffer evidence from which a reasonable
> factfinder could conclude that the training program was actually
> inadequate, and that the inadequacy was closely related to the violation.

*Amnesty Am.*, 361 F.3d at 130 n.10 (internal citations omitted).

Some district courts within the Second Circuit have questioned whether the *Walker* and

*Amnesty America* language survives *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See, e.g., Simms v. City of New York*, No. 10-CV-3420

(NGG)(RML), 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011) (collecting cases);

*Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, at *9 (D. Vt. Apr. 8, 2013) (Reiss, J.).  The

Second Circuit has not addressed this question, and several district courts within the Second

Circuit continue to apply the lenient *Amnesty America* standard.  *See, e.g., Ferrari v. County of*

*Suffolk*, 790 F. Supp. 2d 34, 45-46 (E.D.N.Y. 2011) (citing and applying the lenient *Amnesty*

*America* standard).  In *Michael v. County of Nassau*, the court explained why the lenient *Amnesty*

*America* standard should survive:

> On the surface, it might be argued that *Amnesty America* conflicts with the
> *Iqbal* and *Twombly* standard, by permitting a plaintiff to assert a Monell
> 'failure to train' claim without amplifying the complaint with enough facts
> to render the claim 'plausible'.  But such an argument sees the forest while
> ignoring the trees.  The Supreme Court has instructed that assessing a
> complaint's plausibility 'is context specific, requiring the reviewing court
> to draw on its experience and common sense.'  *Iqbal*, 129 S.Ct. at 1940.
> Though pre-*Iqbal*, the Second Circuit, drawing upon its experience and
> common sense, has recognized that plaintiffs should be afforded a lenient
> pleading standard on failure to train claims, because they have no realistic
> way to learn about a municipality's training programs without discovery.

No. 09-CV-5200(JS)(AKT), 2010 WL 3237143, at *4 n.2 (E.D.N.Y. Aug. 11, 2010); *see also*

*Williams v. City of New York*, 690 F. Supp. 2d 338, 344 (S.D.N.Y. 2010) (continuing to apply

*Amnesty America's* lenient pleading standard post-*Iqbal* and *Twombly*).  The Court should apply *Amnesty America* here and find that Mr. Grega states a claim for failure to train/supervise.

In sum, Dover's arguments for its dismissal from Count VI are unavailing.

## V.   CONCLUSION.

For the foregoing reasons, all pending Rule 12 Motions should be DENIED.

Dated at Boston, Massachusetts this 15th day of December, 2014.

Respectfully submitted,

 */s/ Ian P. Carleton*
Ian P. Carleton, Esq.
Sheehey Furlong & Behm P.C.
30 Main St., Gateway Sq., 6th Fl.
PO Box 66
Burlington, VT  05402-0066
(802) 864-9891
icarleton@sheeheyvt.com

 */s/ Jacob N. Tabor*
Joseph F. Savage, Jr., Esq.
Chad W. Higgins, Esq.
Jacob N. Tabor, Esq.
B. Aidan Flanagan, Esq.
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA 02109
jsavage@goodwinprocter.com
chiggins@goodwinprocter.com
jtabor@goodwinprocter.com
aflanagan@goodwinprocter.com

## CERTIFICATE OF SERVICE

I, Jacob N. Tabor, counsel for Plaintiff John C. Grega, do hereby certify that on

December 15, 2014, I filed with the Clerk of Court the following document:

## PLAINTIFF'S OPPOSITION
## TO ALL PENDING MOTIONS TO DISMISS

using the CM/ECF system.  The CM/ECF system will provide service of such filing via Notice

of Electronic Filing (NEF) to the following NEF parties:

> Jonathan T. Rose, Esq.
> Todd Daloz, Esq.
> Vermont Office of the Attorney General
> 109 State Street
> Montpelier, VT  05609
>
> Colin K. McNeil, Esq.
> Nancy G. Sheahan, Esq.
> McNeil, Leddy & Sheahan, P.C.
> 271 South Union Street
> Burlington, VT  05401

Dated at Boston, Massachusetts this 15th day of December, 2014.


> JOHN C. GREGA
>
>
> /s/   Jacob N. Tabor
> Jacob N. Tabor, Esq. (*pro hac vice*)
> GOODWIN PROCTER LLP
> Exchange Place, 53 State Street
> Boston, MA 02109
> (617) 570-1000
> jtabor@goodwinprocter.com