UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 18   AM 10: 28

CLERK
BY_____
DEPUTY CLERK

JEFF GREGA, in his capacity as Executor of )
Estate of JOHN C. GREGA, )
)
    Plaintiff, )
)
    v. )          Case No. 5:14-cv-00147
)
WILLIAM PETTENGILL, in his individual )
capacity; DAN M. DAVIS, in his individual )
capacity; GLEN CUTTING, in his individual )
capacity; RICHARD HOLDEN, in his )
individual capacity; and TOWN OF )
DOVER, )
)
    Defendants. )

**OPINION AND ORDER RE:**
**DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**
**(Docs. 25, 59)**

Plaintiff John C. Grega brought this action under 42 U.S.C. § 1983 against defendants William Pettengill, Dan M. Davis, Glen Cutting, and Richard Holden in their individual capacities, and against the Town of Dover, Vermont. John Grega died in a motor vehicle accident on January 23, 2015. His executor, Jeff Grega, has been substituted as the plaintiff in this action. For simplicity, this order refers to the claims and allegations made by John Grega.

Grega claims that defendants violated his constitutional rights and state laws in connection with the investigation and prosecution of Grega for the murder of his wife, Christine. Presently before the court are defendants' motions to dismiss Grega's claims for failure to state a claim. A motions hearing was held on June 16, 2015. For the reasons set forth below, the Town of Dover's motion (doc. 59) is GRANTED, and the individual defendants' motion (doc. 25) is GRANTED in part and DENIED in part.

1

## I.    Factual Background

Grega's amended complaint alleges the following facts, which for purposes of this motion the court assumes to be true. (Doc. 53 at 6-49.)

### A.    Events Preceding Christine Grega's Death

John and Christine Grega met as students at St. John's University in 1983. They married in 1985, after each had graduated. The couple settled in New York in 1987, when Grega joined his family's window cleaning business. The Gregas had their first and only child, John Henry Grega, Jr., in 1992. In September 1994, the family was living in Lake Grove, New York.

On September 10, 1994, the Grega family drove from Long Island, New York to the Timber Creek Condominium Complex in Dover, Vermont, for the first leg of a family vacation. They stayed in Unit 69, owned by a former business associate of the family window cleaning business. The Gregas planned to continue their vacation in a family cabin in upstate New York after their stay in Dover. On September 11, 1994 the Gregas shopped, attended a ski show, and dined at a local restaurant. On September 12, the Gregas went to Santa's Land in Putney, Vermont, ate lunch at a McDonald's, and returned to the condo in the mid-afternoon.

In the late afternoon of September 12, Grega took John Jr. out while Christine stayed in the condo alone. Grega and John Jr. went to a playground, and then drove around looking for a restaurant. Grega never stopped at a restaurant, and eventually John Jr. fell asleep in his car seat. Grega returned to the condo to prepare John Jr.'s bed, leaving him asleep in the car. Grega discovered Christine motionless in the bathtub downstairs. He pulled her out of the bathtub, placed her face-up on the bathroom floor, and attempted to perform CPR on her.

Unit 69 had no telephone, so Grega ran to the closest occupied unit, Unit 72, in order to make an emergency call. The Unit 72 occupants heard Grega yell something to the effect that his wife had fallen in the tub and his son was asleep in the car. Fearing for their own safety, they refused to open the door to Grega until he produced his son. Grega retrieved John Jr. from the car, handed him over to the Unit 72 occupants, told them to make an emergency call, and ran back to Unit 69. The Unit 72 occupants made an emergency call around 8:30 p.m.

### B.      The First Response

A Dover police officer ("Dover Officer") arrived at Unit 69 at 8:36 p.m.  He found Grega sobbing on the floor next to Christine.  Upon noting Christine's pallid blue color, he determined—"contrary to standard operating procedure"—that attempting to resuscitate her would be of no use, and did not do so.  (*Id.* at 12.)  He called dispatch to inform them there had been a fatality.

Around 8:40 p.m., an emergency medical technician ("First EMT") arrived.  The First EMT evaluated Christine's vital signs, thought he felt a pulse, and instructed the Dover officer to help him perform CPR.  The initial chest compressions resulted in copious amounts of water flowing out of Christine's nose and mouth, followed by large quantities of vomit.  The First EMT then stopped attempting CPR.

A Deerfield Valley Rescue ambulance along with a senior EMT ("Senior EMT") arrived a few minutes later.  The Senior EMT entered the unit to hear a man's "primal scream," which was Grega crying hysterically in the downstairs bedroom while the Dover Officer tried to console him.  (*Id.*)  Upon arrival, the Senior EMT was "shocked" that neither the Dover Officer nor the First EMT was performing CPR, and noted that the First EMT seemed overwhelmed and disoriented.  (*Id.*)  The Senior EMT ordered that CPR recommence.  CPR was unsuccessful, and Christine was carried to an ambulance, which departed for the local hospital.

A regional medical examiner continued life-saving efforts in the ambulance, but was unsuccessful.  He pronounced Christine Grega dead at 9:10 p.m., and rerouted the ambulance to the Deerfield Valley Health Center and then to a funeral home.

The Chief of the Dover Police ("Police Chief") arrived at Unit 69 at 9:10 p.m.  He observed no crime scene tape cordoning off the unit.  However, he did not order the Dover Officer to secure the scene or restrict access to it, even after he became suspicious that Christine's death was not accidental.  (*Id.* at 13-14.)

The Police Chief then ordered a detective ("Dover Detective") to come to the unit and secure the scene.  The Dover Detective arrived around 10:00 p.m.  He designated only the downstairs bathroom as a crime scene, and responders "move[d] freely" through the upstairs

portion of the unit. (*Id.* at 15.) Consequently, the top floor of the unit had been "contaminated" by around midnight that night, according to a Vermont State Police detective. (*Id.*) No log was maintained recording the people who entered or exited the crime scene. Nor did the Dover Detective or Dover Officer preserve any evidence "of a temporary nature" in the downstairs section of the unit. (*Id.*) Grega alleges that this procedure did not comply with Dover Police Department training materials regarding identifying and securing a crime scene. According to the Dover Detective's testimony, "he was not aware of any protocol to secure a scene" and he did not recall "receiving any training on securing a crime scene." (*Id.*)

An autopsy was performed on Christine's body on September 13. It revealed evidence of extreme trauma including blunt force head wounds, bruises and abrasions, evidence of choking, severe vaginal injuries, and multiple lacerations to the rectal area. An expert who subsequently examined the autopsy results also identified a fractured hyoid bone. A State forensics medical expert concluded that the rectal injuries were caused by an object the size of a fist, pipe, or bat.

## C.    The State's Investigation

Defendant William Pettengill, a Detective Sergeant with the Vermont State Police ("VSP"), and Defendant Glen Cutting, a VSP Detective Lieutenant, conducted the investigation of Christine Grega's murder. Cutting was in charge of the investigation, and Pettengill was the lead investigator working under Cutting's supervision. Defendant Dan Davis, the Windham County State's Attorney, led the State's prosecution. Davis "was intimately involved in all aspects of the investigation . . . [and] there were continual discussions with . . . Davis as to how to proceed." (*Id.* at 24.)

Cutting and Pettengill arrived at Unit 69 at approximately 1:36 a.m. on September 13, 1994. The area was still not cordoned off upon their arrival. However, they "did not order that the scene be secured in any fashion, that efforts be taken to preserve the evidence of a fleeting nature, or that individuals present in the upstairs of the [u]nit be removed so as to preserve the integrity of any evidence" upstairs—despite the fact that Pettengill "concluded almost immediately" that a homicide had occurred. (*Id.* at 14, 16-17.) Cutting did not declare the entire unit to be a crime scene until after taking a statement from Grega. Still, no crime scene tape was put up around the perimeter of the crime scene, nor was any tamper-proof tape affixed to the

unit's doors until after a search was conducted on September 13. (*Id.* at 27.) Grega alleges that Cutting's and Pettengill's conduct did not comply with VSP's death investigation training manuals. (*Id.* at 17.)

Grega alleges that defendants' investigation was additionally deficient in the following respects:

- Over the course of several hours, nearly two dozen local police officers, state troopers, EMTs (who remained in the condo long after Christine was removed), and other individuals entered and exited the condo unit without reasonable limits;
- Doors, door knobs, faucets, and surfaces were touched without regard for the forensically destructive consequences of doing so;
- Some of the investigative team members did not wear gloves;
- Nobody wore protective booties;
- No photographs of Unit 69 were taken the night of September 12;
- Rooms were disturbed and personal items were moved;
- One EMT used the bathroom and flushed the toilet;
- The fixtures and drain on the bathtub where Christine was found were fiddled with, even though they were at the epicenter of forensic inquiry;
- No forensic samples were collected from the bathtub or the floor of the downstairs bathroom despite the fact that this was the epicenter of forensic inquiry;
- Nothing was done to preserve and collect samples of what appeared to be dried vomit in the shape of a shoeprint in the downstairs bathroom, and no one attempted to identify the source of the vomit shoeprint;
- No forensic samples were taken from the downstairs toilet despite the fact that it appeared as though it had been recently used;
- An empty potato chip bag was tossed into a bundle of the forensically sensitive sheets on which Christine had been carried out to the ambulance;
- No log was maintained to document exactly who entered and exited the scene and at what times;
- Several EMTs wiped down and cleaned up the area where Christine's body was found and treated before any biological evidence was collected from that area. As a result, Deerfield Valley Rescue members failed to collect and preserve any blood from Christine's rectal injuries that pooled onto the backboard on which she was treated;
- No investigator requested the recording of Grega's emergency call to the police from the Unit 72 occupants' phone before it was routinely destroyed.

(*Id.* at 12, 18-19, 21). Grega asserts that these actions and omissions indicate noncompliance with Dover Police Department and VSP training manuals as well as VSP written policies and procedures. (*Id.* at 19-20.)

On September 13, 2014, Detective Cutting assigned a VSP detective ("Search Detective") to oversee the search, identification, collection, and preservation of evidence in the

condo unit.  His oversight was required due to "past issues of professional misconduct among the technicians." (*Id.* at 25.)  Nevertheless, the Search Detective's only supervisory act was to "may[be] have asked one of [the technicians] to check for prints on the washing machine." (*Id.*)  One of the lab technicians who collected and evaluated evidence in the investigation was subsequently decertified as a fingerprint expert "for giving erroneous opinions" in a different trial.  (*Id.* at 26.)

Defendants focused on Grega as the only suspect within a few hours of his emergency phone call.  Defendants interviewed him at least five times during the thirty-six hours following his emergency phone call without informing him of his *Miranda* rights.  Grega alleges that they also selectively tape-recorded the interviews in order to make Grega appear in the most culpable light possible.  (*Id.* at 24.)  Pettengill testified that he "never considered the possibility that someone other than . . . Grega had entered Unit 69 and killed Christine." (*Id.* at 31.)

