UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

|  |  |
|---|---|
| JEFF GREGA, in his capacity as Executor of Estate of JOHN C. GREGA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM PETTENGILL, in his individual capacity; DAN M. DAVIS, in his individual capacity; GLEN CUTTING, in his individual capacity; RICHARD HOLDEN, in his individual capacity; and TOWN OF DOVER,<br><br>Defendants. | Case No. 5:14-cv-147 |

## DEFENDANT PETTENGILL AND DAN DAVIS' MOTION FOR A PROTECTIVE ORDER

Defendant William Pettengill and Dan Davis jointly, through undersigned counsel, move pursuant to Fed. R. Civ. P. 26(c) for a protective order limiting the scope of the deposition of Mr. Davis, the Windham County State's Attorney who prosecuted Plaintiff for his wife's murder. Defendant recognizes that Mr. Davis' testimony is relevant to the extent it addresses the fabrication of evidence claims directly at issue in this case and the evidence presented to the jury in the criminal case, including testimony concerning the allegedly fabricated evidence. Defendant also believes that testimony concerning the allegations of fabricated evidence, which would normally be privileged, may not be privileged in this case, given the qualified nature of the applicable privileges. Therefore, Defendant offered to have Mr. Davis testify, and agreed to waive any privileges related to this narrow area if Plaintiff's counsel would enter into a

protective order providing that the deposition would not constitute a waiver of any other applicable privileges. Plaintiff would not agree to this proposal. Instead, Plaintiff indicated that he would seek broad based discovery related to facts that are well beyond the specific claims remaining in the case, including claims related to the investigation that was conducted by the Vermont State Police ("VSP").

Defendant now moves for a protective order: (1) limiting the scope of the deposition to the allegations set forth in paragraphs 167 through 187 of the Amended Complaint that directly address an alleged fabrication of evidence and the evidence presented to the jury in the criminal case; and (2) providing that the disclosure of any privileged testimony on the alleged fabrication of evidence does not waive any otherwise applicable privileges. Such an order is appropriate because the investigation conducted by the VSP is not at issue in the case, and Mr. Davis can offer no testimony on this topic that could lead to the discovery of relevant admissible evidence. Moreover, any information Mr. Davis obtained about the investigation was from others with direct involvement in the investigation. This information is likely to be privileged under the work product and deliberative process doctrines, and is readily available from other sources with direct involvement in the investigation. Therefore, a deposition without limitation, as Plaintiff demands, would serve no purpose but to cause him annoyance, embarrassment and undue burden.

Defendants submit the following memorandum of law in support of this motion, an Affidavit from Dan Davis ("Davis Aff.") submitted in connection with a related motion in state court, and a proposed protective order limiting the scope of Plaintiff's deposition of Mr. Davis.

**Memorandum of Law**

I. <u>**Background**</u>

In 1995, Plaintiff was tried, convicted and sentenced to life in prison for the aggravated murder of his wife. In 2012, after DNA testing on one of two swabs taken from the victim's rectum showed the presence of a small amount of unknown male DNA, Plaintiff was released from prison and a re-trial was scheduled. However, because existing DNA-testing technology was not sufficient to adequately identify the source of the unknown DNA, prosecutors dismissed the charges against Plaintiff without prejudice. Plaintiff challenged the decision to dismiss *without* prejudice, but the Court rejected that challenge, reasoning that the DNA evidence did not affirmatively prove Plaintiff's innocence and later advances in the technology might permit a re-trial at a future date.

Plaintiff subsequently filed a 14-count (later amended to 13 counts) Complaint with this Court alleging a variety of state-law and constitutional claims, including malicious prosecution and false arrest, against Mr. Davis, the prosecutor in the 1994-95 criminal case, as well as three investigators from that case and the 2012-13 re-prosecution.[1] This Court dismissed the majority of these claims in August 2015 (Doc. 67), including all claims against Mr. Davis and two other investigators.