Grega alleges that the focus on him as the primary suspect led to additional investigatory failures.  Defendants only attempted to obtain fingerprints from the washing machine, which the State's fingerprint expert testified matched Grega's.  Because they did not consider that the perpetrator could have been an intruder, defendants never attempted to fingerprint any doors or door knobs to the unit.  They also never attempted to fingerprint the door or doorknob to the downstairs bathroom, the tub, the "switch for the ceiling heat fixture," or the toilet in the downstairs bathroom.  (*Id.* at 26.)  Nor did defendants attempt to obtain fingerprints from Christine's body.  Cutting testified that he did not know what had been fingerprinted but that "he would like to think the entire [u]nit was processed for fingerprints because that would be 'good police practice.'"  (*Id.* at 27.)  Pettengill knew that only the washing machine had been fingerprinted but did not order anything else to be fingerprinted.

Defendants also allegedly ignored other leads.  Two seasonal workers, Bryant Comi and Michael Carpenter, had been painting the building in which the condo unit was located on the day of Christine's death.  They provided false addresses to investigators and gave conflicting stories about their whereabouts that day.  Comi had a criminal record, "including a history of sexual aggression towards women"; smoked Marlboro cigarettes (a piece of a Marlboro cigarette carton had been found in a toilet in Unit 69); admitted to having previously burglarized a condo unit in that complex; and stated that he "'may have joked about the death of a lady and joked that

he had killed the lady' to his girlfriend." (*Id.* at 29.)  The testimony of Carpenter's then-wife and of Comi's then-girlfriend's case worker corroborated Comi's implication in the murder. Moreover, the locks to Unit 69 could be opened by keys not meant for the locks; many workers had access to a lock box of keys to the condo units in the complex; and other condo units had recently been broken into. (*Id.* at 31.)  Despite these facts, Comi and Carpenter were not interviewed until June 1995, two weeks before Grega's trial. (*Id.* at 30.)

On December 19, 1994, Davis and Pettengill filed an information against Grega that charged him with the murder of Christine Grega.  Grega was arrested on December 21, 1994.

### D.    Claims that Fabricated Evidence Was Introduced at Trial

The Search Detective wrote a report detailing the results of his September 13, 1994 inspection of Unit 69.  According to his report, the contents of the refrigerator included "'a full six pack of Long Trail Ale bottles in their container.'" (*Id.* at 33.)  At a deposition that took place in 2012, during Grega's re-prosecution, the Search Detective confirmed that he found all six bottles in the six-pack container in the refrigerator during his search.  He also testified that he pulled one bottle out of the six-pack, placed it on the counter, and photographed it there, in order to show that the brand was Long Trail Ale. (*Id.* at 34.)  The Search Detective replaced the bottle on a shelf in the refrigerator, and *not* back inside the six-pack container.  A photograph was subsequently taken of the contents of the refrigerator.  This photograph was introduced at trial as Trial Exhibit 84. (*Id.* at 34 n.4.)

Davis conducted the direct examination of the Search Detective at Grega's trial.  To prepare himself and witnesses for trial, as a general practice Davis reads all of the witnesses' written reports and prior statements.  Therefore, Davis knew or should have known that at the time of the Search Detective's search of the condo unit on September 13, 1994, all six Long Trail Ale bottles were inside their container.  At trial, the Search Detective testified that "'[t]here was a 6 pack of Long Trail Ale bottles.'" (*Id.* at 35.)  Davis did not ask the Search Detective to elaborate on the location of all six of the Long Trail Ale bottles.  Davis questioned the Search Detective about a video and other photographs that had been taken at the time of the search

under the Search Detective's supervision.  However, Davis did not question the Search Detective about Trial Exhibit 84.[1]

Instead, Davis questioned Detective Pettengill about Trial Exhibit 84.  Davis asked Pettengill if the photograph accurately depicted the contents of the refrigerator as he had observed them on September 19 and not on September 13, before the Search Detective had removed the Long Trail Ale bottle and replaced it in a different location.

The State's forensic medical expert had concluded that the object that had caused Christine Grega's severe rectal injuries was the size of a fist, pipe, or bat.  In closing, Davis argued to the jury that Grega had used a Long Trail Ale bottle to assault Christine Grega and that the very Long Trail Ale bottle used was the one depicted in Trial Exhibit 84 standing on a shelf in the refrigerator apart from the others inside the six-pack container.  Davis argued:

> The photo of the Long Trail Ale, there is one out of the six pack on the shelf of the refrigerator.  The state submits that the Defendant when he came back put the Long Trail Ale there.  Ask yourself why is the one beer off to the side there?  Looks just a little smaller than the head of a baseball bat.

(*Id.* at 33.)  Defendants never fingerprinted the Long Trail Ale bottle, nor did they run any forensic tests on it.

Grega was convicted of aggravated murder on August 4, 1995.  He was sentenced to life imprisonment without parole.

### E.      The Re-Investigation and Re-Prosecution

In the spring of 2010, Grega filed a petition for post-conviction DNA testing under Vermont's Innocence Protection Act.  After a bench trial on September 2, 2011, the Windham County Superior Court ordered the State to perform testing on eight items, including swabs from the rape kit.  On May 14, 2012, DNA testing revealed the presence of an unknown male's DNA on rectal swabs from the kit.  Grega was excluded as the source of that DNA.  As a result, the

---

[1]  At the June 16, 2015 hearing, counsel for Grega stated that the Search Detective did not testify at trial.  Grega's complaint alleges that he did testify at Grega's trial.  On a motion to dismiss, the record before the court does not include the state court trial transcript.  The court need not resolve this factual inconsistency because Grega alleges in any case that Davis read the Search Detective's report before Grega's trial and this allegation is plausible whether or not the Search Detective testified.

Windham County Superior Court vacated Grega's conviction on August 21, 2012.  After serving seventeen years and eight months in prison, Grega was freed on August 22, 2012.

The Windham County State's Attorney continued the prosecution against Grega for Christine's murder after his conviction was vacated.  Defendant Richard Holden, a VSP Detective Sergeant, had responsibility for re-investigating Christine Grega's murder.  The re-investigation centered on attempting additional testing of DNA evidence preserved from the crime scene.

A laboratory identified by Grega as "Strand" tested the DNA evidence from Grega's case.  Grega alleges that an Assistant Attorney General involved in the case falsely told Strand that the rectal swab containing the unknown male's DNA was "'negative for seminal fluid.'" (*Id.*)  Consequently, the laboratory "discarded the extract," rendering it impossible to conclusively determine whether the unknown male's DNA came from sperm cells.  (*Id.*)  Dr. Buel, Director of the Vermont Crime Laboratory, stated in part in an email to the Windham County State's Attorney:

> [T]he extraction technique [Strand] used would not have lysed the sperm cells so the profile they generated is probably mostly epithelial cells (the DNA from the sperm—if they were present on this swab—was thrown away…..)  I was quite surprised by this…..  Was I involved in having this swab analyzed by Strand?

(*Id.* at 41.)  Two minutes later, the State's Attorney responded: "The sperm, if any, was thrown away!?!?!??!?!!?  No, neither you nor I was involved in the Strand analysis.  The AG's office, working with the VFL, got me into this mess……." (*Id.*)

Detective Holden testified that there were three possible explanations for the presence of the unknown male's DNA on the rectal swab: the DNA belonged to the perpetrator; the swab was contaminated; or the DNA was transferred to Christine's rectum from some object of assault such as the Long Trail Ale bottle.  (*Id.* at 42.)

Grega alleges that the possibility of contamination was ruled out by the collection of buccal swabs from thirty males who were involved in the investigation of Christine's murder; none of the thirty males' DNA matched the unknown male's, so the rectal swab was likely not contaminated by a responder or investigator.  Grega asserts that the third option was ruled out by Detective Holden's own statement that the transference theory was "'water cooler talk'" and "'a

long shot'"; the fact that the theory was "so far-fetched and without scientific basis" that Holden and the State's Attorney could not find a forensic expert willing to support it; and the fact that Holden never had the Long Trail Ale bottle forensically tested or DNA-tested to determine whether it contained the unknown male's DNA.  (*Id.* at 41-43.)  Therefore, Grega asserts that according to Holden's own testimony, the only explanation that remained was that the unknown male—clearly not Grega—was the perpetrator.

Grega alleges that Detective Holden also failed to realize that the Long Trail Ale bottle evidence was fabricated.  (*Id.* at 40-41.)

Grega also claims that Detective Holden and the State's Attorney intentionally obstructed and delayed the pre-trial process.  At the November 6, 2012 pre-trial conference, the Vermont Superior Court set a ninety-day deadline for additional DNA testing.  The State's Attorney twice requested and received an extension in which Holden could complete testing, with a final deadline of August 23, 2013.  However, during this time Holden's testing activity produced nothing but unhelpful buccal swabs.  Additionally, Holden continually changed his mind about the number of items he planned to get tested, ending with only an intention to confirm that the swabs to be tested came from Christine Grega—which was, according to Grega, "a completely useless exercise without evidentiary significance."  (*Id.* at 44.)  Nonetheless, Holden continued to advocate for Grega's re-prosecution until August 21, 2013, two days before the DNA testing deadline set by the court.

Defendant Davis reappeared on the scene during Grega's re-prosecution, even though he had returned to private life.  He was quoted in a July 28, 2012 article published in *Newsday*, a Long Island newspaper in wide circulation in Grega's hometown.  The article recounted how Davis "remained stalwart in his victory in convicting Mr. Grega despite the significance of the recently discovered unknown male DNA."  (*Id.* at 46.)

The State was unable to determine the source of the unknown male DNA found on the rectal swabs.  The re-prosecution ended on August 21, 2013, when the Windham County State's Attorney filed a notice of dismissal without prejudice.

F.      **Grega's Legal Claims**

On July 14, 2014 Grega filed this action alleging that defendants deprived him of various constitutional rights in violation of 42 U.S.C. § 1983.  Grega also makes several state law claims.

Specifically, Grega claims: defendants Pettengill and Davis failed to investigate and destroyed exculpatory evidence in violation of § 1983 (Count 1); defendant Pettengill falsified evidence and failed to disclose the false evidence in violation of § 1983 (Count 2); defendant Pettengill conspired with at least one other individual to violate Grega's civil rights through falsification of evidence in violation of § 1983 (Count 5); defendants Pettengill and Holden maliciously prosecuted Grega, in violation of § 1983 and state law (Counts 3, 7, 9); defendants Pettengill and Holden falsely imprisoned Grega in violation of § 1983 and state law (Counts 4, 8, 10, 12); defendants Cutting and Pettengill failed to train inferiors and failed to supervise the investigation of Christine Grega's murder, in violation of § 1983 (Count 6); defendant Town of Dover failed to train its employees and failed to supervise the investigation of Christine Grega's murder in violation of § 1983 (Count 6); defendants Pettengill, Davis, and Holden intentionally inflicted emotional distress upon Grega (Count 11); and defendant Davis defamed Grega (Count 13).