The only claims remaining are against Mr. Pettengill, the VSP case officer in the 1994-95 murder investigation, alleging that he knowingly or recklessly manufactured evidence and conspired with Mr. Davis to introduce the misleading evidence at the time of the original trial. Specifically, Plaintiff alleges that at Plaintiff's criminal trial Mr. Davis introduced, through Pettengill, a picture of a six pack of beer with one bottle removed from the six pack holder, and

---

[1] Plaintiff simultaneously asserted a claim under the civil suit provisions in Vermont's Innocence Protection Act, 13 V.S.A. § 5572 *et. seq*. That case is on-going, and the State has filed a similar motion for a protective order on behalf of Mr. Davis. That motion is pending.

3

then argued during his closing that the bottle that had been removed could have been used as the instrument of the victim's sexual assault. Amended Complaint ¶¶ 167-187 (Doc. 53). Although, as Plaintiff concedes, the beer bottle may actually have been removed from the six pack holder by another investigating officer before the picture was taken, *id*. ¶¶ 174-176, he nonetheless claims Mr. Pettengill and Mr. Davis conspired to manufacture the evidence that showed the single beer bottle outside of the holder. *Id*. ¶¶ 170, 187.

At this stage of the litigation, the parties have exchanged a large volume of documents, including, on the Defendant's part, nearly all of the Windham County State's Attorney's original and re-prosecution files, running into the tens-of-thousands of pages. Plaintiff has deposed the lead officer in the 1994 case (Mr. Pettengill), along with the supervising police lieutenant, Glenn Cutting, personnel from the Vermont Forensic Laboratory and Mr. Davis' investigator, Wayne Dengler. This discovery has provided substantial information surrounding the initial response to the murder and the subsequent investigation.

II. **Argument**

Defendant and Mr. Davis offered to appear for a limited deposition that would permit testimony regarding the specific allegations related to the Long Trail beer bottle and fabrication of evidence claim, but would prohibit broad-based discovery concerning other areas, particularly the investigation that was conducted by the VSP. Plaintiff rejected the offer, claiming he sought only factual information, including information concerning the investigation generally, and that Mr. Davis should be treated like any other fact witness in this case. *See* Excerpt of email from I. Carlton to J. Rose (Oct. 27, 2015), attached as Exhibit A.

But Plaintiff ignores that Mr. Davis' role was unique, and his knowledge of the investigation as it progressed would necessarily impinge on the deliberative process privilege

4

and areas covered by the work product doctrine. Plaintiff also ignores that facts pertaining to the investigation are simply irrelevant here, where there are no claims relating the criminal investigation that remain for trial. In any event, Davis' knowledge about the investigation was indirect, because he did not direct the work of the investigating officers, and his limited participation in that investigation— as Plaintiff acknowledges—was directed early on at building a prosecution against him. *See e.g.*, Compl. ¶¶ 78, 107. Therefore, most of if not all of this testimony would necessarily be protected by the attorney work product and deliberative process privileges.

A. <u>The Limited Claims Remaining in This Action Require a Limited Deposition</u>

Plaintiff desires to depose Mr. Davis without limitation, but the scope of his surviving claims against Mr. Pettengill have been significantly circumscribed by the Court's ruling, and Mr. Davis is no longer a party. The general conduct of the investigation and facts relating to preparation for trial—apart from facts surrounding the jury trial and introduction of the photograph of the beer bottle—are no longer part of Plaintiff's claims.[2] Given Mr. Davis' role as prosecutor, tasked with determining whether and how to charge Mr. Grega based on the information provided to him, he possesses little relevant, admissible evidence, and what testimony he could provide would necessarily be entangled with otherwise privileged material.

In fact, any information Mr. Davis has regarding the investigation into Mrs. Grega's murder is derivative. Davis Aff. ¶ 7, attached as Exhibit B. As his Affidavit makes clear, Mr. Davis has no recollection of going to the crime scene, did not direct the investigators on how they should conduct the investigation, and did not identify the evidence that should be collected. *Id.* ¶¶ 2-4. Indeed, Davis learned the facts about this case from his conversations with Mr.