Grega alleges various injuries resulting from defendants' alleged unconstitutional and tortious behavior, including: seventeen years and eight months of wrongful incarceration; a damaged relationship with his son; emotional distress, including post-traumatic stress disorder (PTSD); and physical and mental health problems due to his time in prison.  He requests compensatory and punitive damages.  Defendants have moved to dismiss all of Grega's claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

II.      **Standard of Review**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but to survive a motion to dismiss it must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . , when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 678-79. This is a context-specific task that draws on both "judicial experience and common sense." *Id.* If a plaintiff has failed to "nudge[ ] [his] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, the claims must be dismissed.

When reviewing a Rule 12(b)(6) motion to dismiss, the court's consideration is limited to "the facts as presented within the four corners of the complaint . . . or to documents incorporated within the complaint by reference." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). The court may also consider documents in the public record. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

## III.     Analysis and Conclusions

### A.     Failure to Investigate and Destruction of Exculpatory Evidence (Count 1)

Grega first claims that Pettengill's and Davis's response to the crime scene and their subsequent investigation were riddled with errors and that these errors wrongly caused defendants to charge Grega with Christine's murder; negatively affected his ability to defend himself at trial; and ultimately led to his wrongful conviction and incarceration. He claims defendants violated his constitutional right to due process by "deliberately and/or recklessly fail[ing] to investigate adequately, as any minimally competent officer would have, whether someone other than Mr. Grega was the Perpetrator . . . ." (Doc. 53 at 49.) He specifically alleges that defendants:

> (a) fail[ed] to fully and appropriately investigate the evidence of the death of Christine Grega; (b) fail[ed] to discover and preserve the vast majority of evidence present at the crime scene, including any exculpatory evidence, even though Mr. Grega's Innocence Protection Act proceedings clearly demonstrate that such exculpatory evidence existed at the time; (c) destroy[ed] exculpatory evidence of the Perpetrator by failing to follow procedures with regard to securing the scene, avoiding contamination of the scene, preserving evidence, collecting evidence, and conducting an adequate canvass of potential witnesses and/or suspects; and/or (d) fail[ed] to follow through on obvious leads into suspects other than Mr. Grega. Moreover, they prematurely ended their investigation even

12

though another person with a history of violence confessed to being involved in the murder.

(*Id.* at 49-50.)

The court construes Grega's Count 1 to make a claim of failure to investigate and an additional claim of destruction of exculpatory evidence.

### i.       Failure to Investigate

Section 1983 is not a source of substantive rights but is "a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege: (1) the deprivation of a right, privilege, or immunity secured by the Constitution or laws, (2) by a person acting under color of state law. 42 U.S.C. § 1983. Defendants contend that Grega's failure-to-investigate claim fails because the Due Process Clause does not confer upon potential criminal defendants a right to an investigation that meets a minimum standard. (Doc. 25-1 at 22.) They point to cases in which courts rejected failure-to-investigate claims and incorporated allegations of failure to investigate into claims of false arrest or malicious prosecution—conduct which violates the Fourth Amendment. *See, e.g.*, *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007) (concluding the right to be protected from a sustained detention "stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence . . . fits comfortably under the coverage of the Fourth Amendment" rather than under substantive due process).

Grega argues that the Second Circuit cases that connect "failure to investigate" claims with claims of Fourth Amendment violations are distinguishable from his because he alleges a different harm. Grega contends that defendants' shoddy investigation caused not his physical detention—which is Fourth Amendment territory—but his inability to mount an effective defense at trial—a harm that is rooted in due process. (Doc. 37 at 16-20.) The Second Circuit has recognized that "ensuring the reliability of any criminal verdict" is within the purview of the Due Process Clause. *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (holding that due process requires disclosure of *Brady* material in time for effective use by defense). Grega claims that defendants' investigation damaged the integrity of the trial process. Defendants accuse Grega of attempting to "shoe-horn" his allegations into a cause of action which necessarily fails. (Doc. 45 at 3.) In fact, Grega attempts to distinguish other similar causes of action from his own.

He does not seek to use a shoehorn; he seeks to develop new shoes by creating a new basis for relief.

Decisional law within the Second Circuit recognizes that the due process right to a fair trial may be impaired by a *Brady* violation or by destroying or fabricating evidence. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000); *United States v. Bakhtiar*, 994 F.2d 970, 975 (2d Cir. 1993). *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." A *Brady* violation has three components: "'[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.'" *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Grega's allegations in support of his "failure to investigate" claim fall short of alleging a *Brady* violation. He does not point to any exculpatory evidence that defendants possessed and suppressed. Likewise, Grega's failure-to-investigate claim is distinct from a claim of evidence fabrication, which he alleges separately in Count 2.

Grega instead argues that a criminal defendant's right to mount a proper defense at trial—the due process concern that leads to the duty to disclose announced in *Brady*—also imposes a duty on those conducting a crime scene investigation to do so without recklessness or intentional misconduct. The "new shoes" which Grega seeks to develop is essentially a malpractice standard based upon "reckless" conduct. In so doing, Grega advocates for an expansion of the range of government conduct that amounts to a violation of a criminal defendant's right to a fair trial in this circuit.

The Eighth Circuit has recognized the cause of action that Grega asserts. In *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001), it extended the due process rights of criminal suspects by imposing upon investigators a duty to follow up potential leads such that potentially existing exculpatory material is not recklessly overlooked. *Id.* at 957 ("Law enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly as illustrated by the *Brady* line of cases requiring the state to disclose exculpatory evidence to the defense.") It is easy to see how a recklessly conducted

14

investigation later impairs the criminal defendant's ability to defend himself at trial.  After all—as the Vermont State training manuals cited by Grega emphasize—the investigation can only be done once, and it is in the State's, and not the criminal defendant's, hands.  (Doc. 53 at 17) ("'In every death investigation enter the scene and assume that it is a homicide. . . . Remember: you can never go back and do it over!'") (quoting VSP death investigation training manuals, dated 1990); *see also id.* at 19-20 ("'What an officer does, or fails to do, in protecting and preserving the crime scene may materially affect the outcome of a case.'") (quoting *Criminal Investigations Introduction*, 4-6.0 (Oct. 1983)).

In *Wilson*, investigators elicited a false murder confession from Wilson, a mentally disabled individual, and secured a guilty plea from him in the absence of reliable corroborating evidence and despite leads indicating that another individual was involved in the murder.  260 F.3d at 949, 957.  After nine years in jail, Wilson was pardoned.  *Id.* at 949.  The Eighth Circuit recognized Wilson's liberty interest in obtaining fair criminal proceedings.  *Id.* at 956 n.8.  It then found "no countervailing equally important governmental interest that would excuse the [defendants-appellants] from fulfilling their responsibility to investigate these leads when faced with an involuntary confession and no reliable corroborating evidence." *Id.* at 957.  The court concluded that, while "[n]egligent failure to investigate other leads or suspects does not violate due process," reckless failure to investigate does. *Id.* at 955, 957.  The Eighth Circuit thus "recognized a substantive due process cause of action for reckless investigation . . . where [it] identified the liberty interest at stake as the interest in obtaining fair criminal proceedings." *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008) (internal citation and quotation omitted).

However appealing the Eighth Circuit's reasoning may appear, the Second Circuit has yet to recognize a claim that a state officer's reckless failure to investigate all aspects of a crime violates the due process rights of the accused.  This point alone does not preclude this court from recognizing such a cause of action.  Developments in the law must start somewhere.  However, to allow this claim to go forward would alter existing standards of governmental liability in ways that case law indicates the Second Circuit would deem unwise. *See United States v. Okatan*, 536 F. App'x 18, 20 (2d Cir. 2013) (noting that right to due process is violated by failure to preserve evidence only if the evidence's exculpatory value was apparent before it was destroyed); *Martinsky v. City of Bridgeport*, 504 F. App'x 43, 46 (2d Cir. 2012) ("[P]olice officers are not

required conclusively to eliminate all alternative explanations offered by a suspect where the evidence reasonably indicates that the suspect may have committed a crime."); *Virgil v. Town of Gates*, 455 F. App'x 36, 40 (2d Cir. 2012) ("If probable cause is established, there is no constitutional right, whether under the Fourth or Fourteenth Amendment, to demand further investigation before arrest or prosecution."); *see also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)[2] (declining to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution" and requiring showing of bad faith to state claim that police's "failure to preserve potentially useful evidence . . . constitute[s] a denial of due process of law").

Moreover, other district courts in this circuit have consistently declined to recognize a claim of "failure to investigate" as a violation of due process giving rise to a damages action. *See, e.g.*, *McCaffrey v. City of New York*, No. 11 Civ. 1636(RJS), 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' claim is not independently cognizable as a stand-alone claim . . . ."); *Edwards v. City of New York*, No. 10-CV-01047(ARR)(LB), 2011 WL 5024721, at *2 (E.D.N.Y. Oct. 18, 2011) ("[P]laintiff's failure to investigate claim does not assert an independent ground for relief . . . ."); *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) (noting "there is no constitutional right to an adequate investigation" and dismissing claim that defendants deliberately or recklessly failed "to conduct a constitutionally adequate investigation"); *Blake v. Race*, 487 F. Supp. 2d 187, 212 n.18 (E.D.N.Y. 2007) (rejecting claim of failure to investigate as a violation of due process). Grega attempts to distinguish these cases for various reasons, such as pleading failures on the part of plaintiffs or because the court did not consider whether the cause of action could exist under the Fourteenth Amendment specifically. (Doc. 37 at 18-19.) Even so, the court finds it persuasive that other

---

[2] Defendants contended at the June 16, 2015 hearing that *Youngblood* bars recognizing a failure-to-investigate cause of action and that Grega's reliance on *Wilson* is misplaced because *Wilson* is inconsistent with *Youngblood*. The court does not agree. While *Youngblood* reaffirmed an ongoing concern with courts imposing hindsight judgment upon police officers' investigatory decisions, it did not foreclose any and all claims stemming from the recklessness of an investigation; it merely required a showing of bad faith to satisfy a due process claim where police failed to preserve potentially exculpatory evidence. *Wilson*, which requires a showing of recklessness for due process claims arising from investigatory failures, is not necessarily inconsistent with *Youngblood*'s bad-faith requirement for the destruction of potentially exculpatory material. The court does, however, read *Youngblood* as counseling against recognizing Grega's proposed failure-to-investigate cause of action.

district courts within the Second Circuit have uniformly declined to recognize the cause of action Grega advocates.

Along with other courts in this circuit, this court is not willing to recognize the claim Grega advocates in the face of precedent indicating it should be rejected. "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *California v. Trombetta*, 467 U.S. 479, 486 (1984). It would be imprudent to announce the arrival of a new legal standard and potentially broad remedy without clear guidance from the appellate courts.

Because in this circuit failure to investigate is not a recognized basis for relief under the Due Process Clause, Grega's version of the proposed claim—while forceful—fails. His cause of action against defendants Pettengill and Davis for "failure to investigate" as a violation of due process is dismissed.

### ii.    Destruction of Exculpatory Evidence

In the same count as his failure-to-investigate claim, Grega also alleges that defendants violated his right to due process by destroying exculpatory evidence. Grega asserts two bases for a due process violation: that defendants destroyed exculpatory evidence and that defendants destroyed, in bad faith, evidence that had exculpatory potential. Both claims fail.