---

[2] As noted above, Plaintiff is pursuing a broader claim of innocence, based on the DNA evidence, in his state court action. Though not likely relevant, he has undertaken broad discovery on the general conduct of the investigation and subsequent DNA testing in that matter.

5

Pettengill, Mr. Dengler, Mr. Cutting and Dover detective Richard Werner. *Id.* ¶ 5. After initiating the charge, as part of his trial preparation, he added to his knowledge through reports and interviews with the individuals who conducted the investigation. *Id.*

Plaintiff has had access to these individuals and the information in their possession, so there is no reason to think Davis has any information—other than information directly relating to the remaining claims—that could not be provided by another non-privileged source. And Plaintiff's depositions thus far support this fact. Mr. Pettengill testified that, though he reported to Mr. Davis regularly, updating him on the progress of the investigation, Mr. Davis did not instruct him on steps to take in his investigation. Pettengill Deposition Testimony (Pettengill Dep."), at 92:11 – 93:5, attached as Exhibit C. To his knowledge, Mr. Davis never directly participated in the investigation; he was not even certain when or if Mr. Davis visited the crime scene. *Id.* Mr. Dengler, the State's Attorney investigator, testified similarly, stating he spoke regularly with Mr. Davis, but Mr. Davis was not directly involved in the investigation and took no independent steps to investigate the crime. Dengler Deposition Testimony at 159:5-160:6, attached as Exhibit D.

Even if Plaintiff merely seeks factual information, at this stage, twenty-two years after the commission of the crime, it is unlikely that Davis could even begin to parse the factual evidence from his mental impressions, which Plaintiff professes not to seek. Thus, to the extent that the materials in Plaintiff's possession do not speak to the remaining allegations of fabricated evidence and conspiracy, Mr. Davis is willing to provide such testimony, waiving any applicable privilege on that limited basis. Beyond that, the Court should prohibit Plaintiff's proposed deposition of Mr. Davis, which, as set forth below, necessarily impinges on privileged information.

B.   Mr. Davis is protected from being compelled to testify in this case by the work product privilege.

Subjecting Mr. Davis to a deposition would necessarily infringe upon his work as the lead prosecutor in Plaintiff's criminal case.  Strong public policies underlie the work product privilege, the purpose of which is to create a "zone of privacy" that allows an attorney to prepare for litigation "free from unnecessary intrusion by his adversaries."  *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)); *see also* 1970 Amendment – Reporter's Notes to Fed. R. Civ. 26 (work-product rule related to *Hickman* principles).  Thus, "at its core, the work-product doctrine shelters the mental processes of the attorney."  *Aldlman*, 134 F.3d at 1197; *see also A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994) ("The attorney work product privilege protects the files and the mental impressions of an attorney reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways prepared in anticipation of litigation.").

Importantly, the work product doctrine applies equally to an attorney's work in civil and criminal litigation.  *United States v. Nobles*, 422 U.S. 225, 238 (1975) (noting that while the privilege is more frequently asserted "in civil litigation, its role in assuring the proper function of the criminal justice system is even more vital").  As the *Nobles* Court noted, "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case."  *Id.* at 238.  Thus, the U.S. District Court sitting in Vermont has protected materials from a prosecutor's office from production in a subsequent civil proceeding based on work product privilege, noting that requiring the Attorney General's Office to disclose materials reflecting the "sifting of information, legal analysis, mental impressions, conclusions and

7

opinions of the A.G.'s Office and investigators working for the A.G.'s Office . . . would create detrimental chilling effects on the Attorney General, the Assistant Attorneys General, and the investigators who author the documents." *Fortunati v. Campagne*, No. 1:07-CV-143, 2009 WL 385433, at *4 (D. Vt. Feb. 12, 2009).