The State's duty to preserve exculpatory evidence is a natural extension of its duty under *Brady* to provide access to criminal defendants of all evidence that is "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "[T]his right would be empty if the government could trump it by the simple expedient of destroying evidence harmful to its theory of the case." *Magraw v. Roden*, 743 F.3d 1, 7 (1st Cir. 2014).

Grega argues that the evidence that was inadvertently destroyed by the State's careless investigation necessarily included exculpatory evidence such as additional DNA from the unknown male. (Doc. 37 at 24-25.) This claim bears a strong resemblance to Grega's failure-to-investigate claim. But the State is not required to preserve and disclose exculpatory evidence it never possessed. *Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) (holding that the government is not required to disclose evidence it does not possess or of which it is not aware). Grega argues that defendants should have known that exculpatory evidence could be found in,

17

for example, the pool of blood they wiped up, given that the DNA of an unknown male was found inside Christine Grega's body. (Doc. 37 at 25.) However, defendants were not aware on September 12, 1994 that the crime scene before them contained traces of another male's DNA; this fact would not be discovered until nearly two decades later. The State does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance." *Youngblood*, 488 U.S. at 58.

Grega also fails to state a claim that defendants destroyed potentially exculpatory evidence in bad faith. When the exculpatory value of evidence was unknown at the time of its destruction, a criminal defendant's due process right is only violated if the State destroyed the evidence in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004).

> A criminal defendant is entitled to relief based on the government's pre-trial destruction of (or failure to preserve) potentially exculpatory evidence where: (1) the government acted in bad faith in destroying the evidence; (2) the evidence possessed an exculpatory value that was apparent before it was destroyed; and (3) the defendant was unable to obtain comparable evidence by other reasonably available means.

*United States v. Hunley*, 476 F. App'x 897, 898-99 (2d Cir. 2012) (Summary Order) (citing *Youngblood*, 488 U.S. at 58) (internal quotations and modifications omitted).

Again, the State is only required to refrain from destroying or losing in bad faith potentially exculpatory evidence that it has already gathered or collected. *See Neil v. Walsh*, No. 07 Civ. 6685(DLC), 2009 WL 382637, at *5 (S.D.N.Y. Feb. 17, 2009) (The State "is not, however, required to disclose evidence it does not possess or of which it is not aware, and there is no due process requirement that the government use any particular investigatory tool, including quantitative testing, to secure exculpatory evidence."); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("The *Brady* obligation extends only to material evidence . . . that is known to the prosecutor. An individual prosecutor is presumed . . . to have knowledge of all information *gathered* in connection with his office's investigation . . . .") (emphasis added) (citations omitted).

To the extent Grega alleges that defendants destroyed potentially exculpatory evidence as a result of their reckless investigation, this claim covers the same ground as Grega's failure-to-investigate claim. The failure to conduct an adequate investigation cannot itself be a basis for

bad faith, as Grega urges.  (Doc. 37 at 25.)  To so allow would impose a duty on the State to gather evidence it did not possess or even knew existed.  This court has already rejected imposing such a duty in dismissing Grega's failure-to-investigate claim.  Additionally, "bureaucratic error alone is not a sufficient basis to infer bad faith on the part of the government in its destruction of potentially exculpatory evidence." *Hunley*, 476 F. App'x at 899; *see also Youngblood*, 488 U.S. at 58 (concluding that negligent failure to refrigerate item of clothing and failure to forensically test semen samples did not amount to bad faith destruction of potentially exculpatory evidence).

Further, as noted above, Grega has failed to allege facts tending to show that any exculpatory value of the evidence not collected would have been readily apparent to defendants. *See Trombetta*, 467 U.S. at 489 (holding that the State has a duty to preserve only evidence which "possess[es] an exculpatory value that was apparent before the evidence was destroyed"); *see also Kelley v. Penny*, No. 94-CV-830S, 1996 WL 1015418, at *22 (W.D.N.Y. Sept. 11, 1996) (concluding that recordings of emergency phone calls had only potential exculpatory value and their destruction did not violate due process).  Obviously if the plaintiff does not know what was not found, the court cannot determine what effect it may have had at trial.  For these reasons, Grega has failed to state a claim of destruction of exculpatory or potentially exculpatory evidence.

### B.    Fabrication of Evidence (Count 2)

Grega claims in Count 2 of his amended complaint that defendant Pettengill fabricated evidence that Grega used a Long Trail Ale bottle to commit the assault on Christine and that Pettengill failed to disclose this false evidence.  (Doc. 53 at 50.)  A criminal defendant has a constitutional right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey*, 221 F.3d at 349.  "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial . . . ." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

A plaintiff who makes a falsified evidence claim must allege that "an (1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4)

forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012). Because "§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986), the deprivation of liberty must be caused by the evidence falsification.

Defendants take issue with various aspects of Grega's claim. First, they argue that it is barred by absolute witness immunity. (Doc. 25-1 at 27-28.) It is true that police officers are absolutely immune from liability for damages under § 1983 for giving perjured testimony. *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983)). Defendants' argument, however, misunderstands Grega's claim. He does not allege that Pettengill gave false testimony at Grega's trial. Rather, he alleges that Pettengill fabricated evidence which led to a deprivation of Grega's liberty. The testimony and argument regarding the fabricated evidence, and the resulting effect on the jury, were necessarily the causal mechanism by which it led to a constitutional violation. The alleged unconstitutional behavior, however, is the fabrication of evidence prior to trial and not the specific testimony offered by a police officer regarding the alleged false evidence at trial. "[A] police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Ricciuti*, 124 F.3d at 130 (internal quotation omitted). The fact that Pettengill testified as a witness does not cloak him in absolute immunity from liability for actions taken before trial commenced or outside of the courtroom. *See Paine v. City of Lompoc*, 265 F.3d 975, 978 (9th Cir. 2001) ("[T]here is no reason that [a witness's] participation should be insulated from liability simply because of his dual roles as witness and fabricator . . . .").

Defendants next argue that the Long Trail Ale bottle evidence, even if falsified, was immaterial to the jury's decision to convict Grega. (Doc. 25-1 at 29.) Defendants contend that it "hardly matters . . . whether the beer bottle was inside or outside of the six-pack holder for purposes of determining whether it could have been used as an instrument of sexual assault." (*Id.*) Grega has alleged, however, that the fabricated Long Trail Ale bottle evidence was likely to influence the jury's decision, and the allegation is not implausible. Grega points out that Davis drew special attention to the position of the single Long Trail Ale bottle during his closing

argument to the jury. The assertion that Grega used that particular Long Trail Ale bottle—or indeed any Long Trail Ale bottle at all—to assault Christine becomes compelling largely to the extent a jury believes that the bottle had been removed from the six-pack container and then replaced on the refrigerator shelf by the perpetrator. The court cannot conclude as a matter of law that the jury would have convicted Grega in the absence of the allegedly fabricated Long Trail Ale bottle evidence. *See Maldonado v. City of New York*, No. 11 Civ. 3514 (RA), 2014 WL 787814, at *10 (S.D.N.Y. Feb. 26, 2014) (declining to conclude as a matter of law that allegedly fabricated police report was not a legal cause of plaintiff's confinement).

Finally, defendants argue that Grega has failed to state a claim for evidence fabrication because there was no fabricated evidence. (Doc. 45 at 9-11.) They contend that Grega's factual allegations describe at most "an innocent mistake by a prosecutor in closing argument." (*Id.*) They also argue that the photographic evidence itself was not false and that Pettengill gave no false testimony concerning its authenticity. (*Id.* at 10-11.) In other words, even though the photograph did not portray the contents of the refrigerator as they appeared when first responders arrived at the scene of the crime, it did indeed portray the contents of the refrigerator on September 19, 1994, when Pettengill viewed it. The essence of defendants' argument is that an unretouched photograph can never constitute false evidence outside of the context given it; and in this case, the context was provided by immunized and truthful witness testimony.

This argument fails because a misleading photograph may constitute fabricated evidence. *See Willis v. Blevins*, 966 F. Supp. 2d 646, 658 (E.D. Va. 2013) (concluding that plaintiff stated a claim for fabrication of evidence where blue-light forensic photographs showed "imperfections" in crime scene wall and plaintiff alleged the wall was not damaged at the time of the crime); *Lisker v. City of Los Angeles*, No. CV09-09374 AHM (AJWx), 2013 WL 1276047, at *24 (C.D. Cal. Feb. 4, 2013) (concluding that photographs of reconstructed crime scene constituted false evidence and denying summary judgment on fabrication of evidence claim). Were that not the case then police officers could manipulate a crime scene; photograph the manipulated crime scene; and introduce the photograph, through truthful testimony, as an accurate portrayal of the crime scene at a time certain after it had been manipulated. A plaintiff would have little recourse from such unjust trial tactics except to seek to establish that the photograph did not accurately depict the scene of the crime before any manipulation occurred. The court does not believe the

evidence fabrication case law does or should place such an unfair burden on the defendant in the case of a doctored crime scene.

Grega alleges that Detective Pettengill falsified evidence—in the form of a falsely contextualized photograph—that Grega used a certain Long Trail Ale bottle to commit an assault on Christine.[3]  Grega further alleges that the false evidence that a beer bottle had been found outside of the six-pack container on a shelf in the refrigerator likely influenced the jury's decision.  He claims not only that Pettengill provided the false evidence to Davis, but also that Davis was aware the evidence was false and agreed to present it to the jury.  Finally, Grega alleges that he suffered a deprivation of liberty as a result of the fabricated Long Trail Ale bottle evidence.  He has therefore sufficiently alleged a claim of fabrication of evidence.  Grega's claim of evidence fabrication against Pettengill survives defendants' motion to dismiss.[4]

### C.  Section 1983 Conspiracy to Fabricate Evidence (Count 5)

Grega claims that defendant Pettengill conspired with Davis and perhaps others to introduce the alleged fabricated evidence at trial, to withhold exculpatory and impeachment evidence, and to conduct an inadequate investigation of the crime scene.  (Doc. 53 at 53.)  The elements of a § 1983 conspiracy are: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are

---

[3]  Defendants do not argue that Grega has failed to allege facts sufficient to show Pettengill's personal involvement in the alleged evidence fabrication.  However, for purposes of concluding that Grega has stated a plausible claim, the court notes that Grega has alleged facts—specifically, the fact that Pettengill supervised the crime scene investigation—sufficient to support a claim that *Pettengill* fabricated evidence.  Pettengill's awareness that the alleged fabricated evidence had been forwarded to Davis would suffice to establish his personal involvement.  *See Ricciuti*, 124 F.3d at 129 (holding that reasonable jury could find defendant officer liable for fabrication of evidence where officer "heard the content of the document in question" and knew that some of its contents were false).

[4]  The court does not consider "failure to disclose false evidence" as it is alleged in Count 2 a separate claim.  The forwarding to prosecutors of fabricated evidence necessarily encompasses a failure to disclose the fact that the evidence was fabricated.

insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002).