In light of these principles, Courts have been especially reluctant to permit depositions of prosecutors. *See O'Connell v. Cowan*, 332 S.W.3d 34, 44 (Ky. 2010) ("An attempt to depose a prosecutor calls for special scrutiny because 'such depositions inherently constitute an invitation to harass the attorney.'" (quoting *State v. Anderson*, 79 S.W.3d 420, 438 (Mo. 2002)); *In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 188 (Tex. 2007) ("For purposes of [a subsequent] civil case, conversations made in the course of the criminal investigation, information learned during that investigation, and the DA's decision to drop the case all constitute work product."); *Messenger v. Ingham Cnty. Prosecutor*, 591 N.W.2d 393, 400 (Mich. App. 1998) ("[P]ublic policy imperatives for ensuring the effective functioning of the prosecutor's office militate against requiring prosecutors to submit to oral discovery concerning their work on a particular case.").

Indeed, because the threat of a subsequent deposition could potentially alter prosecutor conduct, some courts have analogized the protection of prosecutors from deposition to the protection from civil suit afforded by prosecutorial immunity. *See Dowling v. Arpaio*, No. CV-09-1401-PHX-JAT, 2011 WL 1456732, at *5 (D. Ariz. Apr. 15, 2011) ("To allow a party to depose a prosecutor, even though the prosecutor is not a named party to the action, would implicate the same concerns [underlying prosecutorial immunity], namely a chilling effect on a prosecutor's decision-making and thought processes."); *Amobi v. District of Columbia Dep't of Corr.*, 262 F.R.D. 45, 56-57 (D.D.C. 2009) (denying request to depose Assistant U.S. Attorney

based on considerations underlying doctrine of prosecutorial immunity); *Chang v. United States*, 246 F.R.D. 372, 374 (2007) ("[T]he principles of prosecutorial immunity are meant to ensure that neither the specter of damages liability nor the litigation process itself weakens the prosecutor's ability to engage in the vigorous decision-making required by office."). These principles of prosecutorial immunity were, in fact, in play in this Court's decision to dismiss Plaintiff's claims against Davis for all of his actions in this case. *Grega v. Pettengill*, --- F.3d ---, 2015 WL 4931388, at *25 (D. Vt. Aug. 18, 2015) ("The Court concludes that the alleged conduct attributed to Davis—all of which falls within the investigative or prosecutorial processes—is 'within the general authority of his office' and is therefore entitled to absolute immunity under Vermont law.").

Here, the Court should again give meaning to these principles and reject Plaintiff's efforts to depose Dan Davis without limitation. Again, Plaintiff apparently intends to depose Mr. Davis about all his decisions and interactions with officers during the original investigation of Mr. Grega in 1994-95, not simply the beer-bottle photograph. But as demonstrated by the record in this case, those decisions and interactions were almost immediately aimed at building and assessing a potential prosecution[3] and any information Mr. Davis had was second-hand, gained from an investigating officer, who can be (and mostly likely has been) deposed. Exposing Mr. Davis to deposition for his case-building activities would have far-reaching effects in discouraging prosecutors from becoming involved in ongoing investigations at all, a result that could seriously undermine investigators' ability to obtain sound legal advice. *See Fortunati*,

---

[3] For instance, case officer William Pettengill recently testified that Grega became a suspect in the murder as soon as the night of the murder itself. Pettengill Dep., Ex. C at 103-04 and Plaintiff has repeatedly acknowledged (and, in fact, faults the State for the fact) that prosecutors and investigators were focused on building a case against Mr. Grega early on. *See*, *e.g.*, Compl. ¶ 78 ("Despite the fact that the goal of the initial interview of Mr. Grega was to find out what happened, it quickly became apparent that the police were already focusing in on Mr. Grega."); *Id.* ¶ 107 ("[I]n a matter of hours, law enforcement focused in on Mr. Grega as their only suspect.").

9

2009 WL 385433, at *4 (courts have "provide[d] work product immunity if disclosure would . . . alter attorney behavior"). Mr. Davis' interactions and communications with investigators during the 1994-95 investigation and prosecution were made in anticipation of litigation and are protected work product.