First, Grega cannot state a claim of conspiracy to violate his constitutional rights by failing to investigate because the Second Circuit does not recognize a failure-to-investigate claim. Therefore, Pettengill's alleged failure to adequately investigate the crime scene could not inflict an unconstitutional injury on Grega. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A] plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights.").

Second, Grega has not adequately pled a claim of conspiracy to withhold exculpatory and impeachment evidence because his allegations supporting the claim are too conclusory to survive a Rule 12(b)(6) motion. To adequately plead a claim of failure to disclose exculpatory or impeachment evidence—a *Brady* violation—a plaintiff must allege that the evidence is favorable to the accused; it was willfully or inadvertently suppressed by the state; and prejudice ensued. *Jackson*, 345 F.3d at 71. Grega, however, does not identify any exculpatory material that Pettengill withheld. He only alleges that Pettengill and Davis agreed to and did "withhold and conceal information from Grega." (Doc. 53 at 53.) Nor can Grega's conspiracy claim be founded on the alleged destruction of exculpatory evidence, for which Grega has also failed to state a claim.

Regarding the claim of conspiracy to fabricate evidence, defendants first argue that "Grega has not alleged any underlying constitutional or statutory violation that could serve as the basis for a section 1983 conspiracy claim." (Doc. 25-1 at 42.) However, as concluded above, Grega has sufficiently pled a claim that Pettengill fabricated evidence and that the false evidence led to a violation of Grega's Fourteenth Amendment right to due process.

Defendants next argue that "Grega's allegations of a conspiracy simply are not plausible" because he has offered only conclusory allegations of a conspiracy that fall short of "suggesting any 'meeting of the minds' or 'concerted action' on the part of Davis and Pettengill to violate his constitutional rights." (Doc. 25-1 at 43.) Grega alleges:

> Pettengill and Davis, and perhaps others, agreed to introduce evidence of a single Long Trail Ale bottle—which, in the photograph introduced at trial was not in the six pack container . . . —in the refrigerator of Unit 69 as the assault weapon, even

though they had no basis whatsoever for believing that the Long Trail Ale bottle
was the assault weapon.

(Doc. 53 at 32.) Grega supports these allegations with well-pleaded, detailed facts regarding the
creation of the misleading photograph and Pettengill's and Davis's access to the Search
Detective's report indicating that the photograph falsely depicted the crime scene. Grega further
alleges that Davis "was intimately involved" in the investigation and investigatory decisions
were made with his input. (Doc. 53 at 24.) Accepted as true, these allegations render plausible
Grega's claim that Pettengill and Davis agreed to introduce fabricated evidence that a Long Trail
Ale bottle was found conspicuously outside of the six-pack container in order to suggest that
Grega had used it to assault Christine. *See Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231,
238-39, 247 (E.D.N.Y. 2013) (holding that plaintiff adequately pled § 1983 conspiracy to
fabricate evidence where his complaint alleged detailed facts concerning police officers'
agreement to "an altered version" of events and to "omit and falsify information in their
reports"). Grega has sufficiently alleged all of the elements of a § 1983 conspiracy claim,
including that an agreement was made to violate his constitutional rights.

### D.     Malicious Prosecution (Counts 3, 7, and 9)
####     i.     Defendant Pettengill

Grega asserts a claim of malicious prosecution against defendant Pettengill under § 1983,
alleging violations of the Fourth and Fourteenth Amendments.[5] He also makes a claim of
malicious prosecution against Pettengill under Vermont law.

A malicious prosecution claim under § 1983 follows the state law standard, *see Fulton v.
Robinson*, 289 F.3d 188, 195 (2d Cir. 2002), so the federal and state law claims are analyzed
together. In Vermont, "a plaintiff must demonstrate that the defendant initiated the prosecution
(1) without probable cause (2) with a malicious intent, and (3) the proceeding terminated in [the]
plaintiff's favor." *Kent v. Katz*, 146 F. Supp. 2d 450, 460-61 (D. Vt. 2001), *aff'd in part*, 312
F.3d 568 (2d Cir. 2002); *see also Czechorowski v. State*, 872 A.2d 883, 895 (Vt. 2005) ("To state

---

[5]  The court considers Grega's malicious prosecution claim as one sounding in the Fourth
Amendment, made applicable to the states by the Fourteenth Amendment. *See Washington v.
Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) ("[T]he Supreme Court, in a plurality
opinion, determined that only violations of the Fourth Amendment could support § 1983 claims
for malicious prosecution.").

a common law claim for malicious prosecution, a plaintiff must demonstrate that a legal proceeding was instituted with malice and without probable cause, that it terminated in favor of the plaintiff, and that it resulted in damages to the plaintiff."). "[M]alicious prosecution claims are routinely brought against state and local prosecutors, law enforcement officers, and investigators for their actions in connection with the filing of criminal proceedings." *Czechorowski*, 872 A.2d at 895-96.

Defendants argue that Grega fails to state a claim of malicious prosecution because he has not sufficiently alleged a lack of probable cause to prosecute him or that the underlying criminal proceeding terminated in his favor. Defendants also argue that Pettengill is entitled to qualified immunity on the malicious prosecution claims. (Doc. 25-1 at 30-38; Doc. 45 at 11-16.)

"Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). "Put simply, the issue with respect to malicious prosecution is whether probable cause exists as of the time the judicial proceeding is commenced, as opposed to at the time of the arrest." *Fanelli v. City of New York*, No. 13 Civ. 1423 (KBF), 2013 WL 6017904, at *4 (S.D.N.Y. Nov. 1, 2013).

"The mere fact that a criminal tribunal found probable cause normally provides a presumption that probable cause existed in the context of a subsequent wrongful prosecution claim." *Lay v. Pettengill*, 38 A.3d 1139, 1147 (Vt. 2011). "That presumption may be rebutted only by evidence that the [probable cause finding] was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010); *see also Lay*, 38 A.3d at 1147 ("This presumption of probable cause is rebuttable only if a plaintiff can demonstrate that the earlier finding of probable cause was based on misleading, fabricated, or otherwise improper evidence."). In considering a motion to dismiss, the court must determine whether, "on the facts asserted in [Grega's] complaint, it appears beyond doubt" that there was probable cause to prosecute Grega. *Hutchins v. Peterson*, 139 F. Supp. 2d 575, 580 (D. Vt. 2001). Probable cause is a complete defense to a claim of malicious prosecution if it is not later nullified by information establishing the defendant's innocence. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).

Defendants point to the December 19, 1994 probable cause finding of the Windham County Superior Court as establishing a presumption of probable cause to charge Grega with murder. The judge found probable cause on the basis of a sworn affidavit submitted by Detective Pettengill.[6]   (Doc. 25-10.)

Grega alleges that any presumption of probable cause supplied by the judge's finding is rebutted because Pettengill's affidavit included misleading information and omitted material information. (Doc. 37 at 33-36.) Yet Grega makes no specific challenge to the content of Pettengill's affidavit, nor does he specify the allegedly material information it omitted. He alludes generally to the exculpatory material evidence that would have been recovered from the crime scene had defendants adequately conducted the investigation. (*Id.* at 34.) Grega cites a case from the Eastern District of Tennessee for the proposition that "where a plaintiff asserts that a reasonable pre-prosecution investigation would have revealed exculpatory facts and there is evidence to support the allegation, the jury is to determine the facts a reasonable investigation would have disclosed, and then make its probable cause determination considering those facts." (*Id.*) (citing *Day v. Ingle's Markets, Inc.*, No. 2:01-CV-325, 2006 WL 239290, at *2 (E.D. Tenn. Jan. 25, 2006), *aff'd*, 227 F. App'x 486 (6th Cir. 2007)). However, this conflicts with Second Circuit case law, which holds that "it is 'of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation'" giving rise to probable cause. *Crawford v. City of New York*, 477 F. App'x 777, 779 (2d Cir. 2012) (citing *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989)); *see also Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 126 (2d Cir. 2009) ("Whether probable cause exists depends upon the reasonable

---

[6] "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011); *see also Manley v. Utzinger*, No. 10 Civ. 2210, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) ("The Court may take judicial notice of public records in deciding a motion to dismiss."). Although the court could take judicial notice of the facts alleged in Pettengill's affidavit—not for their truth, but to establish the basis of the judge's probable cause finding—the court concludes it is not necessary to do so here. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *see also LaRocco v. Jackson*, No. 10-CV-01651 (NGG)(LB), 2012 WL 947554, at *1 (E.D.N.Y. Mar. 19, 2012) (taking judicial notice of plaintiff's guilty plea in dismissing plaintiff's malicious prosecution and false arrest claims for failure to allege lack of probable cause).

conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (quotation omitted)).  Grega's allegations regarding the integrity of the affidavit are not sufficient to rebut the presumption of probable cause established by the state court's finding.  *See Lewis v. City of New York*, 591 F. App'x 21, 22 (2d Cir. 2015) (Summary Order) (affirming dismissal of malicious prosecution claim where plaintiff's complaint failed to rebut the presumption of probable cause created by the criminal indictment).

The court's conclusion that Grega has successfully alleged a fabrication-of-evidence claim against Pettengill does not affect the probable cause analysis in the context of the malicious prosecution claim because probable cause existed independent of the effects of any allegedly fabricated evidence.  *See Morse v. Spitzer*, No. 07-CV-4793 (CBA)(RML), 2012 WL 3202963, at *4 (E.D.N.Y. Aug. 3, 2012) ("[T]he existence of probable cause independent of the allegedly falsified evidence is a defense to that claim but not to the fair trial claim.").  Grega does not allege that the affidavit giving rise to the judge's probable cause finding mentioned the lone Long Trail Ale bottle captured in the allegedly misleading photograph.  Regardless of the effect of the allegedly fabricated photograph on Grega's right to a fair trial, it had no effect on his Fourth Amendment right to be free from prosecution absent probable cause because it was irrelevant to the state court judge's probable cause finding.

Because the court has concluded that Grega has not successfully alleged a lack of probable cause in the underlying prosecution, it need not consider whether Pettengill is also entitled to qualified immunity.  Grega's claims of malicious prosecution against Pettengill under Section 1983 and under Vermont law are dismissed.

### ii.    Defendant Holden

Grega also makes malicious prosecution claims under § 1983 and Vermont law against Detective Holden, who oversaw the State's investigation during Grega's re-prosecution after his release from prison in 2012.

Defendants argue that Grega's malicious prosecution claims fail because Grega has not sufficiently alleged a lack of probable cause to re-prosecute him.  Defendants contend that the Windham County Superior Court's May 3, 2013 probable cause finding, made in the context of

denying Grega's motion to dismiss the indictment, collaterally estops re-litigation of the probable cause issue in this forum.