   C. Interactions and Information Informing Mr. Davis' Decision on Whether to Prosecute Mr. Grega are Protected by the Deliberative Process Privilege.

"The government's deliberative process privilege protects the decision-making processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." *A. Michael's Piano*, 18 F.3d at 147. The privilege is "designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). Further, it recognizes that "'frank discussions of legal or policy matters in writing might be inhibited if the discussion were made public; and that the decisions and policies formulated would be the poorer as a result.'" *Fortunati*, 2009 WL 385433, at *2 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). The privilege exists because the "failure to place reasonable limits upon private litigants' access to responsible government officials as sources of routine pretrial discovery would result in a severe disruption of the government's primary function." *Gomez v. City of Nashua, N.H.*, 126 F.R.D. 432, 434 (D.N.H. 1989).

The deliberative process privilege "has been applied to protect not only decisions made by federal government agencies, but also decisions by prosecutors." *Starkey v. Birritteri*, 2013 WL 3984599, at *2 (D. Mass. Aug. 2, 2013). The Vermont federal court has found that "the policies behind the deliberative process privilege apply to the [Attorney General's] Office's deliberations about whether to prosecute." *Fortunati*, 2009 WL 385433, at *3. And other courts have found that the privilege applies to prosecutors in the same position as Mr. Davis was in

10

1994-95. *See*, *e.g.*, *Cipolla v. County of Rensselaer*, No. 99-CV-1813, 2001 WL 1223489, at *3 (N.D.N.Y. Oct. 10, 2001) (concluding that privilege applied to transcripts containing the "opinions, thoughts, considerations and factors involved in the process leading [the district attorney's office] to seek an indictment" against several individuals); *Gomez*, 126 F.R.D. at 435 (holding, in subsequent civil action, that the "decision whether to prosecute is the product of a deliberative process which should be afforded a high degree of protection from public inquiry" and therefore denying request to inquire during deposition as to "the Attorney General's decision not to prosecute").

Dan Davis' decision whether to prosecute Plaintiff, and the information informing that decision, is protected by the deliberative process privilege. This includes information Mr. Davis received or exchanged with police or other investigators in order to make his "prosecutorial assessment of the case." *See Dowling*, 2011 WL 1456732, at *3-4 (noting that plaintiff's discovery request was for the prosecutor's "thoughts and assessments of the evidence that was gathered against [plaintiff] and his own deliberations regarding which charges to bring . . . . This information falls within the deliberative process privilege."). As the *Dowling* court observed, prosecutors "must be able to freely consider the evidence and determine how best to proceed against those charged with breaking the law, without having their decisions second-guessed by others." *Id*. at *4. Even more important, they must have the freedom to "develop legal theories based on certain evidence without the fear that the choice to develop theory A over B, or to give greater weight to evidence C over D, would allow that prosecutor to be the subject of a rigorous deposition or courtroom proceeding." *Id*. (rejecting deposition as "an unjustifiable invasion of [the prosecutor's] deliberative process privilege").

Again, in this case, it is difficult to imagine what relevant information, other than that relating to the beer-bottle photographs and the evidence presented to the jury, Mr. Davis would have to offer in a deposition aside from his communications regarding the decision of whether and how best to build a case against Plaintiff for his wife's murder. And in fact, any discovery into Mr. Davis' communications or actions during the original investigation could effectively reveal his strategy and thoughts on that prosecution. As with *Fortunati*, Defendant "has provided Plaintiff[] with all substantive evidence and information gathered and reviewed in connection with the investigation. Thus, what Plaintiff[] seeks is information on the [State's] deliberative process in deciding not to bring charges." *Fortunati*, 2009 WL 385433, at *3. Therefore, the Court should reject Plaintiff's request to depose Mr. Davis without limitation on grounds of deliberative process privilege.