The court takes judicial notice of the fact that the Windham County Superior Court, in its May 3, 2013 order denying Grega's motion to dismiss the information filed against him in connection with the re-prosecution, concluded that "the State ha[d] provided [Grega] with a description of the charge that satisfie[d] . . . the requirement of probable cause." Order Denying Defendant's Motion to Dismiss, No. 1526-12-94 (Vt. Super. Ct. May 3, 2013). The Superior Court's probable cause finding establishes a presumption that probable cause existed to prosecute Grega following the discovery of the unknown male's DNA and the order vacating his conviction. Grega argues that the affidavit relied on by the Windham County Superior Court in 2013 suffers from the same deficiencies as the 1994 affidavit because the 2013 affidavit consisted of the 1994 affidavit plus a one-page supplemental affidavit from Detective Holden. (Doc. 37 at 37.) This argument fails for the same reason. Grega makes no fact-specific claim that any part of the 2013 affidavit contained misleading evidence or omitted material information.

Grega also points to Holden's deposition statements implying that he did not believe that the presence of the unknown male's DNA could have been due to contamination or inadvertent transfer. (*Id.* at 37-38.) Grega argues that "[b]ecause the latter two theories were effectively disproven by the State's own investigation, the DNA could only have been left by the Perpetrator, which by definition means there was no probable cause to re-prosecute Grega." (*Id.* at 38.) Grega's allegations do not suffice for the court to conclude that the DNA belonged to the real killer. Even if they did, at the time probable cause was found in 2013 the other two theories had not yet been "disproven." Grega's malicious prosecution claim fails because his allegations do not successfully rebut the presumption of probable cause accorded to the state trial court's probable cause determination.

The court additionally finds defendants' collateral estoppel argument persuasive. Federal courts must give full faith and credit to judgments entered by state courts of competent jurisdiction. 28 U.S.C. § 1738. A state court judgment can have issue preclusive effect in a § 1983 litigation in federal court. *Allen v. McCurry*, 449 U.S. 90, 104 (1980). Federal courts must give preclusive effect to state court judgments "whenever the courts of the State from

which the judgment emerged would do so." *Id.* at 96.  The court therefore applies Vermont's doctrine of collateral estoppel to Grega's malicious prosecution claims under both § 1983 and Vermont law.  *See also Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (applying New York doctrine of collateral estoppel to false arrest claims under both § 1983 and New York law); *McAdoo v. Dallas Corp.*, 932 F.2d 522, 524 (6th Cir. 1991) ("[T]he U.S. Supreme Court's decision in *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 104 (1984), interprets 28 U.S.C. § 1738 as requiring us to adopt the same doctrine of collateral estoppel as the state in which the earlier judgment was rendered.") (internal citation omitted).

In Vermont, collateral estoppel, or issue preclusion, is found when the following criteria are met:

> (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier v. Getting Organized, Inc.*, 583 A.2d 583, 587-88 (Vt. 1990).  "Preclusion applies only to issues necessarily and essentially determined in a prior action." *In re P.J.*, 969 A.2d 133, 137 (Vt. 2009) (internal quotation omitted).  Moreover, "[t]he party opposing application of collateral estoppel has the burden of showing that it is appropriate to relitigate an issue." *Id.* at 138.

The Vermont Supreme Court has held that a criminal court's rejection of a motion to dismiss an indictment can collaterally estop the re-litigation of the issue of probable cause in a subsequent wrongful prosecution action.  *Lay*, 38 A.3d at 1148.  The *Lay* court found that the elements of collateral estoppel were met because the party opposing collateral estoppel—Lay, the plaintiff in the wrongful prosecution action—had had a full and fair opportunity as a criminal defendant to litigate the probable cause issue in connection with his motion to dismiss the information. *Id.* at 1150.

As in *Lay*, Grega had his first opportunity to litigate the issue of probable cause for his re-prosecution in connection with his motion to dismiss the information.  Grega does not allege that his opportunity to litigate the existence of probable cause in state court was not full and fair.  Following Vermont Supreme Court precedent, the court concludes that Grega is collaterally estopped from re-litigating the issue of probable cause for his re-prosecution here.

Because the court has concluded that Grega has failed to allege a lack of probable cause, it need not determine whether the underlying criminal proceeding terminated in Grega's favor. Nonetheless, the court addresses the favorable termination element because of the exhaustive argument it engendered at the June 16, 2015 hearing.

In order to determine whether a dismissal of a criminal charge satisfies the favorable termination element of a malicious prosecution claim, the Vermont Supreme Court has adopted "the Restatement approach which looks to the circumstances surrounding the dismissal." *Siliski v. Allstate Ins. Co.*, 811 A.2d 148, 151 (Vt. 2002); *see also* Restatement (Second) of Torts § 660 (1977). Under the Restatement approach, "if the dismissal somehow indicates that the defendant is innocent of wrongdoing, it will be considered a favorable termination. On the other hand, if the reason for dismissal is 'not inconsistent' with a defendant's wrongdoing, it will not be considered a favorable termination." *Siliski*, 811 A.2d at 151-52 (citation omitted). Whether a dismissal of charges constitutes a favorable termination of the underlying criminal proceeding is a matter of law for the court to decide. *Chittenden Trust Co. v. Marshall*, 507 A.2d 965, 970 (Vt. 1986). "If, however, there is a question as to the nature of the circumstances leading to that termination, that question is one for the trier of fact." *Murphy v. Lynn*, 118 F.3d 938, 950 (2d Cir. 1997).

The court focuses on the termination of the re-prosecution because the nature of its termination also determines the nature of the original prosecution's termination. *See* Restatement (Second) of Torts § 660(d) (1977) (informing that where "new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused," the termination of the original prosecution was not favorable). On August 21, 2013, the State filed a notice of dismissal of the aggravated murder charge against Grega. (Doc. 25-9 at 2.) The court judicially notices the Windham County Superior Court's October 21, 2013 opinion and order denying Grega's motion for dismissal without prejudice. (*Id.*)

Grega contends that he has sufficiently alleged that his re-prosecution terminated in his favor—despite the fact that the charge was dismissed without prejudice—because the State's notice of dismissal was an admission that "it could not successfully prosecute him a second time given the state of the evidence." (Doc. 37 at 29.) He cites the trial court's observation that "the State as much as concede[d] that in the absence of a better scientific explanation for the unknown

male DNA, its case based on the circumstantial evidence presented at the first trial [was] unlikely to convince a jury of [Grega's] guilt beyond a reasonable doubt." (Doc. 25-9 at 3.) Grega argues that the State's dismissal "reflects negatively on the merits," satisfying the favorable termination element under *Siliski*, or at least meriting a jury's determination of whether it does. (*Id.*)

Grega's argument is unpersuasive. There is no genuine question as to the nature of the circumstances under which the underlying criminal proceeding was terminated such that the favorable termination issue could not be resolved at the motion to dismiss stage. The trial court specifically declined to grant Grega's motion for dismissal with prejudice because the DNA evidence that led to the vacation of his conviction "d[id] not exonerate [Grega] as plainly inconsistent with his guilt." (*Id.* at 5.) The court noted that the State "base[d] its resistance to dismissal with prejudice on its belief that scientific advances, together with improved technical capacity, [would] eventually establish that the additional DNA profile detected in just one of the swabs taken from the victim was the result of contamination." (*Id.*) "Such a development," the court observed, "would arguably make the state of the evidence stronger than at the original trial." (*Id.*)

The dismissal without prejudice of the underlying criminal proceeding was thus clearly "not inconsistent" with the possibility of Grega's guilt—an unfavorable termination as a matter of law under *Siliski*. *Siliski*, 811 A.2d at 152; *see also McGee v. Doe*, 568 F. App'x 32, 39-40 (2d Cir. 2014), *as amended* (July 2, 2014) (Summary Order) (affirming dismissal of malicious prosecution claim on summary judgment where "there was no indication that the dismissal of the action against McGee, and the failure by the prosecution to re-file the claim, constituted a formal abandonment of the charges"); *Lay*, 38 A.3d at 1152 ("[P]roceedings are 'terminated in favor of the accused' . . . only when their final disposition is such as to indicate the innocence of the accused.") (quoting Restatement (Second) of Torts § 660 cmt. a); *cf. Smith-Hunter v. Harvey*, 734 N.E.2d 750, 753, 754 (N.Y. 2000) (stating, "[a]s a general rule, . . . any final termination of a criminal proceeding in favor of the accused, *such that the proceeding cannot be brought again*, qualifies as a favorable termination for purposes of a malicious prosecution action," and noting that "dismissal without prejudice [is] not a final termination of the action") (emphasis added).

Grega points out a public policy concern with concluding that a dismissal without prejudice of criminal charges was not a favorable termination in a case such as his. He observes that the State could foreclose a criminal defendant's ability to succeed on a subsequent malicious prosecution claim by purposefully dismissing the charges without prejudice, no matter how insufficient the evidence against the accused. Meanwhile, the accused would have no choice but to accept the dismissal. (Doc. 37 at 32.) While the public policy concern Grega identifies is real, it is not compelling here. Grega did contest the nature of the State's notice of dismissal as without prejudice and the trial court denied his motion anyway.

The court is further aware of additional policy concerns—those that gave rise to the favorable termination element in the first place. "The requirement that a plaintiff show such a favorable termination is designed principally to ensure against inconsistent judgments, and to avoid parallel litigation as to questions of probable cause." *Murphy*, 118 F.3d at 948. This court has concluded above that Grega's allegations have not sufficiently rebutted the presumption of the probable cause finding connected with his re-prosecution. Moreover, a dismissal without prejudice specifically contemplates the possibility that the State "will pursue the same charges against the same defendant later on. That is why such a termination carries no implications about the legitimacy of the prosecution." *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1999). Indeed, the State intended to again rely on the existence of probable cause that Grega murdered Christine to re-file charges against him after it conducted further DNA testing, and it filed its notice of dismissal without prejudice because it intended to continue testing DNA evidence with the belief that it could form an even stronger case against Grega in the future.

A conclusion in this action that the underlying criminal proceeding terminated in Grega's favor would constitute a conclusion that the dismissal without prejudice "somehow indicate[d] that [Grega was] innocent of wrongdoing." *Siliski*, 811 A.2d at 152. The interests in avoiding inconsistent judgments and parallel probable cause litigation therefore strongly counsel against a conclusion that Grega's underlying criminal proceeding was terminated in his favor. Were it necessary to reach the issue, the court would conclude that Grega has not alleged facts sufficient to establish that the underlying criminal proceeding terminated in his favor.

Grega's claims of malicious prosecution against Detective Holden under § 1983 and under Vermont law are dismissed.

32

### E.      False Imprisonment (Counts 4, 8, 10, 12)

Grega claims false imprisonment against defendants Pettengill and Holden under Vermont law and under § 1983.  A false imprisonment claim under § 1983 tracks the state-law elements of the claim.  *Russo*, 479 F.3d at 204.  Under Vermont law, a person commits the crime of false imprisonment, or unlawful restraint in the second degree, "if the person . . . knowingly restrains another person."  13 V.S.A. § 2406; *see also State v. Alexander*, 795 A.2d 1248, 1253 (Vt. 2002) (describing unlawful restraint in the second degree as the "Vermont equivalent" of false imprisonment).  "Probable cause is a complete defense to a constitutional claim of false arrest and false imprisonment" under both Vermont and federal law.  *Betts*, 751 F.3d at 82; *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 (D. Vt. 2009).  Because the court has concluded that probable cause existed to arrest or otherwise confine Grega in relation to his prosecutions for murder, his false imprisonment claims are dismissed.[7]

### F.      Intentional Infliction of Emotional Distress (Count 11)

Grega claims intentional infliction of emotional distress ("IIED") against defendants Pettengill, Davis, and Holden.  He alleges that defendants' "conduct in falsifying evidence, failing to reveal exculpatory evidence and failing to investigate" constituted outrageous behavior which caused Grega's prosecution and conviction and his resultant severe emotional distress.  (Doc. 53 at 59.)