   D.   <u>Plaintiff Cannot Make Any Showing of Need Sufficient to Overcome the Work Product and Deliberative Process Privileges.</u>

As qualified privileges, the protections of the work product doctrine and deliberative process privilege may be overcome only under limited circumstances. For purposes of the work product doctrine, Plaintiff must show a "substantial need for the materials to prepare" his case and that he "cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(2)(C)(i). Federal courts have instructed that "the mental impressions, conclusions, opinions, or legal theories of an attorney" are to be afforded the highest protection, and should not be subject to discovery absent "a highly persuasive showing of need." *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000) (quoting *United States v. Adlman*, 68 F.3d 1495, 1502 (2d Cir. 1995)). And even fact work product— factual material considered or communicated by an attorney in anticipation of litigation— is protected so long as there is some reasonable alternate means through which the party seeking discovery may obtain it.

Likewise, materials protected by the deliberative process privilege may be disclosed "only after the trial court has made a determination that [the] need for the information outweighs the [party's] claim of privilege." *Fortunati*, 2009 WL 385433, at *3 (quoting *In re United States*, 565 F.2d 19, 23 (2d Cir. 1977)). "The burden of establishing the need for disclosure is upon the person who seeks it." *Id.*; *see also Fleming*, 2003 WL 21474516, at *7 ("The burden of establishing that materials determined to be attorney-work product should be disclosed is on the party seeking production."). Significantly, "[t]his burden is not met by mere speculation that identification might possibly be of some assistance." *Fortunati*, 2009 WL 385433, at *3.

As noted above, all facts related to the original investigation of Plaintiff for his wife's murder have been disclosed or are subject to disclosure in the form of the thousands of pages of discovery materials produced reflecting the State's preparation of the original case and depositions of the investigating officers who took part in the investigation. Thus, even were Mr. Davis in possession of some relevant fact or opinion work-product that meets the requirements of need set out above (and he most certainly is not), it would still not be proper to permit his deposition on this topic because any information he has is already available from those alternate sources. The need to maintain a zone of privacy surrounding Mr. Davis' prosecutorial analysis and decisions strongly outweighs Plaintiff's limited interest in discovering those materials from Mr. Davis because they already are available from another source. To the extent Mr. Davis uniquely holds any evidence relevant to the manufacture of evidence and conspiracy claims or the presentation of evidence to the jury, his deposition should be limited to questions seeking that evidence. The Court should issue a protective order detailing the limited scope of Plaintiff's deposition of Dan Davis and providing that any otherwise applicable privileges are not waived if

Davis discloses privileged information as part of his testimony on the alleged fabrication of evidence.

## Conclusion

For the foregoing reasons, the Defendant and Mr. Davis respectfully request that the Court issue a protective order limiting the scope of Mr. Davis' deposition.

DATED at Montpelier, Vermont this 15th day of January 2016.

>                                STATE OF VERMONT
>
>                                WILLIAM H. SORRELL
>                                ATTORNEY GENERAL
>
>
> By:    /s/ Kate T. Gallagher
>                                Kate T. Gallagher
>                                Todd W. Daloz
>                                Assistant Attorneys General
>                                Office of the Attorney General
>                                109 State Street
>                                Montpelier, VT 05609-1001
>                                (802) 828-3176
>                                kate.gallagher@vermont.gov
>                                todd.daloz@vermont.gov
>
>                                *Counsel for Defendant Pettengill and Dan Davis*

CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of January, 2016, I served Defendant Pettengill and Dan Davis' Motion for a Protective Order with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants.

DATED at Montpelier, Vermont this 15th day of January 2016.

                STATE OF VERMONT

                WILLIAM H. SORRELL
                ATTORNEY GENERAL

By:    */s/ Kate T. Gallagher*
        Kate T. Gallagher
        Todd W. Daloz
        Assistant Attorneys General
        Office of the Attorney General
        109 State Street
        Montpelier, VT 05609-1001
        (802) 828-3176
        kate.gallagher@vermont.gov
        todd.daloz@vermont.gov

        *Counsel for Defendant Pettengill and Dan Davis*