#### i.      Defendant Davis

Defendants first argue that former State's Attorney Davis is absolutely immune from liability for Grega's IIED claim.  (Doc. 25-1 at 47.)  Grega responds that Davis is not entitled to absolute immunity from his IIED claim because the alleged conduct underlying the claim was not performed in Davis's capacity as prosecutor.  (Doc. 37 at 50.)  Defendants reply that Grega

---

[7]  The Second Circuit has distinguished probable cause to arrest from probable cause to prosecute.  *Boyd*, 336 F.3d at 75-76.  Probable cause to prosecute is essentially continuing probable cause to arrest, where the probable cause has not been nullified by evidence establishing the criminal defendant's innocence by the conclusion of trial.  *See Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003).  Where, as here, probable cause to prosecute is based on the same evidence that gave rise to probable cause to arrest, the existence of the former necessarily indicates existence of the latter.

confuses the federally-pronounced prosecutorial immunity doctrine with Vermont's official immunity scheme, under which Davis receives absolute immunity.  (Doc. 45 at 20.)

Vermont law affords "high executive officials" absolute immunity from lawsuits arising from conduct within the scope of their authority, and this immunity extends as well to Vermont state's attorneys.  *O'Connor v. Donovan*, 48 A.3d 584, 592, 595 (Vt. 2012).  "Absolute immunity protects judges and the state's highest executive officers, including prosecutors, from civil suits for certain actions 'closely associated' with their judicial or prosecutorial activities, including—among other things—the decision whether to prosecute and the prosecution of the action."  *Czechorowski*, 872 A.2d at 889.  It is the state law immunity standard which governs state law tort claims in this court, not the federal immunity doctrine which governs constitutional claims.  *Wilkinson v. Balsam*, 885 F. Supp. 651, 660 (D. Vt. 1995).

In *Muzzy v. State By and Through Rutland County State's Attorney*, 583 A.2d 82, 83 (Vt. 1990), the Vermont Supreme Court suggested that prosecutors' absolute immunity from civil suit depended on whether the underlying conduct fell "within the prosecutorial function."  However, in *Czechorowski*, the Court held that "[q]ualified immunity applies to prosecutorial functions outside the area of advocacy, such as investigation or administration."  *Id.* at 889-90 (concluding that general counsel to Department of Aging and Disabilities was entitled only to qualified immunity for activities "not strictly prosecutorial in function," such as reviewing investigator's report of abuse, "rendering advice, and drafting the decision" before an appeal was filed with the Board).  In the Court's most recent pronouncement on prosecutorial immunity, it "disapproved" *Muzzy*'s "suggestion."  *O'Connor*, 48 A.3d at 592.  The Court overruled "[s]ubsequent decisions that may have interpreted *Muzzy* to confine a state's attorney's absolute immunity in state tort actions to those acts closely associated with the litigation process."  *Id.* at 592 n.4.

The court interprets Vermont Supreme Court precedent to preclude limiting a prosecutor's immunity based on whether the underlying conduct was investigatory in function.  The court concludes that the alleged conduct attributed to Davis—all of which falls within the investigative or prosecutorial processes—is "within the general authority of his office" and is therefore entitled to absolute immunity under Vermont law.  *Id.* at 588; *see id.* at 593 ("Supervising the investigative activities of police officers that result in the referral of cases for prosecution and reviewing those matters with other law enforcement personnel must, as a

practical matter, fall within the general oversight authority of the state's attorney as the chief law enforcement officer in the county."). Consequently, Grega's IIED claim against Davis fails because Davis is entitled to absolute immunity from liability. Defendants' motion to dismiss Grega's IIED claim is granted as to Davis.

### ii.    Defendants Pettengill and Holden

To state a claim for IIED, a plaintiff must allege: "(1) conduct that is extreme and outrageous, (2) conduct that is intentional or reckless, and (3) conduct that causes severe emotional distress." *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990). The plaintiff bears a heavy burden. *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Denton v. Chittenden Bank*, 655 A.2d 703, 706 (Vt. 1994) (internal modification omitted). There is an objective test for the severity of the emotional distress, *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995), and "[i]t is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets this test." *Jobin v. McQuillen*, 609 A.2d 990, 993 (Vt. 1992). When the alleged outrageous conduct is comprised of a "'series of events' . . . , then the plaintiff must make a 'showing' of at least one 'significant outrageous act.'" *Kucera v. Tkac*, No. 5:12-cv-264, 2014 WL 6463292, at *17 (D. Vt. Nov. 17, 2014) (quoting *Fromson v. State*, 848 A.2d 344, 348 (Vt. 2004)).

Grega's IIED claim fails to the extent it relies on defendants' alleged failure to investigate as the outrageous conduct.

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (analyzing IIED claim under New York law, whose elements are substantively identical to Vermont's). Case law indicates that the failure to investigate the crime scene alleged by Grega is not extreme or outrageous conduct in Vermont. *See Baptie v. Bruno*, 88 A.3d 1212, 1219 (Vt. 2013) (holding that even inadequate or incomplete investigation

"cannot be considered outrageous in the extreme" where defendant made some effort to investigate); *Kucera*, 2014 WL 6463292, at *17 (applying *Baptie* to conclude that "series of alleged deficiencies regarding Detective Tkac's investigation" were not outrageous or extreme, even were the court to find it inadequate, because he made "some effort to investigate"). Because Grega's allegations clearly show that defendants Pettengill and Holden each made "some effort" to investigate Christine's murder, a claim of IIED cannot lie from their investigations' alleged failures.

By contrast, a police officer's fabrication of evidence in order to inculpate a criminal suspect may constitute the extreme and outrageous behavior sufficient to support a claim of IIED. *See Pitt v. District of Columbia*, 491 F.3d 494, 506 (D.C. Cir. 2007) (holding that reasonable jury could find that submitting affidavit in support of arrest warrant containing "several glaring omissions and at least one false statement" and "tamper[ing] with evidence in an attempt to link [plaintiff] to the scene of the crime" satisfied claim of IIED); *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996) (noting under New York law that a police officer's allegedly fabricated claim that plaintiff bit him may be "sufficiently outrageous to satisfy the conduct element of the emotional distress tort"); *Saunders v. City of Chicago*, No. 12-cv-09158, 2013 WL 6009933, at *12 (N.D. Ill. Nov. 13, 2013) (concluding that allegations of evidence fabrication, confession coercion, and exculpatory evidence suppression stated claim for IIED); *Miles v. City of Hartford*, 719 F. Supp. 2d 207, 217-18 (D. Conn. 2010), *aff'd*, 445 F. App'x 379 (2d Cir. 2011) (concluding that defendant officers' alleged fabrication that three plastic bags were found at the crime scene would justify a finding of liability for IIED); *Robinson v. City of Memphis*, 340 F. Supp. 2d 864, 869-74 (W.D. Tenn. 2004) (denying summary judgment on IIED claim where evidence indicated defendants may have "made the decision to falsify evidence by placing a box cutter next to the decedent in an attempt to create probable cause").

Pettengill's alleged fabrication of the Long Trail Ale bottle evidence, discussed above, may therefore be extreme and outrageous enough to satisfy the conduct prong of Grega's IIED claim. Although defendants do not challenge the other elements in their papers, the court notes that Grega has alleged that the conduct was intentional or reckless and that it caused (through its violation of his right to a fair trial) the severe emotional distress associated with being falsely

36

convicted of murder and serving eighteen years' imprisonment.  Grega has successfully stated a claim of IIED against Pettengill.

Grega has not alleged that Holden fabricated evidence.  Rather, he alleges that Holden failed to adequately investigate, including a failure "to discover the false evidence of the Long Trail Ale bottle."  (Doc. 53 at 41.)  However, as concluded above, Holden's allegedly inadequate investigation does not support a claim of IIED.  Because Grega has not alleged conduct by Holden that could be extreme and outrageous, he has failed to state a claim of IIED against Holden.  Defendants' motion to dismiss Grega's IIED claim is granted as to Holden, and denied as to Pettengill.

### G.    Defamation (Count 13)

Grega claims that former State's Attorney Davis made a defamatory statement about him to a reporter who published the statements in an article that appeared in *Newsday Long Island* on July 28, 2012.  Davis was quoted as having stated: "The evidence clearly shows that he was responsible for the death of his wife."  (Doc. 53 at 60.)  To state a defamation claim, a plaintiff must allege:

> (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Russin v. Wesson*, 949 A.2d 1019, 1020 (Vt. 2008).

Expressions of opinion are not actionable unless they "imply assertions of objective fact." *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 25 (1990)).  "On the other hand, if a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable." *Levin*, 119 F.3d at 197; *see also* Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion").  "Whether a statement is opinion or fact is a question of law for the

court." *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 720 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014).

Defendants argue that Grega has failed to state a claim for defamation because Davis's statement was "an opinion that cannot be shown to be false." (Doc. 25-1 at 49.) Grega contends that "Davis'[s] claim that the evidence shows Mr. Grega killed his wife is a specific assertion of fact." (Doc. 37 at 56.) He also argues that Davis's statement implies undisclosed knowledge concerning the evidence in Grega's case. (*Id.* at 57.) Defendants reply that, far from implying knowledge of undisclosed facts, "Davis explicitly state[d] that his assessment [was] based on the 'substantial circumstantial case' originally brought against Grega." (Doc. 45 at 23.)

In determining whether an alleged defamatory statement is a statement of opinion under Vermont law, this District has previously applied the factors identified by the Second Circuit. *See Knelman*, 898 F. Supp. 2d at 721. Those factors are:

> (1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which "might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Id.* (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 403 n.7 (2d Cir. 2006)).

Even if the court construes Davis's statement as opinion, Grega argues that it is similar to the one found actionable in *Harrington v. Wilber*, 353 F. Supp. 2d 1033 (S.D. Iowa 2005). There, the plaintiff had been convicted of murder and spent twenty-five years in prison before his conviction was reversed on account of the prosecutor's *Brady* violation. *Id.* at 1036. The prosecutor subsequently issued a press release in which he stated: "[S]hould additional evidence come to light, or should evidence which is currently not admissible become admissible, our office could refile the charge . . . . After personally spending hundreds of hours on this case, I have no doubt that Terry Harrington committed the murder . . . ." *Id.* at 1036-37. The court found that the prosecutor's statements were actionable because "a reasonable mind could find that the reference to an insufficiency of 'admissible evidence' indicate[d] that [the prosecutor's]

hundreds of hours of investigation revealed facts to him supporting his certainty that [Harrington was] a murderer." *Id.* at 1042.

Defendants point to *Ferguson v. Short*, No. 2:14-cv-04062-NKL, 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) as providing a more closely analogous statement to Davis's. In that case, the plaintiff, Ferguson, was released from prison eight years after a jury convicted him of second-degree murder. *Id.* at *1. The prosecutor was quoted in a newspaper article as stating: "I obviously think he's good for the offense, or I wouldn't have prosecuted him." *Id.* at *12. The court dismissed Ferguson's defamation claim, concluding as a matter of law that the prosecutor's statement was one of non-actionable opinion. The court distinguished the prosecutor's statement from that at issue in *Harrington*, concluding that "the statements made by [the prosecutor] d[id] not imply knowledge of inadmissible facts or facts otherwise unknown to the public which establish that Ferguson murdered [the victim]." *Id.* at *14.

Applying the relevant factors to Davis's statement, the court determines that it is a non-actionable statement of opinion. Davis's statement appeared in the following context: "'The new DNA evidence should not change the guilty verdict that the jury returned,' said Davis, now a criminal defense attorney. 'Although it was a circumstantial case, there was a substantial amount of circumstantial evidence. The evidence clearly shows that he was responsible for the death of his wife.'" (Doc. 45 at 22.) An examination of the full context of the communication reveals that Davis expressed his opinion of Grega's guilt based on the circumstantial evidence presented at the trial. A statement that a case built on circumstantial evidence is sufficient to establish a criminal defendant's guilt in spite of the discovery of the unknown male's DNA evidence does not lend itself to being objectively characterized as true or false. Reasonable minds could differ about whether the discovery of the unknown male's DNA renders the circumstantial evidence insufficient to indicate Grega's guilt. The prefatory phrase, "The evidence clearly shows that," conveys to a listener or reader that Davis was stating his opinion about what the evidence showed rather than stating for a fact that Grega murdered his wife.

Nor is Grega's argument that the statement implies knowledge of undisclosed facts supportive of Davis's opinion persuasive. Unlike the prosecutor's statements in *Harrington*, Davis did not reference inadmissible evidence or any other knowledge unavailable to the general public. While it would not be unreasonable for a reader to assume that as the former prosecutor

Davis is privy to inadmissible evidence, Davis's statements do not give rise to an implication that his opinion was based on any such information. As defendants argue, Davis explicitly stated the premise—the "substantial amount of circumstantial evidence"—for his opinion.

The court concludes as a matter of law that the alleged defamatory statement is a non-actionable statement of opinion. Because Grega has not alleged a "false and defamatory statement," his defamation claim cannot survive defendants' motion to dismiss for failure to state a claim.

### H.      Failure to Train and Failure to Supervise Claims Against Defendants Cutting and Pettengill (Count 6)

Grega claims that defendants Cutting and Pettengill "failed to train and supervise adequately investigators from the Dover Police Department, the Vermont State Police, and the Vermont Forensic Laboratory." (Doc. 53 at 54.)

The first step in any § 1983 claim "is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Defendants argue that Grega has failed to allege any constitutional deprivation for which Cutting and Pettengill could be held liable in their supervisory capacities. (Doc. 25-1 at 44; Doc. 45 at 19.) This argument succeeds in part. Because Grega's claims under the Fourth Amendment as well as his Due Process claims stemming from defendants' allegedly inadequate investigation fail, Grega also fails to state a claim of supervisory liability for any of these alleged constitutional violations. However, the court has concluded that Grega has sufficiently pled claims of evidence fabrication and conspiracy to fabricate evidence. To the extent Grega alleges that Cutting and Pettengill's failure to train or supervise caused the fabrication of evidence—resulting in a violation of Grega's due process right to a fair trial—he has sufficiently alleged an underlying constitutional violation.

Defendants further argue that Grega has failed to show that Cutting and Pettengill were personally involved in the alleged constitutional violation. There is no *respondeat superior* liability in § 1983 cases. *Iqbal*, 556 U.S. at 676. To state claims of failure to train and failure to supervise, a plaintiff must plausibly allege defendants' personal involvement in the alleged constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("[P]ersonal

involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

> To demonstrate a supervisor's personal involvement, a plaintiff must allege that:
>
> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[8]

The underlying constitutional violation Grega has alleged is a deprivation of his due process right to a fair trial through the fabrication of the Long Trail Ale bottle evidence.  Grega has not alleged sufficient facts demonstrating that Cutting was personally involved in the alleged Long Trail Ale bottle evidence fabrication.  The extent of the relevant allegations are as follows: Cutting assigned the Search Detective the task of overseeing the search of Unit 69 on September 13, 1994, "including the identification, collection, and preservation of evidence"; and either the Search Detective or a VSP captain who was present during the search "reported back" to Cutting on the results of the search.  (Doc. 53 at 24-25.)  Grega makes no allegation that Cutting knew of the Search Detective's (potentially accidental) manipulation of the evidence, nor does Grega allege that Cutting was grossly negligent in supervising the Search Detective's work.  Because Grega has not sufficiently pled facts demonstrating Detective Cutting's personal involvement in the alleged evidence fabrication, he has failed to state claims of failure to train and failure to supervise against Cutting.

---

[8] The Supreme Court held in *Iqbal* that "a plaintiff must plead that each . . . defendant, through the official's own individual actions, has violated the Constitution," and that "mere knowledge" of a subordinate's discriminatory purpose is insufficient to establish supervisory liability. 556 U.S. at 676-77.  Some courts have concluded that *Iqbal* "narrowed the grounds upon which supervisors are liable." *Erdogan v. Nassau Cnty.*, No. 10-CV-05837 (AKT), 2014 WL 1236679, at *14 (E.D.N.Y. Mar. 25, 2014) (citing cases).  This court follows the "majority" of courts in this circuit—and District precedent—in continuing to apply all five *Colon* factors to non-discrimination claims under § 1983 absent a Second Circuit pronouncement otherwise. *Thompson v. Pallito*, 949 F. Supp. 2d 558, 574-75 (D. Vt. 2013).

As to Detective Pettengill, Grega alleges that he conspired with State's Attorney Davis to introduce the fabricated Long Trail Ale bottle evidence at trial. (*Id.* at 32.) As described above, Grega has pled sufficient facts regarding Pettengill's involvement in the investigation and the trial to render the allegation non-conclusory. Grega has therefore successfully alleged the personal involvement of Pettengill. *See also Colon*, 58 F.3d at 873 (listing a supervisory defendant's direct participation in the alleged underlying constitutional violation as sufficient to demonstrate personal involvement).

In addition to personal involvement, a plaintiff asserting a claim of failure to supervise must allege deliberate indifference on the part of the defendant—not mere negligence—as well as a "causal relationship between the failure to supervise and the alleged deprivation[]." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007); *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). As described in more detail above, Grega alleges that Pettengill knew the Search Detective working under his supervision had moved one of the Long Trail Ale bottles from its original location within the condo's refrigerator; Pettengill knew the photograph taken on September 19, 1994 was misleading as to the contents of the refrigerator as they existed at the time first responders arrived at the condo; Pettengill made a conscious decision to aid Davis in introducing the photograph as an exhibit at Grega's trial; and the introduction of the fabricated evidence at trial deprived Grega of his due process right to a fair trial. Grega has thus pled sufficient facts to state a claim of failure to supervise against Pettengill.

Defendants argue persuasively that Grega has not otherwise stated a claim of failure to train against Pettengill. Other than his conclusory allegation that Pettengill failed to adequately train the employees involved in the investigation, Grega alleges no facts suggesting how Pettengill's training of his subordinates was deficient, or even that Pettengill was charged with the duty of training them. *See Scott v. Fischer*, 616 F.3d 100, 109 (2d Cir. 2010) ("A [§ 1983] claim for failure to act is cognizable only in the presence of a corresponding duty to have acted.") Grega's lone, conclusory allegation that Pettengill failed to adequately train his VSP subordinates "constitutes nothing more than [a] recitation[] of the applicable standard without supporting factual context," and is legally insufficient. *JCG v. Ercole*, No. 11 Civ. 6844 (CM) (JLC), 2014 WL 1630815, at *27 (S.D.N.Y. Apr. 24, 2014), *report and recommendation*

*adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014) (quoting *Randle v. Alexander*, 960 F. Supp. 2d 457, 479 (S.D.N.Y. 2013)) (dismissing failure-to-train claim where plaintiff alleged that defendant "knew of various constitutional violations committed by his staff and failed to properly train and supervise them"); *see also Tricoles v. Bumpus*, No. 05CV3728(JFB)(JO), 2006 WL 767897, at *4 (E.D.N.Y. Mar. 23, 2006) ("Courts have dismissed § 1983 . . . claims where a complaint merely asserts bare conclusory statements that a defendant supervisor failed to supervise or train . . . .").

Grega's claims against Cutting and his failure-to-train claim against Pettengill are dismissed. Defendants' motion to dismiss Grega's failure-to-supervise claim against Pettengill is denied.

## IV.     The *Monell* Claim Against the Town of Dover (Count 6)

Grega seeks to hold the Town of Dover ("Dover") liable under § 1983 for its alleged failures to train and supervise its employees in connection with the investigation of Christine Grega's death. (Doc. 53 at 55-56.)

### A.     Elements of a *Monell* Claim

Although "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), it can be held liable for constitutional violations "caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012).

> In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (stating elements as: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right").[9]

---

[9] Defendants concede that the Police Chief is a policymaking public official for purposes of this motion. (Doc. 59-1 at 15-16.)

### B.  Analysis

Dover argues that Grega's *Monell* claim fails because he has not alleged an underlying constitutional violation.  (Doc. 59-1 at 4-12.)  Grega responds that the amended complaint "contains ample factual allegations to support a claim against the Dover [e]mployees for failure to investigate and destruction of exculpatory evidence."  (Doc. 64 at 4.)

The court has concluded above that the Second Circuit does not recognize police officers' failure to adequately investigate a crime scene as an actionable constitutional tort under § 1983. The court has also concluded that Grega has not sufficiently pled destruction of exculpatory evidence.  Grega alleges no other constitutional violation committed by Dover employees, nor can the court trace his successful constitutional claims—for fabrication of evidence and conspiracy to fabricate evidence—to any Dover employee conduct.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  Because Grega has not successfully alleged a constitutional violation for which Dover can be held liable, his *Monell* claims for failure to train and failure to supervise fail.  *See id.* ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Claudio v. Sawyer*, 675 F. Supp. 2d 403, 410 (S.D.N.Y. 2009) (dismissing plaintiff's *Monell* claim for lack of alleging underlying constitutional violation).  The court need not address the parties' other arguments.

## V.      Conclusion

For the reasons stated above, Defendant Town of Dover's motion to dismiss is GRANTED, and the individual Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Grega's claims of evidence fabrication; conspiracy to fabricate evidence; intentional infliction of emotional distress; and failure to supervise against defendant Pettengill survive defendants' motion to dismiss.

Dated at Rutland, in the District of Vermont, this ___ day of August, 2015.

Geoffrey W. Crawford, Judge
United States District Court